WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Monica Abboud,<br><br>    Plaintiff,<br><br>v.<br><br>Circle K Stores Incorporated,<br><br>    Defendant. | No. CV-23-01683-PHX-DWL<br><br>**ORDER** |

   In this putative class action, Monica Abboud ("Plaintiff") alleges that Circle K Stores Inc. ("Defendant") violated the Telephone Consumer Protection Act ("TCPA") by sending several text messages to her without her consent after she registered her phone number on the National Do Not Call Registry ("DNC Registry"). Now pending before the Court is Defendant's Rule 12(b)(6) motion to dismiss, or in the alternative, Rule 12(f) motion to strike Plaintiff's class allegations. (Doc. 13.) For the following reasons, the motion is denied.

## BACKGROUND

I. <u>Relevant Factual Background</u>

   The following facts, presumed true, are derived from Plaintiff's operative pleading, the First Amended Complaint ("FAC"). (Doc. 11.)

   Defendant "operates convenience stores that sell a wide variety of products, with locations throughout the world" and engages in the "sole business [of] the sale of goods at its convenience stores." (*Id.* ¶¶ 6-7, 30.)

In February 2020, Plaintiff registered her phone number on the DNC Registry. (*Id.* ¶ 20.)

On August 2, 2023, Defendant sent two text messages to that number. (*Id.* ¶ 21.) The first stated: "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. [phone number redacted]." (*Id.* ¶ 22.) The second stated: "Circle K: Reply 'YES' to get offers via txt. Go to myck.site/k2KmEU, Age-verify 18/21+ offers. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. [phone number redacted]." (*Id.*)

On September 11, 2023, Defendant sent Plaintiff another text message. (*Id.* ¶ 21.) This message, similar to the second text message on August 2, 2023, stated: "Circle K: Reply 'YES' to get offers via txt. Go to myck.site/Qb9PtF, Age-verify 18/21+ offers. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. [phone number redacted]." (*Id.* ¶ 22.)

Clicking the link in the second and third text messages "takes the recipient to Defendant's website, https://www.circlek.com/." (*Id.* ¶ 26.) This "website contains a Text Messaging Program Terms and Conditions page that states that the Defendant sends 'MARKETING TEXT MESSAGES VIA AUTOMATED TECHNOLOGY.'" (*Id.* ¶ 27.)

Plaintiff neither had a "relationship with Defendant" nor "provided her telephone number to Defendant or otherwise consented to advertisements or text messages from Defendant." (*Id.* ¶¶ 23-24.)

II.     Procedural History

On August 17, 2023, Plaintiff initiated this action by filing a complaint. (Doc. 1.)

On October 9, 2023, Defendant filed a motion to dismiss the complaint for failure to state a claim, or in the alternative, to strike the class allegations. (Doc. 9.)

On October 20, 2023, Plaintiff filed the FAC. (Doc. 11.) In the FAC, Plaintiff asserts a single claim under the TCPA. (*Id.*) The FAC is styled as a "Class Action Complaint" and alleges that Plaintiff is pursuing claims "individually and on behalf of a class of persons and entities similarly situated." (*Id.* at 1.) To that end, in the "Class Action Statement" section of the FAC, Plaintiff alleges that she is bringing claims on behalf of a

"National Do Not Call Registry Class" (the "DNC Class"), which consists of:

> All persons throughout the United States (1) who did not provide their telephone number to Circle K Stores Inc., (2) to whom Circle K Stores Inc. delivered, or caused to be delivered, more than one text message within a 12-month period, which read, in part, either "Circle K: Reply YES to Sign Up to receive special offers via txt message" or "Circle K: Reply YES to get offers via txt", (3) where the person's residential or cellular telephone number had been registered with the National Do Not Call Registry for at least thirty days before Circle K Stores Inc. delivered, or caused to be delivered, at least two of the text messages within the 12-month period, (4) within four years preceding the date of this complaint and through the date of class certification.

(*Id.* ¶ 33, internal quotation marks omitted.)

The FAC includes allegations that Plaintiff is a proper class representative (*id.* ¶ 34), that "[t]here are numerous questions of law and fact common to Plaintiff and to the proposed [DNC] Class" (*id.* ¶¶ 43-44, 46); and that Plaintiff's counsel is experienced in handling class actions (*id.* ¶ 45). The FAC also provides "Plaintiff does not know the exact number of members in the [DNC] Class, but Plaintiff reasonably believes [DNC] Class members number, at minimum, in the hundreds." (*Id.* ¶ 38.)

On October 25, 2023, the Court denied the motion to dismiss the original complaint as moot because Plaintiff had filed the FAC. (Doc. 12.)

On November 3, 2023, Defendant filed the pending motion to dismiss the FAC for failure to state a claim, or in the alternative, to strike the class allegations. (Doc. 13.)

On November 10, 2023, Plaintiff filed a response. (Doc. 14.)

On November 17, 2023, Defendant filed a reply. (Doc. 15.)[1]

**DISCUSSION**

I. <u>Article III Standing</u>

Defendant's motion raises a threshold issue the Court must address before turning to the merits—whether Plaintiff has Article III standing to bring this suit. *Sinochem Int'l*

---

[1] Defendant's request for oral argument is denied because the issues are fully briefed and oral argument will not aid the decisional process. *See* LRCiv 7.2(f).

*Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430-31 (2007) ("[A] federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction).")

Defendant argues that "[b]ecause Plaintiff's number was entered on Circle K's system and provided in order to receive such messages, Plaintiff did not suffer an injury in fact that is fairly traceable to any conduct by Circle K violating the TCPA." (Doc. 13 at 6 n.3.)[2] To the extent this argument seeks to challenge the existence of Article III standing,[3] it is unavailing—as the Ninth Circuit has explained, a TCPA defendant's contention that the plaintiff consented to the receipt of the challenged communication is a merits-based defense, not an obstacle to Article III standing. *Romero v. Dep't Stores Nat'l Bank*, 725 F. App'x 537, 539 (9th Cir. 2018) ("Disputes regarding whether Romero gave prior express consent to receive calls from the Banks or revoked that consent go to the merits of her TCPA claim, not to her standing."); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043-44 (9th Cir. 2017) (concluding that "Van Patten alleged a concrete injury in fact sufficient to confer Article III standing" even though the Ninth Circuit later concluded that he "consented to receiving the text messages").

II.   Motion To Dismiss

   A.   **Legal Standard**

"[T]o survive a motion to dismiss [under Rule 12(b)(6)], a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

---

[2] This argument arises in the context of Defendant's motion to strike class allegations: "Plaintiff cannot maintain a claim under the TCPA and cannot possibly have standing to represent a class of people who did not enter their numbers into Circle K's system, as required by the proposed class definition." (*Id.*)

[3] To the extent this argument is meant to challenge Plaintiff's statutory standing, it is addressed in Part II.D.2 below. *Olney v. Job.com, Inc.*, 2013 WL 5476813, *1 (E.D. Cal. 2013) ("[T]he argument that Plaintiff lacks statutory standing must be evaluated as a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) . . . .").

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### B. **Judicial Notice/Incorporation By Reference**

In its motion, Defendant asks the Court to "take judicial notice of Circle K's sign-up screen and Terms and Conditions, copies of which are attached to the Declaration of Victorino Perrine." (Doc. 13 at 3 n.2.) Plaintiff, in turn, seems to agree that the Court "can take judicial notice of Defendant's website." (Doc. 14 at 8 n.4.)

"Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). For materials incorporated by reference, "[a] court may consider evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion." *Marder*, 450 F.3d at 448.

The Court agrees with both sides that the website materials proffered by Defendant are properly before the Court at this juncture.[4] Plaintiff's theory of liability is that

---

[4] Although both sides seem to view judicial notice as the doctrine authorizing consideration of these website materials, in the Court's view the more applicable doctrine is incorporation by reference.

- 5 -

Defendant's text messages were telephone solicitations because "the text messages here encouraged [her] to sign up to receive 'offers' and 'special offers'" and "included a link to the front page of Defendant's website where [she] could, among other things, locate Defendant's stores and learn about its products." (Doc. 14 at 8, citations omitted; Doc. 11 ¶ 26 [link to Defendant's website]; *id.* ¶ 27 n.1 [link to the terms and conditions on Defendant's website].)

### C. The Parties' Arguments

Defendant argues that the messages Plaintiff received are not "telephone solicitations" within the meaning of the TCPA because "these 'opt in' confirmation messages do not offer the purchase or rental of, or investment in, property, goods, or services." (Doc. 13 at 2.) In reliance on *An Phan v. Agoda Co. Pte. Ltd.*, 351 F. Supp. 3d 1257 (N.D. Cal. 2018), *aff'd sub nom. Phan v. Agoda Co. Pte. Ltd.*, 798 F. App'x 157 (9th Cir. 2020), *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466 (S.D.N.Y. 2018), *Daniel v. Five Stars Loyalty, Inc.*, 2015 WL 7454260 (N.D. Cal. 2015), and *Aderhold v. Car2go N.A., LLC*, 2014 WL 794802 (W.D. Wash. 2014), *aff'd,* 668 F. App'x 795 (9th Cir. 2016), Defendant argues that "the messages here are clearly *confirmation* messages that follow from the entry of Plaintiff's phone number into Circle K's system during a register transaction, which includes an express consent to receive messages." (*Id.* at 5, emphasis in original.)[5] Defendant adds that "[t]his is particularly true where [Defendant] has confirmed that Plaintiff's phone number was entered on August 2, 2023." (*Id.*)

Plaintiff responds that the FAC "adequately alleges that Defendant's text messages are telephone solicitations." (Doc. 14 at 3-5.) According to Plaintiff, it is irrelevant that the text messages did not *explicitly* mention a good, product, or service—in Plaintiff's view, Defendant's intent to use the messages for marketing purposes can be inferred from the fact that "Defendant engages in no business other than the sale of goods through its convenience stores," which shows that Defendant's intent in "encouraging [her] to opt-in

---

[5] Defendant describes the September 11, 2023 message as "confirm[ing] that Circle K had removed [Plaintiff's] number from its system, in part because [she] did not respond 'STOP' to the first message." (*Id.* at 2 n.1.)

- 6 -

to receive 'offers' and 'special offers' . . . [was] to entice her to purchase goods from Defendant." (*Id.* at 4-6.) Plaintiff next argues that Defendant's reliance on *Rotberg*, *An Phan*, *Daniel*, and *Aderhold* is "misplaced" because unlike those cases where "it was undisputed that the plaintiff provided his telephone number to the defendant as part of the transaction that led to the text messages at issue," she "never provided her telephone number to Defendant and never consented to receive any text messages from Defendant, whether telemarketing or otherwise." (*Id.* at 6-7.) Plaintiff adds: "[T]hat some unidentified person may have provided [her] telephone number to Defendant does nothing to further the analysis here as only [she] (or someone she authorized) can provide consent for Defendant to send text messages to her telephone number." (*Id.* at 7 n.3.) Plaintiff also contends that *Rotberg* is distinguishable because "unlike in *Rotberg*, where the lone text message simply contained a link to terms and conditions, the text messages here encouraged [her] to sign up to receive 'offers' and 'special offers.'" (*Id.* at 8, citations omitted.)

In reply, Defendant argues that "Plaintiff does not actually dispute that Circle K utilizes opt-in confirmation messages, which are sent only after a customer has already provided their prior express consent to receive messages from Circle K. Instead, Plaintiff now contends that she did not individually enter her number during a point-of-sale transaction at Circle K. As such, Plaintiff now argues that the 'opt in' messages she received from Circle K were not confirmation messages . . . but were instead unprompted solicitations encouraging [her] to purchase Circle K's goods." (Doc. 15 at 2-3.) Defendant contends that "[e]ven if it were true that someone else mistakenly (or intentionally) entered Plaintiff's phone number during a Circle K transaction, that does not inextricably transform Circle K's automatic opt-in confirmation messages into unprompted solicitations to Plaintiff. . . . For this reason, Plaintiff's attempts to distinguish *An Phan* and *Rotberg* are misplaced." (*Id.* at 3.) Defendant concludes that "[t]he fact remains undisputed that someone entered her number, triggering the transmission of the subsequent opt-in confirmation messages, and resulting in (i) the provision of prior express consent and (ii) establishing a business relationship between the individual who provided the number

during the purchase and Circle K. Both consequences preclude the messages from being considered 'telephone solicitations' under the TCPA." (*Id.*)

### D. Analysis

The TCPA and its implementing regulations prohibit initiating "more than one telephone [solicitation] within any 12-month period" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). "Telephone solicitation" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4). A telephone solicitation can be a call or text message. 47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers."). *See also Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 988 (9th Cir. 2023) ("We have previously held that the receipt of 'unsolicited telemarketing phone calls or text messages' in violation of the TCPA is 'a concrete injury in fact sufficient to confer Article III standing.'") (cleaned up). In a nutshell, Defendant argues that Plaintiff's claim should be dismissed because (1) the text messages at issue were not solicitations, and (2) Plaintiff consented to receiving the messages.

#### 1. Telephone Solicitations

The purpose of a text or call determines whether it qualifies as a telephone solicitation, and courts use "a measure of common sense" to determine its purpose. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012). *See also Whittaker v. Freeway Ins. Servs. Am., LLC*, 2023 WL 167040, *2 (D. Ariz. 2023) (applying *Chesbro* to

a claim under 47 U.S.C. § 227(c)(5)). As courts have recognized, "[t]ext messages constitute a telephone solicitation even if the text message 'serves a dual purpose—that is, includes both advertising/telemarketing and merely informational or transactional communications.'" *Vallianos v. Schultz*, 2019 WL 4980649, *3 (W.D. Wash. 2019) (cleaned up). *See also Physicians Healthsource, Inc. v. Advanced Data Sys. Int'l, LLC*, 2020 WL 2764826, *8 (D.N.J. 2020) ("[H]aving informational content does not conclusively prevent a fax from being classified as an advertisement."). "'[T]elephone solicitation' encompasses calls 'referring a consumer to another entity if the purpose of the referral is to encourage a purchase, even if a purchase from another entity or a future purchase.' Thus, to engage in 'telephone solicitation,' a caller does not need to directly offer property or services for sale, but may merely encourage the future purchase of property or services." *Faucett v. Move, Inc.*, 2023 WL 2563071, *4 (C.D. Cal. 2023) (cleaned up). *See also Chesbro*, 705 F.3d at 918 ("Neither the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context."); *Orea v. Nielsen Audio, Inc.*, 2015 WL 1885936, *3 (N.D. Cal. 2015) ("A call that encourages future purchasing activity may be a telephone solicitation, even if the sales pitch is not explicitly contained in the call itself.").

The FAC alleges that the three text messages from Defendant sought to "market offers about[] its goods and services" and "were sent to Plaintiff for the express purposes of encouraging the purchase of its property, goods, or services." (Doc. 11 ¶¶ 25, 28.) Although those allegations parrot conclusory language from the statute, Plaintiff also provides specific factual allegations, including screenshots of the messages. According to the FAC, the texts "advise[d] Plaintiff to reply 'YES' to sign up to 'receive special offers' and to 'get offers' from Defendant" (*id.* ¶¶ 22, 29), the second and third messages included a link to Defendant's website (*id.* ¶¶ 22, 26), and "Defendant's sole business is the sale of goods at its convenience stores" (*id.* ¶ 30).

These facts make it plausible that the purpose of the text messages was to encourage Plaintiff to sign up to receive offers for future shopping at Circle K. *Miholich v. Senior*

*Life Ins. Co.*, 2022 WL 410945, *5 (S.D. Cal. 2022), *reconsideration denied*, 2022 WL 1505865 (S.D. Cal. 2022) ("The FAC alleges that the text messages advertised 'Financed Leads,' contained a link to [a] webinar provided by Defendant, and were 'an attempt to promote or sell Defendant's services.' . . . The FAC alleges that the webinar was also for the purpose 'to offer goods in the form of quality life insurance leads to prospective contractors.' The FAC alleges that Defendant 'benefits commercially from the marketing campaign on various levels, including cultivating a network of agents through which Defendant ultimately sells its goods and services,' and 'receives revenue, and compensation in turn, for its service of providing the financed leads.' . . . Accepting the FAC's factual allegations as true, it is plausible that the text messages constituted telephone solicitations.") (internal citations omitted). Although the messages did not expressly seek to induce Plaintiff to purchase a particular product, it is difficult to imagine why Defendant would repeatedly encourage her to sign up for offers other than to encourage her to make future purchases of goods at Defendant's stores based on those offers. *Whittaker*, 2023 WL 167040 at *2 ("Except for encouraging the purchase of its products, it is hard to imagine why an insurance company would contact a consumer not already insured by it and state that it looked forward to saving the consumer money, as did the recorded message in this case."); *Fiorarancio v. WellCare Health Plans, Inc.*, 2022 WL 111062, *3 (D.N.J. 2022) ("'[W]e know from common experience that free offers often come with strings attached.' . . . Thus, while Defendant's messages may have been informational on their face, it is plausible that they were part of a larger marketing, or profit-seeking, scheme and, as such, fall within the TCPA's prohibition."). Courts have concluded that messages with language similar to the ones at issue here encourage future purchases and thus constitute telemarketing.[6] *Chesbro*, 705 F.3d at 916, 918 (concluding that calls from Best Buy encouraging plaintiff to redeem his reward points "required going to a Best Buy store and

---

[6] The definition of "telemarketing" under the TCPA is substantially similar to the definition of "telephone solicitation": "[T]elemarketing means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13); *Chesbro*, 705 F.3d at 918.

- 10 -

making further purchases of Best Buy's goods . . . [and] encouraged the listener to make future purchases at Best Buy" and that "[b]ecause the calls encouraged recipients to engage in future purchasing activity, they also constituted telemarketing"); *Meyer*, 2015 WL 431148 at *1, *3 (concluding it was plausible that the text message "[g]et on the list! Reply YES to confirm opt-in. 10% OFF reg-price in-store/online. Restrictions apply. 2msg/mo, w/latest offers. Msg & data rates may apply" was sent "to encourage future purchases") (citation omitted).

The language in the second and third text messages directing Plaintiff to "[g]o to" Defendant's website further supports Plaintiff's contention that the messages qualify as telephone solicitations, as the website includes graphics about the products Defendant sells and information about Defendant's rewards program. *See, e.g.*, *Bennett v. Boyd Biloxi, LLC*, 2015 WL 2131231, *3 (S.D. Ala. 2015) ("As noted, the defendant patently encouraged the plaintiff to view online all its offers for sale. Employing common sense, what possible purpose could the defendant have for such an encouragement other than that of obtaining future sales to the plaintiff of the goods and services being offered? The defendant suggests none.").

The FAC also alleges that "Defendant's website contains a Text Messaging Program Terms and Conditions page that states that the Defendant sends 'MARKETING TEXT MESSAGES VIA AUTOMATED TECHNOLOGY.'" (Doc. 11 ¶ 27.) Although a reference to marketing in the terms and conditions may, alone, not be enough to make the text messages telephone solicitations, *Rotberg*, 345 F. Supp. 3d at 479 ("[A] caller seeking out a consumer's express written consent to send subsequent telemarketing or advertising texts is not as a matter of law already engaged in telemarketing.") (cleaned up), this allegation when considered in combination with the allegations discussed above further supports the conclusion that the text messages plausibly qualify as telephone solicitations. *Comprehensive Health Care Sys. Of the Palm Beaches, Inc. v. M3 USA Corp.*, 232 F. Supp. 3d 1239, 1242 (S.D. Fla. 2017) ("The faxes at issue direct a potential participant to a survey weblink, which in turn directs the potential participant to the website's 'Privacy Policy,'

stating that Defendant may target advertising and marketing based upon information provided by a potential participant during the registration process. . . . Moreover, Defendant's 'Terms of Use' specify that by using the company's sites and providing 'User Materials,' the user grants Defendant and others the right 'to use User Materials in connection with all aspects of the operation and promotions of Company.' In the face of these allegations, the ultimate question of whether Defendant's survey fax is merely a pretext for advertising its goods or services is a question of fact not suitable for disposition as a matter of law upon a motion to dismiss.") (internal citations omitted).

*Rotberg* is not to the contrary. There, the court analyzed two text messages—an initial message and an opt-out message. *Rotberg*, 345 F. Supp. 3d at 478-81. The court concluded that the plaintiff did not sufficiently plead that the initial message qualified as "telemarketing" for two reasons. First, the complaint "simply parrot[ed] a legal requirement of his cause of action." *Id.* at 479. Second, the plaintiff's "only specific allegation regarding the content of that text message is that it referred recipients [to a] . . . webpage [that] consists of the terms and conditions required for participation in Defendants' automated mobile marketing program. But a caller seeking out a consumer's express written consent to send *subsequent* telemarketing or advertising texts is not as a matter of law already engaged in telemarketing." *Id.* (cleaned up, emphasis in original). The court "decline[d] to construe the linked-to webpage as itself constituting marketing material" because the plaintiff only received the message directing him to those terms "after he had given his prior express consent to be contacted by [defendant]." *Id.* at 479-80. Regarding the opt-out message, the court concluded it did not qualify as telemarketing or advertising because it "merely confirm[ed] the consumer's opt-out request and d[id] not include any marketing or promotional information." *Id.* at 480-81 (cleaned up).

This case is distinguishable for several reasons. As explained above, the FAC includes specific, non-conclusory factual allegations regarding the content of the text messages, and those details are sufficient to plausibly establish that the messages qualify as telephone solicitations. Further, the FAC alleges that Plaintiff received the text

- 12 -

messages directing her to Defendant's website and terms and conditions even though she did not provide her phone number to Defendant, "consent[] to advertisements or text messages from Defendant," or have a relationship with Defendant (Doc. 11 ¶¶ 23-24), unlike the plaintiff in *Rotberg* who received texts directing him to terms and conditions *after* giving consent to be contacted. Although Defendant argues in its motion, and through the Declaration of Victorino Perrine attached to its first motion to dismiss, that Plaintiff or someone else must have provided Plaintiff's phone number to Defendant, the Court must accept Plaintiff's contrary allegations as true at this stage of the case. *Abrahamian v. loanDepot.com LLC*, 2024 WL 1092442, *3 (D. Ariz. 2024) (plaintiff adequately pleaded that he did not consent to defendant's messages based on his allegation that "he never provided his telephone number to Defendant"); *Whittaker*, 2023 WL 167040 at *2 ("Defendant contends . . . the call was made in response to Plaintiff's inquiry and was not a solicitation. But Plaintiff alleges that she did not have a preexisting relationship with Defendant and never 'expressed any interest in Defendant's insurance policies, products, or services.' The Court must accept this allegation as true in ruling on Defendant's motion, and it defeats any argument that the calls were made in response to Plaintiff's inquiry.") (cleaned up); *Blalack v. RentBeforeOwning.com*, 2022 WL 7320045, *5 (C.D. Cal. 2022) ("Defendant contends that 'someone signed up for and wanted to receive these messages.' However, that contention presents a factual question that cannot be resolved on a motion to dismiss.") (internal citation omitted).

For similar reasons, this case is distinguishable from *An Phan*, *Daniel*, and *Aderhold*. Those courts concluded that the messages at issue were not telemarketing because they were sent to complete an ongoing business transaction. *An Phan*, 351 F. Supp. 3d at 1265 ("[T]his Court holds that the text messages Agoda sent to Phan were neither advertising nor telemarketing. . . . [T]hese messages were sent as part of an ongoing business transaction between Agoda and Phan."); *Daniel*, 2015 WL 7454260 at *4 ("The context in which the text message was sent—i.e., minutes after Daniel asked the Flame Broiler cashier about Five Stars and gave the cashier his telephone number—merely

highlights the text's purpose of enabling Daniel to complete the registration process that he had initiated minutes before."); *Aderhold*, 2014 WL 794802 at *9 ("There is no indication that the text was intended for anything other than the limited purpose stated in its two sentences: to permit Mr. Aderhold to complete registration."). Here, because the FAC alleges (and the Court must accept as true) that Plaintiff did not have a business relationship with Defendant before receiving the text messages, Defendant could not have sent the messages to complete a business transaction.

*Rotberg* is also distinguishable because the FAC does not suggest that any of the text messages were opt-out confirmations. The FAC provides a screenshot of the third text: "Circle K: Reply 'YES' to get offers via txt. Go to myck.site/Qb9PtF, Age-verify 18/21+ offers. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. [phone number redacted]." (Doc. 11 ¶ 22.) Although Defendant seeks to factually contradict this allegation, claiming that the September 11, 2023 message actually "reads: 'Circle K: Out-Out [sic] confirmed. Thank you for responding. Msg and Data rates may apply. To Sign Up in the future reply yes. [phone number redacted]'" (Doc. 13 at 2 n.1), the Court must accept the contrary factual allegation in the FAC at this stage of the case.

        2.       <u>Consent</u>

Defendant's final argument is that Plaintiff lacks statutory standing because her phone number was entered into its system. In so arguing, Defendant urges the Court to disregard Plaintiff's allegations in the FAC that she did not provide her cell phone number to Defendant, otherwise consent to receive Defendant's texts, or have a business relationship with Defendant.

At this stage of the proceedings, the Court must assume Plaintiff's factual allegations to be true. Thus, Defendant's Rule 12(b)(6) statutory standing argument is unavailing. *Cf. Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1225 (9th Cir. 2022) ("The complaint alleges that some of the plaintiffs have placed their 'residential' cell phone numbers on the national do-not-call registry. At the motion to dismiss stage and based on the particular allegations in the plaintiffs' complaint, plaintiffs' phones are presumptively

residential for purposes of § 227(c). We therefore conclude that these plaintiffs have standing to sue under § 227(c).").

III. Motion To Strike Class Allegations

A. **Legal Standard**

Under Rule 12(f) of the Federal Rules of Civil Procedure, a court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Id.* A statement is not immaterial if it "relates directly to the plaintiff's underlying claim for relief." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 974 (9th Cir. 2010). A statement is not impertinent if it "pertains directly to the harm being alleged." *Id.* Rule 12(f) is not a vehicle to challenge the legal sufficiency of claims or allegations. *Id.*

Motions to strike under Rule 12(f) are "viewed with disfavor and are not frequently granted." *Operating Eng'rs Local 324 Health Care Plan v. G & W Constr. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015); *accord Whittaker*, 2023 WL 167040 at *5 ("Motions to strike are a drastic remedy and generally disfavored. Striking class allegations is particularly disfavored before discovery may clarify class allegations.") (cleaned up).

B. **The Parties' Arguments**

Defendant argues that "Plaintiff's class allegations should be stricken" because the DNC Class "is fail-safe, lacks commonality, and fails to sufficiently allege numerosity." (Doc. 13 at 6, capitalization omitted.) Regarding the fail-safe argument, Defendant argues, in reliance on *Olney v. Job.com, Inc.*, 2013 WL 5476813 (E.D. Cal. 2013), *Dixon v. Monterey Financial Services, Inc.*, 2016 WL 3456680 (N.D. Cal. 2016), and *Tomaszewski v. Circle K Stores, Inc.*, 2021 WL 2661190 (D. Ariz. 2021), that the DNC Class definition "would require the Court to affirmatively establish each individual plaintiff's lack of consent" and "require class members to prevail on liability under the TCPA in order to be members of the class, for once it is determined that a person who is a possible class member cannot prevail against the defendant under the TCPA, they would drop out of the class." (*Id.* at 7-8.) Regarding commonality, Defendant argues that "[t]he question of consent is not 'common' such that it can be ascertained on a class-wide basis" and requires "an

individualized inquiry." (*Id.* at 8-9.)  Regarding numerosity, Defendant notes that Plaintiff concedes in the FAC that she "does not know the exact number of members in the [DNC] Class" and contends that Plaintiff's reference to just "two lawsuits filed in the past three years (involving a total of three plaintiffs) . . . negates, rather than supports, the existence of 'hundreds' of class members over the past four years."  (*Id.* at 9, citation omitted.)[7]

In response, Plaintiff argues that "motions to strike are a drastic remedy and generally disfavored" and that "it is an open question as to whether it is ever proper to strike class allegations under Rule 12(f)."  (Doc. 14 at 9, cleaned up.)  Plaintiff adds: "[G]iven that courts regularly certify TCPA class actions, Defendant's suggestion that [she] cannot meet the elements necessary to certify her proposed TCPA class is not credible."  (*Id.* at 11.)  Plaintiff also argues that "striking [her] class allegations is inappropriate . . . because [her] complaint gives adequate notice of the claim being asserted" and because the class definition can be modified.  (*Id.*, internal quotation mark omitted.)  Plaintiff then argues that "concerns about the potential fail-safe nature of the proposed class are best resolved at the class certification stage, not through a motion to strike," but regardless, her "proposed class here is not a fail-safe class" because the "definition is not a circular one that determines the scope of the class only once it is decided that a class member was actually wronged."  (*Id.* at 12-13, cleaned up.)  Plaintiff argues that *Olney*, *Dixon*, and *Tomaszewski* are distinguishable because "in each of those cases, the proposed class was defined in terms of consent of the texted party," but "[h]ere, the proposed definition does not mention anything about consent."  (*Id.* at 13.  *See also id.* at 15 [discussing *Tomaszewski*].)[8]  Next, Plaintiff argues that "Defendant has not shown that

---

[7] Defendant adds that "[t]he fact that Circle K sends . . . *additional* verification messages *only after* a customer enters their phone number during a transaction or otherwise signs up to receive messages online *confirms* that Circle K does not send messages to 'numerous' persons without first obtaining their prior express consent or having a pre-existing relationship."  (*Id.*, emphasis in original.)

[8] Plaintiff also argues "Defendant's assertion that the text messages at issue are not telephone solicitations underscores that the proposed class is not fail-safe" because the DNC Class members "will remain in the class *regardless* of whether this Court ultimately finds in favor of Defendant on the issue of whether those text messages are telephone solicitations under the TCPA."  (*Id.* at 14, internal citation omitted, emphasis in original.)

- 16 -

it is impossible for [her] to establish commonality" because "[t]his case presents a host of common questions." (*Id.* at 14-16.) Next, Plaintiff argues that "[n]umerosity is not an element of [her] TCPA claim. Thus, she need not make a showing of numerosity at the pleadings stage." (*Id.* at 16.) Plaintiff further argues Defendant has not satisfied its burden "to establish that it would be impossible for [her] to establish numerosity." (*Id.* at 17.) Plaintiff argues that "given that this is at least the third lawsuit against Defendant in the past three years in this District alone for sending unsolicited telemarketing text messages to consumers, and given that Defendant has thousands of stores in the United States that likely participate in its Text Messaging Program, establishing numerosity will not be impossible." (*Id.*, internal citations omitted.) Last, Plaintiff seeks leave to amend "[s]hould this Court find [her] amended complaint or class allegations deficient." (*Id.*)

In reply, Defendant argues that "Plaintiff's contention that someone else entered her phone number only supports Circle K's position that the class allegations should be stricken if the claims are not dismissed in their entirety" because "the proposed class here—on its face—is *not* capable of class-wide resolution." (Doc. 15 at 4, emphasis in original.) Defendant also argues that Plaintiff's contention "that the class is not fail safe because the proposed class does not include the buzzword 'consent'" fails because "[p]rovision of a phone number constitutes consent" and "also creates, when made during a purchase, a business relationship." (*Id.* at 5, citation omitted.) Regarding numerosity, Defendant argues that "Plaintiff misstates her burden. It is not sufficient for Plaintiff to plead 'mere possibility,' but instead Plaintiff's allegations must be 'plausible.'" (*Id.* at 6, citation omitted.) Defendant then argues that "Plaintiff fails to meet her burden here" because she "argues only that it will not be impossible to establish numerosity because of the existence of three lawsuits against Circle K—with this being the third—over three years. Plaintiff only otherwise states that Circle K has thousands of stores in the United States." (*Id. See also id.* at 6-7 [discussing cases "where a court struck class allegations based on a plaintiff's failure to make a *prima facie* showing of numerosity"].)

…

- 17 -

C.  **Analysis**

Although "[a] defendant may move to deny class certification before a plaintiff files a motion to certify a class" under Federal Rule of Civil Procedure 23, *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 941 (9th Cir. 2009), that is not the approach Defendant took here. Instead, Defendant seeks to strike the class allegations in the FAC pursuant to Rule 12(f). As the Court has previously noted, the limited categories of information that may be struck pursuant to Rule 12(f) do not map neatly onto a class allegation. *Canady v. Bridgecrest Acceptance Corp.*, 2022 WL 279576, *3 (D. Ariz. 2022). Such an allegation is not a defense, is not redundant, is not impertinent, and is not scandalous. At most, it might be said that a facially deficient class allegation is "immaterial," but even that is something of a stretch. *See generally* 1 Steven S. Gensler & Lumen N. Mulligan, Federal Rules of Civil Procedure, Rules and Commentary, Rule 23, at 666-67 (2022) (characterizing as "problematic" the use of Rule 12(f) to strike class allegations). Further, "[m]otions to strike class allegations are particularly disfavored because it is rarely easy to determine before discovery whether the allegations are meritorious." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 834 (D. Ariz. 2016). *See also Baughman v. Roadrunner Communications, LLC*, 2013 WL 4230819, *2 (D. Ariz. 2013) ("Motions to strike class allegations are disfavored because a motion for class certification is a more appropriate vehicle in which to consider the issue.") (cleaned up); *Varsam v. Lab'y Corp. of Am.*, 120 F. Supp. 3d 1173, 1184 (S.D. Cal. 2015). Thus, courts have held that resort to Rule 12(f) is improper "where the issues raised in the motion to strike are the same ones that would be decided in connection with determining the appropriateness of class certification under Rules 23(a) and 23(b)." *Rahman v. Smith & Wollensky Restaurant Group, Inc.*, 2008 WL 161230, *3 (S.D.N.Y. 2008). *See also Whittlestone*, 618 F.3d at 974 ("Were we to read Rule 12(f) in a manner that allowed litigants to use it as a means to dismiss some or all of a pleading (as Handi–Craft would have us do here), we would be creating redundancies within the Federal Rules of Civil Procedure, because a Rule 12(b)(6) motion (or a motion for summary judgment at a later stage in the proceedings) already

serves such a purpose.").

Such is the case here. The bases for Defendant's Rule 12(f) motion—fail-safe class, lack of commonality, and failure to show numerosity—are the same issues that will be decided when determining whether to grant class certification. Thus, Defendant's reliance on Rule 12(f) is misplaced. *Tinnin v. Sutter Valley Med. Found.*, 647 F. Supp. 3d 864, 874 (E.D. Cal. 2022) ("[T]he Court finds that the procedural mechanism of a motion to strike is not the appropriate means for addressing a fail-safe problem."). *Cf. Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 464-65 (S.D.N.Y. 2013) (denying Rule 12(f) motion to strike class allegations because "KPMG's objections go to whether Plaintiffs can satisfy the requirements of Rule 23(a)(2), (b)(2), and (b)(3)," which are "exactly the sorts of issues that would be litigated and decided in the context of a motion for class certification," and were thus "procedurally premature") (cleaned up); *Webb v. Circle K Stores Inc.*, 2022 WL 16649821, *3 (D. Ariz. 2022) ("Circle K does not explain why this possibility that, at certification, a slightly more definite class definition will be needed establishes all class allegations should be stricken at the pleading stage. The proper stage for fine-tuning the class definition is certification, not pleading.").[9]

…

…

…

…

---

[9] *See also Abrahamian*, 2024 WL 1092442 at *4 ("Comprehensive briefing of the issues surrounding the proposed class are not before the Court and it is premature to address the appropriateness of its scope.") (cleaned up); *Nickerson v. Goodyear Tire & Rubber Corp.*, 2020 WL 4937561, *11 (C.D. Cal. 2020) (denying Rule 12(f) motion to strike class allegations—on the basis that the allegations are overbroad and lack commonality—as premature); *Legacy Gymnastics, LLC v. Arch Ins. Co.*, 2021 WL 2371503, *3-4 (W.D. Mo. 2021) (denying Rule 12(f) motion to strike class allegations because "all of Arch's Rule 23(b) arguments would be better addressed at the class certification stage after discovery yields more information"); *Edwards v. Conn's, Inc.*, 2020 WL 4018926, *3 (D. Nev. 2020) (denying motion to strike class allegations because "arguments regarding whether the proposed classes are improper fail-safes or overly broad are premature and more appropriately decided after Edwards moves for class certification"); *Larson v. Harman Mgmt. Corp.*, 2016 WL 6298528, *5 (E.D. Cal. 2016) (same); *Juarez v. Citibank, N.A.*, 2016 WL 4547914, *5 (N.D. Cal. 2016) (same).

Accordingly,

**IT IS ORDERED** that Defendant's motion to dismiss and/or to strike (Doc. 13) is **denied**.

Dated this 24th day of April, 2024.

Dominic W. Lanza
United States District Judge