**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Monica Abboud,

               Plaintiff,

v.

Circle K Stores Incorporated,

               Defendant.

No. CV-23-01683-PHX-DWL

**ORDER**

In this putative class action, Monica Abboud ("Plaintiff") alleges that Circle K Stores Inc. ("Defendant") violated the Telephone Consumer Protection Act ("TCPA") by sending several text messages to her without her consent after she registered her phone number on the National Do Not Call Registry ("DNC Registry").  Now pending before the Court is Defendant's motion for summary judgment.  (Doc. 38.)  For the reasons that follow, the motion is denied.

## BACKGROUND

I.    Relevant Factual Background

The background facts below are taken from the parties' summary judgment submissions and other materials in the record and are uncontroverted unless noted.

A.    **The Parties**

Since before 2023, Plaintiff has been the "regular and customary user of . . . [t]he telephone number ending in 3670."  (Doc. 51-1 at 29 ¶¶ 4-5.)  That phone number "is

assigned to a cellular telephone service and [Plaintiff] use[s] the phone number as a residential telephone line." (*Id.* at 29 ¶ 5.) Plaintiff "registered [her] telephone number . . . on the Federal Trade Commission's National [DNC] Registry prior to 2023 and it has remained registered since that time." (*Id.* at 29 ¶ 6.)

Defendant is a corporation headquartered in Tempe, Arizona, and its "business is selling fuel and convenience store items." (*Id.* at 6.) Defendant has "close to 14,000 stores" globally and "[r]oughly, 7,000 stores" throughout the United States. (*Id.*)

B. **The Messaging Program**

Defendant "operates a messaging program through which customers can affirmatively opt-in to the receipt of messages containing notice of discounts on products at [Defendant's] stores." (Doc. 39-1 at 4 ¶ 3.) More specifically, Defendant "offers a 'Tobacco club' (or Marlboro Club) program through which customers can sign up by entering their phone number on a touchscreen display," called the Lift System, that is "located at the transaction counter." (*Id.* at 4 ¶¶ 5-6.) This "20-inch screen located at [the] checkout counter" displays advertisements in a loop when no transaction is taking place. (Doc. 51-1 at 7-8.) However, when a customer or sales attendant scans a certain product at the checkout counter, the Lift System "show[s] a screen to upsell the customer for . . . a promo that's related to the item that's been scanned." (*Id.* at 8, 13.) At that point, the customer has the option to enter a phone number into the Lift System. (*Id.* at 13.) With the Tobacco club program, a customer who enters a phone number will also "save $1.70 instantly when [they] buy a 2nd identical item." (Doc. 39-1 at 8.) Small text at the bottom of the screen informs the customer that:

> By providing my mobile number, I consent to receiving marketing messages via automated technology from Circle K/Holiday to the mobile number provided above. I understand my consent is not a condition of purchase. I understand that entering the mobile number provided above enrolls me in all Circle K/Holiday text message programs, and that my consent applies to all Circle K/Holiday text message programs.

(*Id.*)

Once the customer enters a phone number and receives the discount, that customer's

interaction with the Lift System ends.  (Doc. 51-1 at 14-15.)  However, upon entry of the phone number, an automatic process is triggered that results in a text message being sent to the just-entered phone number.  (*Id.* at 16-17.)  First, the phone number is uploaded to the Lift System cloud, and that system then transmits the phone number to a third-party messaging service, Mobivity Holdings Corp ("Mobivity"), and asks Mobivity to send a text message to the number.  (*Id.*)  Defendant refers to this sequence as "a double opt-in process.  If an individual enters their phone number to consent to enroll in [Defendant's] messaging program, [Defendant] sends a message to the individual asking them to respond 'YES' to complete their sign-up."  (Doc. 39-1 at 4 ¶ 8.)  Defendant then "sends up to three confirmation messages" (*id.* at 4 ¶ 9), with "about a month" between each text message (Doc. 51-1 at 20).  "If the individual either (a) responds 'STOP' to opt-out or (b) fails to respond following the third confirmation attempt, the individual is opted out and will not receive any discount or marketing messages."  (Doc. 39-1 at 4 ¶ 10.)[1]

C.     **The Transaction And Text Messages**

On August 2, 2023, someone entered Plaintiff's phone number ending in 3670 into the Lift System at one of Defendant's stores in Texas in order to receive a discount on cigarettes.  (Doc. 39-1 at 14-32.  *See also* Doc. 39 at 4 [explaining the electronic records].)  This action "began the enrollment process into [Defendant's] messaging program" (Doc. 39 at 4) and Defendant sent four text messages to Plaintiff's phone number ending in 3670 as follows:

• August 2, 2023:  "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message.  Msg & Data rates may apply.  Txt 'STOP' to Opt-Out. 855-276-1947." (Doc. 39-1 at 34.)

• August 2, 2023:  "Circle K: Reply 'YES' to get offers via txt.  Go to myck.site/k2KmEU, Age-verify 18/21+ offers.  Msg & Data rates may apply.  Txt 'STOP' to Opt-Out.  855-276-1947."  (*Id.*)

---

[1]     If a recipient responds with "wrong number" instead of "STOP," the system will send that person a duplicate of the first text message.  (Doc. 51-1 at 25.)  If, at that point, the recipient fails to respond, the automated messages will cease.  (*Id.*)

• September 11, 2023:  "Circle K: Reply 'YES' to get offers via txt.  Go to myck.site/Qb9PtF, Age-verify 18/21+ offers.  Msg & Data rates may apply.  Txt 'STOP' to Opt-Out.  855-276-1947."  (*Id.*)

• September 12, 2023:  "Circle K: Opt-Out confirmed.  Thank you for responding.  Msg & Data rates may apply.  To Sign Up in the future reply yes.  855-276-1947."  (*Id.*)[2]

"The link provided in the text messages sent to Plaintiff would take an individual to [Defendant's] online age-restricted sign-up form."  (*Id.* at 5 ¶ 16.)  This form appears on a standalone "micro site" (Doc 57-1 at 6-7) where the viewer is prompted to enter additional information, including their name, email address, physical address, and birthday (Doc. 39-1 at 12-13).  Although this webpage is separate from Defendant's main webpage, it contains hyperlinks to the "Terms and Conditions" and "Privacy Policy" for the messaging program, which are hosted on Defendant's main webpage.  (Doc. 39-1 at 10, 13.)

Plaintiff avows that she never consented to receive text messages from Defendant or Mobivity and "never provided, or authorized anyone to provide" her telephone number to either party.  (Doc. 51-1 at 29-30 ¶¶ 7-8, 10-13.)  Plaintiff also avows that she never entered her telephone number into "a computer or other platform at [Defendant's] store" and that she "do[es] not smoke or use any tobacco products, and ha[s] never purchased any tobacco product from [Defendant]."  (*Id.* at 30 ¶¶ 9, 14.)  Defendant does not attempt to challenge these assertions and admits that it "do[es] not have anything in [its] possession to show any relationship to [Plaintiff]."  (*Id.* at 21-22.)  Instead, Defendant asserts that someone entered Plaintiff's phone number ending in 3670 into the Texas store's Lift System and "the person in front of the Lift screen"—whom Defendant concedes it cannot identify—"[saw] the disclaimer and [was] aware that there [was] going to be a text message that's going to be occurring after entering the phone number."  (*Id.* at 24, 26.)

…

…

---

[2]    Although the final message reads "[t]hank you for responding" (Doc. 39-1 at 34) Defendant's representative states that "Plaintiff did not respond to [Defendant's] messages" and "Plaintiff was affirmatively opted-out" (*id.* at 5).

II.    Procedural History

On August 17, 2023, Plaintiff initiated this action by filing a class action complaint. (Doc. 1.)

On October 20, 2023, Plaintiff filed the First Amended Complaint ("FAC"), alleging additional facts to support her TCPA claim and revising the complaint's class definition.  (Doc. 11.)

On November 3, 2023, Defendant moved to dismiss the FAC for failure to state a claim or, in the alternative, to strike class allegations.  (Doc. 13.)

On April 24, 2024, the Court denied Defendant's motion.  (Doc. 20.)

On June 5, 2024, with Defendant's consent, Defendant filed the Second Amended Complaint ("SAC").  (Doc. 28.)  The SAC included Mobivity as an additional defendant. (*Id.*)

On July 16, 2024, Defendant filed the pending motion for summary judgment. (Doc. 38.)

On August 29, 2024, Plaintiff filed a response.  (Doc. 51.)

On September 11, 2024, Plaintiff filed a motion to amend her complaint in two respects: (1) removing Mobivity as a Defendant; and (2) broadening the proposed class while changing the original proposed class to a subclass.  (Doc. 55.)

On September 20, 2024, Defendant filed a reply in support of its summary judgment motion.  (Doc. 57.)

On November 8, 2024, the Court granted Plaintiff's motion to amend her complaint and noted that "also pending is [Defendant's] motion for summary judgment, which is fully briefed and will be resolved in due course."  (Doc. 62 at 1 n.1, cleaned up.)

On November 13, 2024, Plaintiff filed her operative pleading, the Third Amended Complaint ("TAC").  (Doc. 63.)[3]

On January 6, 2025, the Court issued a tentative ruling.  (Doc. 73.)

On January 22, 2025, the Court heard oral argument.  (Doc. 76.)

---

[3]    Because the TAC's substantive allegations are identical to the SAC's substantive allegations, the Court will treat the summary judgment motion as addressing the TAC.

1                                     **LEGAL STANDARD**

2       "The court shall grant summary judgment if [a] movant shows that there is no

3 genuine dispute as to any material fact and the movant is entitled to judgment as a matter

4 of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of

5 the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue

6 in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d

7 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable

8 to the nonmoving party and draw all reasonable inference in the nonmoving party's favor."

9 *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is

10 improper where divergent ultimate inferences may reasonably be drawn from the

11 undisputed facts." *Fresno Motors*, 771 F.3d at 1125 (internal quotation marks omitted).

12       A party moving for summary judgment "bears the initial responsibility of informing

13 the district court of the basis for its motion, and identifying those portions of 'the pleadings,

14 depositions, answers to interrogatories, and admissions on file, together with the affidavits,

15 if any,' which it believes demonstrate the absence of a genuine issue of material fact."

16 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of

17 production, the moving party must either produce evidence negating an essential element

18 of the nonmoving party's claim or defense or show that the nonmoving party does not have

19 enough evidence of an essential element to carry its ultimate burden of persuasion at trial."

20 *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . .

21 [the] moving party carries its burden of production, the nonmoving party must produce

22 evidence to support its claim or defense." *Id.* at 1103.

23       "If the nonmoving party fails to produce enough evidence to create a genuine issue

24 of material fact, the moving party wins the motion for summary judgment." *Id.* There is

25 no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty*

26 *Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not

27 significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal

28 citations omitted). At the same time, "[t]he evidence of the non-movant is to be believed,

and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

## DISCUSSION

It is undisputed that Defendant (through Mobivity) sent four text messages to Plaintiff's phone number ending in 3670 between August 2, 2023, and September 12, 2023. Plaintiff's theory of liability is that the first three text messages constituted "telephone solicitations" within the meaning of the TCPA and that, because she had not consented to receive such solicitations and had registered her phone number on the DNC Registry, Defendant violated the TCPA by causing the three text messages to be sent. (Doc. 63 ¶¶ 16-43.) Defendant now argues it is entitled to summary judgment for three reasons: (1) the text messages do not qualify as "telephone solicitations" within the meaning of the TCPA; (2) alternatively, the TCPA creates an exception to liability when an individual provides consent to be contacted, as Plaintiff did here; and (3) further alternatively, the TCPA creates an exception to liability when an established business relationship exists between the sender and recipient, as existed here between Defendant and Plaintiff. (Doc. 38.)

Before turning to the merits of these arguments, it is helpful to begin with some background principles. The TCPA and its implementing regulations prohibit initiating "more than one telephone [solicitation] within any 12-month period" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). "Telephone solicitation" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in,

property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization."  47 U.S.C. § 227(a)(4).  A telephone solicitation can be a call or text message.  47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers.").

I.    Whether The Text Messages Qualify As "Telephone Solicitations"

A.    **The Parties' Arguments**

Defendant argues that the text messages at issue do not qualify as "telephone solicitations" under the TCPA because a solicitation must "encourage the future purchase of property or services" and the messages in this case "were merely to *confirm* Plaintiff's opt-in to a program through which plaintiff could thereafter receive special offers.  While those future special offers might encourage the purchase of property, goods, or services, the initial messages confirming enrollment in a program did no such thing."  (Doc. 38 at 9-10, cleaned up.)    According to Defendant, that confirmatory purpose is further established by the "preceding context which triggered the transmission," namely, that "Plaintiff received the messages because her phone number was entered during a transaction to which she signed up for [Defendant's] messaging program."  (*Id.* at 10, emphasis omitted.)  Defendant concludes that "this is not a case in which the purpose of the message was to encourage a non-customer to purchase a product or service at all.  To the contrary, the very purpose of the opt-in messages at issue here is to protect Plaintiff from receiving any unwanted marketing messages in the future."  (*Id.* at 10.)

Plaintiff responds that the text messages do, in fact, qualify as "telephone solicitations" under the TCPA.  (Doc. 51 at 10-17.)  According to Plaintiff, the text messages could not have been "merely meant to confirm [Plaintiff's] opt-in to a program" because she never opted in to the program in the first instance.  (*Id.* at 12.)  Plaintiff also

points out that the text messages "encourage[] [Plaintiff] to receive 'offers' and 'special offers' from [Defendant] by replying 'Yes.'" (*Id.* at 13). This is significant, Plaintiff argues, because "it is difficult to imagine why Defendant would repeatedly encourage [Plaintiff] to sign up for offers other than to encourage her to make future purchases of goods at Defendant's stores based on those offers." (*Id.* at 13, citation omitted.) Plaintiff cites several cases in which courts have found that messages were "telephone solicitations" and argues that those cases are analogous to this one. (*Id.* at 13-17.)

In reply, Defendant argues that the cases cited by Plaintiff are distinguishable. (Doc. 57 at 3-6.) According to Defendant, "to be a telephone solicitation, the message must contain actual language encouraging the expenditure of funds for a product, good, or service." (*Id.* at 2.) That was not the case here, Defendant argues, because (1) "the embedded link in the text messages was a . . . 'standalone website' that does not 'allow [a customer] to click through to get to the [Defendant's] website'"; and (2) "[Defendant's] messages do *not* encourage the purchase or rental of, or investment in, any specific good or service." (*Id.* at 2, 7.) According to Defendant, a solicitation must be more than "a confirmation message sent by a company whose business is to sell products . . . indirectly sent to encourage a future purchase," because "[i]f that were so, every message sent by any business" would qualify as a solicitation. (*Id.* at 6, cleaned up.) In addition, Defendant reiterates that the messages were not intended as solicitations because "[the] double opt-in process is a means of protecting consumers by ensuring only those who truly want [Defendant's] marketing messages will receive them in the future." (*Id.*) Defendant further argues that "Plaintiff's allegation that someone else entered her number does nothing to change the context in which the message is sent or transform the purpose of the message. Indeed, courts have uniformly rejected a similar argument with respect to emergency calls and messages, holding that even if sent to the wrong person, that does not convert the purpose of the call or subject the caller to TCPA liability." (*Id.* at 7, citation omitted.)

…

…

- 9 -

1

     **B.**    **Analysis**

2

     Under the TCPA, the term "telephone solicitation" is defined as "the initiation of a

3 telephone call or message for the purpose of encouraging the purchase or rental of, or

4 investment in, property, goods, or services, which is transmitted to any person . . . ."

5 47 U.S.C. § 227(a)(4). Courts in the Ninth Circuit use "a measure of common sense" to

6 determine the message's purpose. *Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918

7 (9th Cir. 2012). *See also Whittaker v. Freeway Ins. Servs. Am.*, *LLC*, 2023 WL 167040,

8 \*2 (D. Ariz. 2023) (applying *Chesbro* to a claim under 47 U.S.C. § 227(c)(5)). The Ninth

9 Circuit has also held "that so-called 'dual purpose' calls, those with both a customer service

10 or informational component as well as a marketing component, are prohibited." *Chesbro*,

11 705 F.3d at 917.[4] *See also Vallianos v. Schultz*, 2019 WL 4980649, \*3 (W.D. Wash. 2019)

12 ("Text messages constitute a telephone solicitation even if the text message serves a dual

13 purpose—that is, includes both advertising/telemarketing and merely informational or

14 transactional communications.") (cleaned up); *Fiorarancio v. WellCare Health Plans, Inc.*,

15 2022 WL 111062, \*3 (D.N.J. 2022) ("'[W]hile Defendant's messages may have been

16 informational on their face, it is plausible that they were part of a larger marketing, or

17 profit-seeking, scheme and, as such, fall within the TCPA's prohibition."); *Physicians*

18 *Healthsource, Inc. v. Advanced Data Sys. Int'l, LLC*, 2020 WL 2764826, \*8 (D.N.J. 2020)

19 ("[H]aving informational content does not conclusively prevent a fax from being classified

20 as an advertisement."). Thus, even if a message "also served a dual, administrative

21 function of facilitating plaintiff's possible opt-in" to future solicitations, it may itself

22 qualify as a solicitation if had a "marketing component," such as "to encourage future

23 purchases." *Meyer v. Bebe Stores, Inc.*, 2015 WL 431148, \*3 (N.D. Cal. 2015).

24

25

26

27

28

---

[4]     During oral argument, Defendant's counsel seemed to argue that *Chesbro*'s holding on this point is inconsistent with the underlying federal regulations: "I do agree that *Chesbro* under the Ninth Circuit framework does talk about a dual purpose or a dual purpose framework for text messages but when you look at the FCC regulation underlying that decision it's very clear that the regulators are not talking about some sort of ancillary implied second purpose. They're talking about a direct clear second purpose within the text of the message themselves." This argument is unavailing because the Court must follow *Chesbro*. *Hasbrouck v. Texaco, Inc.*, 663 F.2d 930, 933 (9th Cir. 1981) ("District courts are bound by the law of their own circuit . . . no matter how egregiously in error they may feel their own circuit to be.").

1    Additionally, "to engage in 'telephone solicitation,' a caller does not need to directly offer

2    property or services for sale, but may merely encourage the future purchase of property or

3    services." *Faucett v. Move, Inc.*, 2023 WL 2563071, *4 (C.D. Cal. 2023) (cleaned up).

4    *See also Chesbro*, 705 F.3d at 918 ("Neither the statute nor the regulations require an

5    explicit mention of a good, product, or service where the implication is clear from the

6    context."); *Orea v. Nielsen Audio, Inc.*, 2015 WL 1885936, *3 (N.D. Cal. 2015) ("A call

7    that encourages future purchasing activity may be a telephone solicitation, even if the sales

8    pitch is not explicitly contained in the call itself.").

9         Given these principles, Defendant is not entitled to summary judgment.  At bottom,

10   whether the text messages qualify as "telephone solicitations" turns on Defendant's

11   purpose in causing the messages to be sent.  But questions about a party's purpose or intent

12   are almost quintessential questions of fact.  *See, e.g.*, *Nat. Basketball Ass'n v. SDC

13   Basketball Club, Inc.*, 815 F.2d 562, 569 (9th Cir. 1987) ("Evidence of intent, of course, is

14   a question of fact.").  In a related vein, even though many of the underlying facts here (such

15   as the wording of the text messages) are undisputed, a reasonable factfinder could draw

16   divergent inferences from those facts about Defendant's purpose in causing the messages

17   to be sent.  *Fresno Motors*, 771 F.3d at 1125 ("Summary judgment is improper where

18   divergent ultimate inferences may reasonably be drawn from the undisputed facts.").  Even

19   if one of those purposes was to confirm that Plaintiff had opted in to receive future text

20   messages, liability may attach if Defendant was also motivated by the dual purpose of

21   encouraging Plaintiff to make future purchases.  *Chesbro*, 705 F.3d at 917; *Meyer*, 2015

22   WL 431148 at *3.  Such purpose need not take the form of an explicit mention of a good,

23   product, or service—instead, it may be inferred from the context.  *Chesbro*, 705 F.3d at

24   918.  Here, when the full context of the messages is considered and when all reasonable

25   inferences are drawn in Plaintiff's favor, a factfinder could conclude that one of

26   Defendant's purposes in causing the text messages to be sent was to encourage Plaintiff to

27   make future purchases of Defendant's products.

28        *Chesbro* and *Meyer*, although not factually identical, support this conclusion.  In

*Chesbro*, the defendant sent "robot-calls [that] urged the listener to 'redeem' his Reward Zone points, directed him to a website where he could further engage with the [Reward Zone Program], and thanked him for 'shopping at Best Buy.'"  705 F.3d at 918.  The defendant argued that these "purely informational courtesy calls . . . did not run afoul of the TCPA and its implementing regulations" because they "did not explicitly reference any property, goods, or services."  *Id.*  The district court granted summary judgment in the defendant's favor but the Ninth Circuit reversed, holding that because the calls "directed [the listener] to a website where he could further engage with the [Reward Zone Program]" and that program required future purchases, "common sense" and "context" suggested that "the calls encouraged the listener to make future purchases at Best Buy."  *Id.*  "In sum, these calls were aimed at encouraging listeners to engage in future commercial transactions with Best Buy to purchase its goods.  They therefore constituted . . . telephone solicitations . . . within the meaning of the TCPA . . . ."  *Id.* at 919.  Similarly, in *Meyer*, the plaintiff "received an unsolicited text message from defendant" that read: "Get on the list!  Reply YES to confirm opt-in. 10% OFF reg-price in-store/online. Restrictions apply. 2msg/mo, w/latest offers. Msg & data rates may apply."  2015 WL 431148 at *1.  The defendant moved to dismiss on the ground that "the text at issue was merely an informational or administrative message 'confirming' plaintiff's opt-in (not one sent for advertising or telemarketing purposes)" but the district court rejected that argument, holding that "[e]ven if [the text message] also served a dual, administrative function of facilitating plaintiff's possible opt-in," its reference to an offer of "10% OFF reg-price in-store/online" was "presumably to encourage future purchases" and thus it might "plausibly constitute[] an 'advertisement'" under the TCPA.  *Id.* at *3.

Defendant argues that this case is distinguishable from *Chesbro* because "none of the messages referred to any 'shopping' at Circle K" and is distinguishable from *Meyer* because "[t]he message [in *Meyer*] included, in the text itself, the encouragement of a purchase by offering 10% off." (Doc. 57 at 5.)  But these distinctions are immaterial.  The first text message that Plaintiff received included a promise of "special offers via txt

message" while the second and third text messages renewed this promise of future "offers via text" while also adding an express reference to offers that Plaintiff could unlock by visiting a cross-referenced website: "Age-verify 18/21+ offers."  Although these offers were not expressed in the form of a specific percentage discount, like the 10% offer in *Meyer*, a reasonable factfinder could still infer, when using common sense and considering the context, that they were made for the purpose of encouraging Plaintiff to make future purchases of Defendant's products.  *Cf. Bennett v. Boyd Biloxi, LLC*, 2015 WL 2131231, *3 (S.D. Ala. 2015) ("[T]he defendant patently encouraged the plaintiff to view online all its offers for sale.  Employing common sense, what possible purpose could the defendant have for such an encouragement other than that of obtaining future sales to the plaintiff of the goods and services being offered?").  For similar reasons, although the text messages did not expressly refer to "shopping" like the message in *Chesbro*, a reasonable factfinder could still infer that one of Defendant's purposes in sending the messages was to encourage future shopping.

Defendant's remaining arguments do not compel a different conclusion.  Although Defendant contends that the text messages cannot qualify as "telephone solicitations" because they were intended merely to confirm Plaintiff's enrollment in Defendant's messaging program, this contention ignores that a message may be sent for more than one purpose.  And as Plaintiff correctly notes, Defendant does not "explain why—if those messages were truly simply confirmation attempts—the messages would reference 'offers' and 'special offers.'"  (Doc. 51 at 13.)

Defendant's decision to include this language is significant.  Plaintiff's counsel conceded during oral argument that if the text messages had merely stated "Circle K, reply yes to confirm the receipt of future text messages," they would not run afoul of the TCPA.  But that is not what the text messages said.  Defendant made a discretionary choice to add additional verbiage to the text messages that went beyond confirming the recipient's consent to receive future messages.  Moreover, in the second and third messages, Defendant added a second sentence that read: "Go to myck.site/k2KmEU, Age-verify

18/21+ offers."  As Defendant's counsel seemed to acknowledge during oral argument, that additional language was unnecessary to achieve the purpose of confirming the recipient's consent to receive future messages: "I would agree with your Honor that there probably could be language in the text that makes it a little bit clearer that this is . . . just a sign-up process and not a solicitation."  A reasonable factfinder could infer that because this additional language was unnecessary to confirm the recipient's consent, Defendant was necessarily motivated by some other purpose—here, the purpose of encouraging future purchases of goods and services—when deciding to add it.[5]

For related reasons, there is no merit to Defendant's contention, raised during oral argument, that the text messages cannot qualify as solicitations because they were sent as part of an "automated process" intended to obtain consent.  This argument ignores that it was Defendant who created that automated process and chose the wording of the text messages to be sent as part of it.  Defendant could have chosen to use narrow wording that was limited to obtaining consent but instead chose to follow a different approach.  Also unavailing is Defendant's contention that denying summary judgment would effectively expose businesses to TCPA liability whenever they send a text message (because businesses, by their nature, exist to sell goods and services, and thus any communication from a business could be viewed as intended to encourage future purchases).  Again, this doomsday argument ignores the specific facts of this case, where Defendant chose to add references to "offers" that were unnecessary to achieve its stated intent of obtaining consent to receive future messages.

Defendant also cites a series of district court decisions in which courts concluded that particular messages did not trigger liability under the TCPA.  Putting aside the fact that those decisions are not binding here, the analysis in many of them focused on whether the sender had received the recipient's consent.  *An Phan v. Agoda Co. Pte. Ltd.*, 351 F.

---

[5]    During oral argument, Defendant's counsel seemed to suggest that Defendant added the sentence "Age verify 18/21+ offers" in an effort to comply with unspecified regulatory requirements.  Not only is this argument forfeited because it was raised for the first time at oral argument, but a reasonable factfinder could still infer, from the reference to "offers," that one of Defendant's purposes was encouraging the future purchase of goods and services.

Supp. 3d 1257, 1267 (N.D. Cal. 2018) ("[Defendant] has thus successfully demonstrated that it is entitled to judgment as a matter of law on the affirmative defense of consent."); *Wick v. Twilio, Inc.*, 2016 WL 6460316, *1 (W.D. Wash. 2016) ("Because the Court agrees that plaintiff did consent to receiving this text message and phone call, it finds it unnecessary to address defendant's other arguments."); *Daniel v. Five Stars Loyalty, Inc.*, 2015 WL 7454260, *1 (N.D. Cal. 2015) ("[B]y providing his telephone number Daniel gave his prior express consent to receive the text."); *Aderhold v. Car2go N.A., LLC*, 2014 WL 794802, *7 (W.D. Wash. 2014) ("Considering all of the foregoing authority, the court concludes that Mr. Aderhold gave his 'prior express consent' to receiving the text message from car2go.").  Although consent may provide an alternative ground for avoiding liability under the TCPA—an issue addressed in later portions of this order—it is analytically distinct from whether the text messages themselves qualify as "telephone solicitations," which turns on Defendant's purpose in causing the messages to be sent.  *Cf. Moskowitz v. American Savings Bank, F.S.B.*, 37 F.4th 538, 541 (9th Cir. 2022) ("Express consent is not an element of a plaintiff's prima facie case but is an affirmative defense.").

Defendant also cites two cases to support the proposition that a telemarketer who mistakenly sends a message to the wrong person is shielded from liability under the TCPA. (Doc. 57 at 8.)  But those cases analyze a separate provision of the TCPA that exempts telemarketers from liability when a call is for "emergency purposes."  *Lindenbaum v. CVS Health Corp.*, 2018 WL 501307, *2 (N.D. Ohio 2018); *Roberts v. Medco Health Solutions, Inc.*, 2016 WL 3997071, *3 (E.D. Mo. 2016).  Defendant does not explain why this exception would apply to this non-emergency situation.

Defendant also appears to contend that a communication can only qualify as a solicitation if it "contain[s] *actual* language encouraging the expenditure of funds" or "encourage[s] the purchase or rental of, or investment in, any *specific* good or service." (Doc. 57 at 2, 7, emphases added.)  But this argument is foreclosed by *Chesbro*, which holds that "[n]either the statute nor the regulations require an explicit mention of a good, product, or service where the implication is clear from the context."  705 F.3d at 918.  *See*

*also Panacci v. A1 Solar Power, Inc.*, 2015 WL 3750112, *5 (N.D. Cal. 2015) ("[C]ontrary to Defendants' assertion, telephone solicitations do not need to encourage a 'specific purchase.'").  A reasonable factfinder could conclude that, just like the messages in *Chesbro* that encouraged the plaintiff to visit the defendant's store and use points, the text messages in this case that encouraged Plaintiff to visit a website to "verify" offers "were aimed at encouraging [recipients] to engage in future commercial transactions with [the sender] to purchase its goods." *Chesbro*, 705 F.3d at 919.  *Cf. Faucett*, 2023 WL 2563071 at *4 ("[T]o engage in 'telephone solicitation,' a caller does not need to directly offer property or services for sale, but may merely encourage the future purchase of property or services.  Here, . . . Realtor.com called [Faucett] in order to connect him with a real estate agent . . . [and thus] encouraged Faucett to purchase property or services . . . .").

Finally, Defendant argues that although the Court concluded at the pleading stage of the case that the factual allegations in the FAC were sufficient to show that the text messages in question could plausibly qualify as "telephone solicitations" (Doc. 20 at 8-14), that determination was based in part on a factual allegation that was not borne out during discovery—that the text "messages included a link to [Defendant's] website through which goods would be visible."  (Doc. 57 at 3.)  According to Defendant, "discovery has confirmed that the link is to a standalone site containing only the age-restricted verification form, and that it does not permit navigation to [Defendant's] general website."  (*Id.*, emphasis omitted.)

This argument fails for two reasons.  First, it overstates the evidence.  Defendant's representative Victorino Perrine simply attests that "[t]he link provided in the text messages sent to Plaintiff would take an individual to [Defendant's] online age-restricted sign-up form." (Doc. 39-1 at 5.)  Although the form itself appears to be a standalone "micro site" (Doc. 57-1 at 6), it contains hyperlinks to Defendant's "Privacy Policy" and "Terms and Conditions," both of which are hosted on Defendant's main webpage (Doc. 39-1 at 13).  A user who navigated to the "Privacy Policy" page would immediately see a tab at the top of the screen entitled "Our products," and a user who clicked on that link would be

directed to a webpage containing a variety of information about the food and drink products offered at Defendant's stores.  *Privacy Policy*, Circle K, https://www.circlek.com/privacy-policy  (last visited Jan. 3, 2025).  Given this backdrop, a reasonable factfinder could conclude, just as Plaintiff alleged in the complaint, that the text messages included a link to Defendant's website through which goods would be visible.

Second, and more important, even if the link in the text messages did not allow a user to access Defendant's webpage, the outcome here would be the same.  A lack of direct access to Defendant's webpage may weaken the inference that one of the purposes of Defendant's messages was solicitation, but a reasonable factfinder could still infer such a purpose in light of the messages' express references to "offers" and "special offers" for products.  The presence of these references also helps distinguish this case from many of the district court decisions cited in Defendant's motion papers.  *Hulce v. Zipongo, Inc.*, 2024 WL 1251108 (E.D. Wisc. 2024) (encouraging plaintiff to use services that were free under his health plan); *Miholich v. Senior Life Insurance Co.*, 2022 WL 410945, *5 (S.D. Cal. 2022) ("Offers of employment are not telephone solicitations within the meaning of the TCPA."); *Vallianos*, 2019 WL 4980649 at *3 (encouraging a plaintiff to watch the defendant's political speech); *Orea*, 2015 WL 1885936 at *4 ("[C]alls conducting surveys and market research are not considered telephone solicitations unless they serve as a pretext to a telephone solicitation or otherwise prohibited advertisement.").[6]

II.    <u>Consent</u>

A.    **The Parties' Arguments**

Defendant argues "that any entity or person making telephone solicitations will not be liable for a TCPA violation if it has obtained the subscriber's prior express invitation or permission evidenced by a signed, written agreement between the consumer and caller which states that the consumer has agreed to be contacted and includes the telephone number to which the calls may be placed."  (Doc. 38 at 6, citation and emphasis omitted.)

---

[6]    These cases, although distinguishable, also undermine Defendant's contention that, unless its summary judgment arguments are accepted, "every message sent by any business" would qualify as a solicitation.  (Doc. 57 at 7.)

Defendant further argues that Plaintiff's act of "voluntarily providing her phone number to Defendant constitutes written consent" and that "[t]here is not a genuine dispute of material fact that Plaintiff's phone number was provided to [Defendant] in order to expressly consent to receive the messages in question." (*Id.* at 6-7.)

Plaintiff responds that "'[p]rior express invitation or permission'" is an affirmative defense and that Defendant "must establish the existence of the elements of [this] defense before [Plaintiff] is obligated to bring forward specific facts to rebut them." (Doc. 51 at 5-6.) On the merits, Plaintiff cites *N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164 (9th Cir. 2020), and argues that "consent to call must come from the called party," so Defendant's "contention that *someone* provided [Plaintiff's] telephone number to it does not establish that [Plaintiff] provided prior express invitation or permission to [Defendant.]" (*Id.* at 6-7.) Plaintiff further argues that she "presented uncontroverted evidence that she did not provide, or authorize anyone else to provide, consent to [Defendant] to deliver the text messages at issue to her telephone number . . . ." (*Id.* at 9-10.)

In reply, Defendant argues that Plaintiff is relying on a "misleading string of caselaw discussing the definition of 'called party' under 47 U.S.C. § 227." (Doc. 57 at 7.) According to Defendant, *N. L. by Lemos* is inapplicable because "the case arose in the context of a 'reassigned number' (which was reassigned years ago) distinguish[ing] its applicability from the case of a number (even erroneously) entered by an actual Circle K customer triggering the immediate response of an opt-in confirmation message." (*Id.* at 9, emphasis omitted.) Defendant also argues that the cases cited in *N. L. by Lemos* undermine rather than support Plaintiff's position, placing particular emphasis on *ACA International v. FCC.*, 885 F.3d 687 (D.C. Cir. 2018), *Leyse v. Bank of America National Association*, 804 F.3d 316 (3rd Cir. 2015), *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014), and *Soppet v. Enhanced Recovery Co.*, LLC, 679 F.3d 637 (7th Cir. 2012). (*Id.* at 7-9.) According to Defendant, "[c]ontrary to the Court's ruling in *N. L. by Lemos*, neither *ACA International*, the F.C.C., nor *Leyse* ever stated the 'called party' referred only to the

1    owner of the reassigned number who received the call.  Nor are *Osorio* or *Soppet* different

2    as they are also reassigned number cases, with the *Osorio* court stating its concern that

3    there should not 'be any long-term consent to call a given Cell Number.'  In the context of

4    a wrong number, however, there is no such authority precluding a caller from relying on

5    the consent of the person who provided the phone number before making a call."  (*Id.* at

6    9.)  Finally, Defendant argues that "adopting Plaintiff's 'called party' interpretation for the

7    consent and established business relationship exceptions to 'telephone solicitations' would

8    preclude any company from responding to any inquiry received from any phone number

9    within three months."  (*Id.* at 11.)  Such a result, according to Defendant, "would negate

10   the very protections specifically provided in 47 C.F.R. § 64.1200" and lead to plaintiffs

11   manufacturing lawsuits.  (*Id.*)

12        B.    **Analysis**

13        There can be no liability under 47 U.S.C. § 227(c)(5) for a call or message that is

14   sent "to any person with that person's prior express invitation or permission."  47 U.S.C.

15   § 227(a)(4); 47 C.F.R. § 64.1200(c)(2).  *See also Johansen v. Nat'l Gas & Elec. LLC*, 2018

16   WL 3933472, *5 (S.D. Ohio 2018) ("[A] call is excluded from the definition of a telephone

17   solicitation if it is placed to any person with that person's prior express invitation or

18   permission.").  The presence of such consent "is not an element of a plaintiff's prima facie

19   case but is an affirmative defense for which the defendant bears the burden of proof."  *Van

20   Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).  *See also True

21   Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("We see

22   no distinction between 'express consent' and 'prior express invitation or permission' that

23   would affect which party bears the burden of proving consent.").  The federal regulations

24   require that a party's prior express invitation or permission "must be evidenced by a signed,

25   written agreement between the consumer and seller which states that the consumer agrees

26   to be contacted by this seller and includes the telephone number to which the calls may be

27   placed."  47 C.F.R. § 64.1200(c)(2)(ii).

28        The relevant facts bearing on the issue of consent are as follows.  Plaintiff avows

that she never consented to receive text messages from Defendant or Mobivity and "never provided, or authorized anyone to provide" her telephone number to either party. (Doc. 51-1 at 29-30.) Plaintiff also avows that she never entered her telephone number into "a computer or other platform at [Defendant's] store" and that she "do[es] not smoke or use any tobacco products, and ha[s] never purchased any tobacco product from [Defendant]." (*Id.* at 30.) Defendant makes no effort to rebut Plaintiff's testimony on these points and admits that it "do[es] not have anything in [its] possession to show any relationship to [Plaintiff]." (*Id.* at 21-22.) Instead, Defendant asserts that consent exists because an unknown person entered Plaintiff's phone number into the Texas store's Lift System and that "person in front of the Lift screen [saw] the disclaimer and [was] aware that there [was] going to be a text message that's going to be occurring after entering the phone number." (*Id.* at 24, 26.)

The Ninth Circuit's decision in *N. L. by Lemos* provides the starting point for assessing whether consent exists under these facts. The question presented in *N. L. by Lemos*: "When a caller who is otherwise subject to the TCPA phones someone who has not consented to its calls, can the caller avoid liability . . . if the person it intended to call had consented to the calls?" 960 F.3d at 1167. In that case, a bank's vendors made almost 200 automated phone calls to N.L., an 11-year-old boy, while trying to collect past-due debt payments from D.V., an unrelated non-party. *Id.* at 1165. Although D.V. had consented to being contacted at the phone number in question, "unbeknownst to the bank, [D.V.'s] cell phone number had been reassigned" to N.L.'s mother. *Id.* The mother sued the bank on behalf of N.L. under a provision of the TCPA "which makes it unlawful to call a cell phone 'using any automatic telephone dialing system,' or ATDS, without the 'prior express consent of the called party.'" *Id.* at 1166. The case went to trial, and one of the disputed issues when formulating the jury instructions was whether the bank could avoid liability by showing that it had "a good-faith basis to believe that [it] had consent to call N.L.'s telephone number" based on the consent previously provided by D.V. *Id.* at 1166. The district court rejected the bank's request for such an instruction, holding instead that "[t]he

law requires the consent of the current subscriber of the called phone, in this case [N.L.'s mother], or the consent of the nonsubscriber, customary user of the called phone, in this case, N.L.  Consent from the intended recipient of the call, that is, D.V., is not sufficient." *Id.* at 1166-67 (cleaned up).  Based on that instruction, the jury returned a verdict in N.L.'s favor and the Ninth Circuit affirmed, holding that the bank's "intent to call a customer who had consented to its calls does not exempt [it] from liability under the TCPA when it calls someone else who did not consent." *Id.* at 1167.

The rule articulated in *N. L. by Lemos* applies with equal force in this case. Defendant correctly points out that *N. L. by Lemos* addressed a different provision of the TCPA—§ 227(b)(1)(A) rather than § 227(a)(4) and (c)(5)—and a reassigned phone number rather than a "wrong number."  But these distinctions were immaterial to the Ninth Circuit's analysis.  Instead, the court in *N. L. by Lemos* reached its conclusion based on principles of statutory interpretation.  960 F.3d at 1167 ("This [rule] follows from the language of the TCPA itself.").  Application of the same principles to § 227(a)(4) and § 227(c)(5) leads to the same conclusion here.

As noted in *N. L. by Lemos*, "[w]e interpret the statute in accordance with its ordinary and natural meaning, considering the key statutory terms in the context in which they are used."  960 F.3d at 1167.  Here, the key provision is 47 U.S.C. § 227(a)(4)(A), which provides that the term "telephone solicitation" does "not include a call or message . . . to any person with *that person's* prior express invitation or permission." *Id.* (emphasis added).  The italicized language provides a clear textual clue that the person receiving the call—in this case, Plaintiff—must be the same person who provided the prior consent. *Cf. N. L. by Lemos*, 960 F.3d at 1168 ("One notices that this provision nowhere references an 'intended' recipient of the calls.  [Defendant's] argument thus starts off in the backseat, for there is no obvious statutory text on which to ground an 'intended recipient.'").

This interpretation is further bolstered by consideration of the statutory and regulatory framework as a whole. *Food & Drug Admin. v. Brown & Williamson Tobacco*

*Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole.") (cleaned up).    Section 227(c)(5), coupled with the relevant regulations, creates a private right of action when "[a] residential telephone subscriber who has registered his or her telephone number on the national [DNC] registry" receives a telephone solicitation.    47 C.F.R. § 64.1200(c)(2).    Read harmoniously together, these provisions reinforce that the person who receives the unwanted text message—*i.e.*, the "residential telephone subscriber"—must be the same "that person" who provided "prior express invitation or permission" under § 227(a)(4)(A).[7]

This reading of the statute is consistent with other cases that have drawn parallels between "consent" under § 227(b)(1) and "express invitation or permission" under § 227(a)(4).    *See e.g.*, *True Health Chiropractic, Inc.*, 896 F.3d at 931 ("We see no distinction between 'express consent' and 'prior express invitation or permission' that would affect which party bears the burden of proving consent."); *Jacksen v. Chapman Scottsdale Autoplex, LLC*, 2023 WL 142533, *2 (D. Ariz. 2023) ("The Court can see no meaningful difference between 'prior express consent' and 'prior express . . . permission.'"); *Gorss Motels Inc. v. A.V.M. Enters., Inc.*, 2021 WL 1163022, *5 (D. Conn. 2021) ("Both because the ordinary meaning of 'prior express permission' and 'prior express consent' are essentially the same and because the statutory and regulatory regimes use these terms interchangeably, the Court finds that these two terms carry an equivalent meaning under the TCPA.").    Indeed, it would be anomalous if the person receiving automated phone calls needed to personally give "express consent" under § 227(b)(1) but an unrelated third party could give "prior express invitation or permission" under § 227(a)(4).

Defendant's arguments to the contrary are unavailing.    Defendant argues, for

---

[7]    Similarly, under 47 C.F.R. § 64.1200(c)(2)(ii), "[a]ny person or entity making telephone solicitations (or on whose behalf telephone solicitations are made) will not be liable for violating this requirement if . . . [i]t has obtained *the subscriber*'s prior express invitation or permission." *Id.* (emphasis added).    This, too, suggests that it is the residential subscriber receiving the unwanted text messages, and not some third party, who must provide "prior express invitation or permission."

example, that adopting Plaintiff's proposed approach "would preclude any company from responding to any inquiry received from any phone number within three months" and negate the "protections specifically provided in 47 C.F.R. § 64.1200." (Doc. 57 at 11.) But other than this blanket citation to 47 C.F.R. § 64.1200, Defendant does not explain what provisions, if any, Plaintiff's proposed interpretation would undermine. Defendant also overlooks that the TCPA creates a broad affirmative defense for defendants who have "established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5). And Defendant further overlooks that the Ninth Circuit considered, and rejected, a similar policy argument in *N. L by Lemos*: "Perhaps because the statutory text stands in opposition to its argument, Credit One focuses more intently on . . . the policy implications of the district court's instruction . . . insist[ing] that imposing liability on a caller that unknowingly dials a reassigned number would undermine the TCPA's intended balance, placing companies in constant risk of staggering statutory damages for calls to reassigned numbers, with no way to know whether any particular number has been reassigned. But Credit One's interpretation conflicts with the very congressional findings upon which it relies . . . ." 960 F.3d at 1169-70 (cleaned up).

Defendant's invocation of the absurdity doctrine fares no better. Defendant argues that Plaintiff's approach would allow TCPA plaintiffs to manufacture lawsuits—"an absurd result . . . antithetical to the spirit and purpose of the TCPA." (Doc. 57 at 11.) But the absurdity doctrine is not a license for courts to rewrite an otherwise valid statute. *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1088 (9th Cir. 2015) ("The absurdity canon isn't a license for us to disregard statutory text where it conflicts with our policy preferences; instead, it is confined to situations where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone. . . . Congress made a policy judgment in selecting the words of section 326(a), and we are in no position to contradict it.") (cleaned up); *Caminetti v. United States*, 242 U.S. 470, 485 (1918) ("It is elementary that the meaning of a statute must, in the first

instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the lawmaking body which passed it, the sole function of the courts is to enforce it according to its terms.").  *Cf. Manufacturers Hanover Tr. Co. v. C.I.R.*, 431 F.2d 664, 668 (2d Cir. 1970) ("[I]t transcends the judicial function to rewrite the statute to conform to considerations of policy.  If the facts of this case demonstrate a . . . loophole Congress, not the courts, should plug it.") (cleaned up). At any rate, and as noted by the Ninth Circuit in *N. L. by Lemos*, it is Defendant's proposed interpretation that would arguably lead to an absurd result: "[W]hy would the 'consent' that could eliminate liability be given by some third person who is alien to the telecommunication that triggered the statute?"  960 F.3d at 1169.

Finally, to the extent Defendant argues that *N. L. by Lemos* was wrongly decided and that the Court should instead follow the decisions of other Circuits, that argument is a non-starter, at least as directed toward this Court.  *Hasbrouck*, 663 F.2d at 933 ("District courts are bound by the law of their own circuit.").

III.    Established Business Relationship

A.    **The Parties' Arguments**

Last, Defendant argues that there can be no liability under the TCPA "where . . . there exists an established business relationship" and that "[its] records indisputably demonstrate the existence of an established or pre-existing business relationship between Plaintiff and [Defendant]."  (Doc. 38 at 6, 8.)  That business relationship, according to Defendant, is evidenced by the fact that "[d]uring the transaction on August 2, 2023, when Plaintiff's phone number was entered, both fuel and cigarettes were purchased from [Defendant].  Indeed, Plaintiff's phone number was entered to directly receive a discount on the cigarette purchase, which also began the enrollment process into [Defendant's] messaging program."  (*Id*.)

Plaintiff responds that Defendant bears the burden of proof as to this affirmative defense (Doc. 51 at 4-5) and argues an established business relationship is lacking here because it requires "a voluntary two-way communication," yet Defendant "fails to offer

any evidence that [Plaintiff] participated in the August 2, 2023 transaction through which [Defendant] contends it obtained her telephone number.  Nor does [Defendant] offer any evidence that [Plaintiff] engaged in any other purchase or transaction with [Defendant] in the eighteen months prior to the text messages at issue during which she provided her telephone number." (*Id.* at 8, citations omitted.)  Plaintiff argues that, to the contrary, she has "presented uncontroverted evidence" that "[s]he never input her telephone number into [Defendant's] Lift system at any time, including on August 2, 2023. . . .  And she has never purchased tobacco products from [Defendant] as she does not smoke, or otherwise use tobacco." (*Id.* at 9.)

In reply, Defendant argues that the same cases it cited in relation to the consent issue are "particularly worth considering when determining the existence of an established business relationship." (Doc. 57 at 10.)  Defendant also argues that *N. L. by Lemos* does not apply to the established business relationship exception because the debt-collection messages in that case came three years after the debt was incurred and "defendant would not have been determined to have an applicable business relationship with the plaintiff in the first place." (*Id.*)  Finally, Defendant seeks to distinguish the cases cited by Plaintiff, arguing that none addressed whether "it was [plaintiff] or another party who made an inquiry or purchase." (*Id.* at 10-11.)

B. **Analysis**

There can be no liability under 47 U.S.C. § 227(c)(5) for a call or message that is sent "to any person with whom the caller has an established business relationship."  47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2).  *See also Hovila v. Tween Brands, Inc.*, 2010 WL 1433417, *5 (W.D. Wash. 2010) ("[T]he Court finds that plaintiff and defendant's relationship falls within the EBR [established business relationship] exemption to the TCPA.  The Court therefore GRANTS defendant's motion for summary judgment.").  The federal regulations define "established business relationship" to mean:

> [A] prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months

immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(c)(2)(ii).

For similar reasons that consent is lacking here, Defendant cannot take advantage of the "established business relationship" exception. The relevant statutory provision is 47 U.S.C. § 227(a)(4)(B), which provides that the term "telephone solicitation" does "not include a call or message . . . to any person *with whom* the caller has an established business relationship." *Id.* (emphasis added). This italicized language suggests that the person receiving the message—here, Plaintiff—and the person having the established business relationship with Defendant must be the same person. However, Plaintiff did not have an established business relationship with Defendant at the time she received the text messages. The relevant regulation states that an established business relationship may arise from a voluntary communication between an entity and a "residential subscriber" involving "the subscriber's" purchase or transaction or "the subscriber's" inquiry or application. 47 C.F.R. § 64.1200(c)(2)(ii). Here, the relevant "subscriber" is Plaintiff, but Plaintiff did not complete any purchases or transactions with Defendant and did not submit any inquiries or applications to Defendant. True, Defendant may have entered into an established business relationship with the unknown person who entered Plaintiff's phone number into the Lift system in Defendant's store in Texas, but that encounter did not involve any purchase, transaction, inquiry, or application by Plaintiff herself. Thus, Plaintiff cannot be said to have entered into an established business relationship with Defendant.

This conclusion is consistent with how the FCC has defined "business relationship" in its administrative guidance. Although Defendant argues that "the FCC rejected any narrow definition in favor of a broad definition that encompasses a wide variety of business relationships" (Doc. 38 at 8, cleaned up), none of the sources cited by Defendant supports an understanding of "business relationship" that is broad enough to include a relationship between a residential subscriber and a company that receives the subscriber's phone

number without that person's knowledge or consent. Even under the broadest possible understanding of "established business relationship," "the exemption focuses on the relationship between the sender of the message and the consumer." *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14078, 14081 (2003) ("We emphasize here that the definition of 'established business relationship' requires a voluntary two-way communication *between a person or entity and a residential subscriber* . . . . Any seller or telemarketer using the [established business relationship] as the basis for a telemarketing call must be able to demonstrate, with clear and convincing evidence, that they have an [established business relationship] *with the called party*.") (emphasis added). Such a relationship is absent here.

To the extent Defendant contends its proposed approach is preferable as a matter of public policy and is necessary to avoid absurd outcomes (Doc. 57 at 11), those arguments fail for the same reasons as Defendant's parallel arguments concerning the consent exception. Finally, to the extent Defendant suggests that a business can have an established business relationship with a phone number rather than a person—"This is not even a 'wrong number case' in the sense used by separate cases, in which the caller misdials a phone number, for which the incorrectly dialed number never provided consent or there was no business relationship with that phone number" (*id.* at 8 n.4, emphasis omitted)— this argument fails because, as discussed above, the statutory text and relevant regulations require the relationship to be with the subscriber.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (Doc. 38) is **denied.**

Dated this 27th day of January, 2025.

Dominic W. Lanza
United States District Judge

- 27 -