1
2
3
4
5
6 **IN THE UNITED STATES DISTRICT COURT**
7 **FOR THE DISTRICT OF ARIZONA**
8

| | |
|---|---|
| 9 Monica Abboud, | No. CV-23-01683-PHX-DWL |
| 10        Plaintiff, | **ORDER** |
| 11 v. | |
| 12 Circle K Stores Incorporated, | |
| 13        Defendant. | |
| 14 | |
| 15 | |

16        In advance of the motion hearing on September 17, 2025, the Court wishes to
17 provide the parties with its tentative ruling. The point of providing it beforehand is to
18 streamline oral argument and enhance the parties' ability to address any perceived errors
19 in the Court's tentative analysis. This is not an invitation to submit additional evidence or
20 briefing. Also, if the parties jointly agree, after reviewing the tentative ruling, that oral
21 argument is unnecessary, they may file a stipulation to vacate oral argument and issue a
22 final order based on the tentative ruling.
23        Dated this 12th day of September, 2025.

24
25
26                                        Dominic W. Lanza
27                                  United States District Judge
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14                    <u>TENTATIVE RULING</u>
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In this putative class action, Monica Abboud ("Plaintiff") alleges that Circle K Stores Inc. ("Defendant") violated the Telephone Consumer Protection Act ("TCPA") by sending several text messages to her after she registered her phone number on the National Do Not Call Registry ("DNC Registry").  Plaintiff also alleges that Defendant sent identical text messages to millions of other persons whose telephone numbers appear on the DNC Registry (the "proposed Class") and to hundreds of people, like her, who never provided their telephone phone numbers to Defendant (the "proposed Subclass").  Now pending before the Court is Plaintiff's motion for class certification and appointment of counsel. (Doc. 69.)  For the reasons that follow, the Court certifies Plaintiff's proposed Subclass but declines to certify the proposed Class.

## BACKGROUND

I.    <u>Relevant Factual Background</u>

    A.    **The Parties**

Since before 2023, Plaintiff has been the "regular and customary user of . . . [t]he telephone number ending in 3670."  (Doc. 51-1 at 29 ¶¶ 4-5.)  That phone number "is assigned to a cellular telephone service and [Plaintiff] use[s] the phone number as a residential telephone line."  (*Id.* at 29 ¶ 5.)  Plaintiff "registered [her] telephone number . . . on the [DNC Registry] prior to 2023 and it has remained registered since that time."  (*Id.* at 29 ¶ 6.)

Defendant is a corporation headquartered in Tempe, Arizona, and its "business is selling fuel and convenience store items."  (*Id.* at 6.)  Defendant has "close to 14,000 stores" globally and "[r]oughly, 7,000 stores" throughout the United States.  (*Id.*)

    B.    **The Messaging Program**

Defendant "operates a messaging program through which customers can affirmatively opt-in to the receipt of messages containing notice of discounts on products at [Defendant's] stores."  (Doc. 39-1 at 4 ¶ 3.)  More specifically, Defendant "offers a 'Tobacco club' (or Marlboro Club) program through which customers can sign up by entering their phone number on a touchscreen display," called the Lift System, that is

located at the checkout counter. (*Id.* at 4 ¶¶ 5-6.)    This 20-inch screen displays advertisements in a loop when no transaction is taking place. (Doc. 51-1 at 7-8.) However, when a customer or sales attendant scans a certain product at the checkout counter, the Lift System "show[s] a screen to upsell the customer for . . . a promo that's related to the item that's been scanned." (*Id.* at 8, 13.) At that point, the customer has the option to enter a phone number into the Lift System. (*Id.* at 13.) Under the Tobacco club program, a customer who enters a phone number will "save $1.70 instantly when [they] buy a 2nd identical item." (Doc. 39-1 at 8.) Small text at the bottom of the screen informs the customer that:

> By providing my mobile number, I consent to receiving marketing messages via automated technology from Circle K/Holiday to the mobile number provided above. I understand my consent is not a condition of purchase. I understand that entering the mobile number provided above enrolls me in all Circle K/Holiday text message programs, and that my consent applies to all Circle K/Holiday text message programs.

(*Id.*)

Once the customer enters a phone number and receives the discount, that customer's interaction with the Lift System ends. (Doc. 51-1 at 14-15.) However, upon entry of the phone number, an automatic process is triggered that results in a text message being sent to the just-entered phone number. (*Id.* at 16-17.) First, the phone number is uploaded to the Lift System cloud, and that system then transmits the phone number to a third-party messaging service, Mobivity Holdings Corp ("Mobivity"), and asks Mobivity to send a text message to the number. (*Id.*) Defendant refers to this sequence as "a double opt-in process. If an individual enters their phone number to consent to enroll in [Defendant's] messaging program, [Defendant] sends a message to the individual asking them to respond 'YES' to complete their sign-up." (Doc. 39-1 at 4 ¶ 8.) Defendant then "sends up to three confirmation messages" (*id.* at 4 ¶ 9), with "about a month" between each text message (Doc. 51-1 at 20). "If the individual either (a) responds 'STOP' to opt-out or (b) fails to respond following the third confirmation attempt, the individual is opted out and will not

receive any discount or marketing messages." (Doc. 39-1 at 4 ¶ 10.)[1]

### C.     The Transaction And Text Messages

On August 2, 2023, someone entered Plaintiff's phone number ending in 3670 into the Lift System at one of Defendant's stores in Texas to receive a discount on cigarettes. (Doc. 39-1 at 14-32. *See also* Doc. 39 at 4 [explaining the electronic records].) This action "began the enrollment process into [Defendant's] messaging program" (Doc. 39 at 4) and Defendant ultimately sent four text messages to Plaintiff's phone number ending in 3670, to which she never responded. (39-1 at 34.) Those text messages read:

• <u>August 2, 2023:</u> "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. 855-276-1947." (Doc. 39-1 at 34.)

• <u>August 2, 2023:</u> "Circle K: Reply 'YES' to get offers via txt. Go to myck.site/k2KmEU, Age-verify 18/21+ offers. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. 855-276-1947." (*Id.*)

• <u>September 11, 2023:</u> "Circle K: Reply 'YES' to get offers via txt. Go to myck.site/Qb9PtF, Age-verify 18/21+ offers. Msg & Data rates may apply. Txt 'STOP' to Opt-Out. 855-276-1947." (*Id.*)

• <u>September 12, 2023:</u> "Circle K: Opt-Out confirmed. Thank you for responding. Msg & Data rates may apply. To Sign Up in the future reply yes. 855-276-1947." (*Id.*)[2]

Plaintiff avows that she never consented to receive text messages from Defendant or Mobivity and "never provided, or authorized anyone to provide" her telephone number to either party. (Doc. 51-1 at 29-30 ¶¶ 7-8, 10-13.) Plaintiff also avows that she never entered her telephone number into "a computer or other platform at [Defendant's] store" and that she "do[es] not smoke or use any tobacco products, and ha[s] never purchased any

---

[1]     If a recipient responds with "wrong number" instead of "STOP," the system will send that person a duplicate of the first text message. (Doc. 51-1 at 25.) If, at that point, the recipient fails to respond, the automated messages will cease. (*Id.*)

[2]     Although the final message reads "[t]hank you for responding" (Doc. 39-1 at 34) Defendant's representative states that "Plaintiff did not respond to [Defendant's] messages" and "Plaintiff was affirmatively opted-out" (*id.* at 5).

1    tobacco product from [Defendant]." (*Id.* at 30 ¶¶ 9, 14.) Defendant admits it "do[es] not

2    have anything in [its] possession to show any relationship to [Plaintiff]." (*Id.* at 21-22.)

3        D.    **Putative Class Members**

4        Plaintiff alleges that Defendant sent similar text messages to other people, like her,

5    whose telephone numbers were registered on the DNC Registry. (Doc. 63 ¶ 3.) In support

6    of these allegations, Plaintiff attaches the report of her expert, Dr. Olund. (Doc. 74-1.)

7        Plaintiff initially sought discovery from Defendant of "electronically stored

8    information sufficient to identify the unique telephone numbers to which Defendant . . .

9    delivered or attempted to deliver during any twelve-month period with[in] the Relevant

10   Time Period at least two text messages that read, in part, either 'Circle K: Reply 'YES' to

11   Sign Up to receive special offers via txt message' or 'Circle K: Reply 'YES' to get offers

12   via txt.'" (Doc. 43-1 at 4 ¶ 12 [discovery request].) After the Court ordered Defendant to

13   comply with the discovery request (Doc. 46), Plaintiff retained Dr. Olund to analyze the

14   "data produced via an external hard drive prepared by the Defendant." (Doc. 74-1 at 5

15   ¶ 11.) Based on this analysis, Dr. Olund estimates that the files contain 37,880,244 unique

16   phone numbers. (*Id.* at 6-7.) Dr. Olund then took "a 5,000 record sample of text messages

17   believed to have been sent in February 2021" and cross-referenced those recipient

18   telephone numbers with data from a "third party DNC Registry data provider." (*Id.* at 5-6

19   ¶¶ 12-13.) Based on that analysis, Dr. Olund concluded that "approximately 22% were

20   registered on the DNC Registry at least 31 days before the start of the class period." (Doc.

21   69 at 8.) Plaintiff argues this analysis provides an approximation of putative Class

22   membership, that is:

23       All persons throughout the United States (1) to whom Circle K Stores Inc.
         delivered, or directed to be delivered, more than one text message within a
24       12-month period, which read, in part, either "Circle K: Reply 'YES' to Sign
         Up to receive special offers via txt message" or "Circle K: Reply 'YES' to
25       get offers via txt", (2) where the person's residential telephone number had
         been registered with the National Do Not Call Registry for at least thirty days
26       before Circle K Stores, Inc. delivered or directed to be delivered at least two
         of the text messages within the 12-month period, (3) from June 6, 2020
27       through the date of class certification.

28

(Doc. 63 ¶ 45 [defining proposed Class]; Doc. 69 at 8 ["[T]here are millions of persons who fall within this Class definition."].)

In addition, during the discovery process, Defendant provided Plaintiff with "all incoming text messages to [Defendant] in which an individual messaged [Defendant] stating 'wrong number,' 'wrong telephone number,' 'wrong #,' 'wrong phone,' 'incorrect number,' 'incorrect #,' 'incorrect phone,' 'bad number,' 'bad phone number,' or 'wrong person.'"  (Doc. 69-2 ¶ 2.)  After refining and filtering this dataset, Dr. Olund identified 219 unique phone numbers "on the National DNC Registry 31+ days prior to June 6, 2020." (Doc. 74-1 at 4, capitalization omitted.)  According to Plaintiff, this number represents an approximation of putative Subclass membership, that is:

> All persons throughout the United States (1) who did not provide their telephone number to Circle K Stores Inc., (2) to whom Circle K Stores Inc. delivered, or directed to be delivered, more than one text message within a 12-month period, which read, in part, either "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message" or "Circle K: Reply 'YES' to get offers via txt", (3) where the person's residential telephone number had been registered with the National Do Not Call Registry for at least thirty days before Circle K Stores, Inc. delivered or directed to be delivered at least two of the text messages within the 12-month period, (4) from June 6, 2020 through the date of class certification.

(Doc. 64 ¶ 45 [defining proposed Subclass].)

Defendant disputes the accuracy of these estimates.  (Doc. 78-1 at 137-95 [expert rebuttal reports].)

II.    Procedural History

On August 17, 2023, Plaintiff initiated this action.  (Doc. 1.)

On October 20, 2023, Plaintiff filed the First Amended Complaint ("FAC"), alleging additional facts to support her TCPA claim and revising the class definition.  (Doc. 11.)

On November 3, 2023, Defendant moved to dismiss the FAC for failure to state a claim or, in the alternative, to strike class allegations.  (Doc. 13.)

On April 24, 2024, the Court denied Defendant's motion to dismiss.  (Doc. 20.)

On June 5, 2024, with Defendant's consent, Plaintiff filed the Second Amended Complaint ("SAC").  (Doc. 28.)  The SAC added Mobivity as a defendant.  (*Id.*)

On July 16, 2024, Defendant filed a motion for summary judgment.  (Doc. 38.)

On September 11, 2024, Plaintiff filed a motion to amend the SAC in two respects: (1) removing Mobivity as a Defendant; and (2) refining the proposed Class while adding the proposed Subclass.  (Doc. 55.)

On November 8, 2024, the Court granted Plaintiff's amendment request.  (Doc. 62.)

On November 13, 2024, Plaintiff filed her operative pleading, the Third Amended Complaint ("TAC").  (Doc. 63.)

On December 12, 2024, Plaintiff filed the pending motion for class certification and appointment of counsel.  (Doc. 69.)

On January 27, 2025, the Court denied Defendant's summary judgment motion. (Doc. 77.)  That same day, Defendant filed a response to Plaintiff's motion for class certification.  (Doc. 78.)  The response brief included a "supplemental expert rebuttal report" from Madelyn Moran as an exhibit (the "Supplemental Report").  (Doc. 78-1 at 179-95, capitalization omitted.)

On February 26, 2025, Plaintiff filed a reply.  (Doc. 81.)  Pursuant to LRCiv 7.2(m)(2),[3] Plaintiff requested the Court to strike the Supplemental Report.  (*Id.*)

On March 6, 2025, the parties filed a joint motion for: "(1) [Defendant] to file a two (2) page response to [Plaintiff's] request, contained in her reply in support of her motion for class certification, to strike the [Supplemental Report]; and (2) [Plaintiff] to file an optional two (2) page reply in support of its request to strike the Supplemental Report." (Doc. 82 at 2.)

On March 7, 2025, the Court granted the parties' joint motion.  (Doc. 84.)  That same day, Defendant filed its two-page response.  (Doc. 85.)

On March 12, 2025, Plaintiff filed a two-page reply.  (Doc. 86.)

---

[3]    LRCiv 7.2(m)(2) provides that "[a]n objection to (and any argument regarding) the admissibility of evidence offered in support of or opposition to a motion must be presented in the objecting party's responsive or reply memorandum and not in a separate motion to strike or other separate filing."

On September 12, 2025, the Court issued a tentative ruling.  (Doc. 92.)

On September 17, 2025, the Court heard oral argument.

## LEGAL STANDARD

### I.    Class Certification

"At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action."  Fed. R. Civ. P. 23(c)(1)(A).  Under Rule 23(a), "[o]ne or more members of a class may sue . . . as representative parties on behalf of all members only if":

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

*Id.*  In addition, under Rule 23(b)(3), the certifying court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  *Id.*[4]

"Before a class may be certified, the district court must conduct a rigorous analysis to determine if the prerequisites of FRCP 23 have been satisfied."  *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (cleaned up).  "Plaintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022).  The standard of proof is a preponderance of the evidence.  *Id.*  "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves

---

[4]    Plaintiff does not seek class certification under Rule 23(b)(1) or Rule 23(b)(2).

1  considerations that are enmeshed in the factual and legal issues comprising the plaintiff's

2  cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (cleaned up).

3  However, the "[m]erits questions may be considered only to the extent that they are

4  relevant to determining whether the Rule 23 prerequisites for class certification are

5  satisfied." *Olean Wholesale*, 31 F.4th at 667 (cleaned up).

6  II.    Telephone Consumer Protection Act

7      The TCPA and its implementing regulations prohibit initiating "more than one

8  telephone [solicitation] within any 12-month period" to "[a] residential telephone

9  subscriber who has registered his or her telephone number on the national do-not-call

10 registry of persons who do not wish to receive telephone solicitations that is maintained by

11 the Federal Government." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). "Telephone

12 solicitation" is defined as "the initiation of a telephone call or message for the purpose of

13 encouraging the purchase or rental of, or investment in, property, goods, or services, which

14 is transmitted to any person, but such term does not include a call or message (A) to any

15 person with that person's prior express invitation or permission, (B) to any person with

16 whom the caller has an established business relationship, or (C) by a tax exempt nonprofit

17 organization." 47 U.S.C. § 227(a)(4). A telephone solicitation can be a call or text

18 message. 47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph (c) and (d) of this

19 section are applicable to any person or entity making telephone solicitations or

20 telemarketing calls or text messages to wireless telephone numbers.").

**DISCUSSION**

21

22 I.    The Proposed Class

23     The proposed Class includes all persons whose residential phone numbers are

24 registered on the DNC Registry and to whom Defendant sent more than one text message

25 within a 12-month period, which text messages read, in part, "Circle K: Reply 'YES' to

26 Sign Up to receive special offers via txt message" or "Circle K: Reply 'YES' to get offers

27 via txt." (Doc. 63 ¶ 45.) Defendant does not challenge numerosity or commonality with

28 respect to the Class. Instead, Defendant argues the "proposed class is overbroad,"

"individual issues of consent and established business relationship predominate over purported common issues," "Plaintiff pursues an atypical claim," and "Plaintiff is not an adequate representative." (Doc. 78 at 8-13, 17-20, capitalization omitted.) Because predominance and typicality are dispositive, the analysis begins there.

A. **Predominance**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This "inquiry asks the court to make a global determination of whether common questions prevail over individualized ones. For purposes of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (cleaned up). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as . . . some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) (citation omitted).

At the same time, "[d]efenses that must be litigated on an individual basis can defeat class certification," *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018), particularly when individualized questions are "complicated" and there is no "representative evidence introduced to fill . . . evidentiary gap[s]," *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 471 (9th Cir. 2023). The predominance analysis ultimately turns on "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Ambrosio v. Progressive Preferred Ins. Co.*, __ F.4th __, 2025 WL 2628179, *3 (9th Cir. 2025) (citation omitted). "A district court is in the best position to determine whether

individualized questions . . . will overwhelm common ones and render class certification inappropriate under Rule 23(b)(3)."  *Olean Wholesale*, 31 F.4th at 669 (cleaned up).

### 1.    The Parties' Arguments

Plaintiff identifies several common questions of law and fact that are susceptible to class-wide proof, such as "whether the Offer Text messages are 'telephone solicitations' under the TCPA" and "[w]hether [Defendant] sent Offer Text messages to telephone numbers on the DNC Registry."  (Doc 69 at 10-11.)  Plaintiff also argues that "whether Class . . . members could effectively give consent by agreeing to [Defendant's] terms and conditions on its Lift [System]" is a common question.  (*Id*. at 11)  Further, to the extent consent is an individual question, Plaintiff argues it will not predominate over common questions because Defendant "cannot identify any person who entered a telephone number into its Lift system" and therefore Defendant "acknowledges that it cannot establish a defense of prior express consent, or established business relationship ('EBR'), as to any member of the Class . . .  because it cannot prove the identity of any of the persons from whom it obtained the telephone numbers to which it sent Offer Text Messages."  (*Id*. at 14.)  Last, Plaintiff argues that "to be TCPA compliant, a consumer's consent to receive solicitations from a seller must comply with the E-SIGN Act" and that the Lift System does not contain many of the disclosures required by that statute.  (*Id*. at 14-15.)

In response, Defendant identifies two issues that will require individualized proof: (1) "express invitation or permission"; and (2) EBR.  (Doc. 78 at 10-13.)  Defendant argues that it "has presented evidence that every customer it messaged provided consent and created a business relationship prior to [Defendant] sending even the opt-in confirmation message" and that these two issues "will necessarily predominate" because Plaintiff has not "advance[d] a viable theory employing generalized proof to establish liability" or otherwise shown that "individual adjudication of the pivotal element of prior express consent is unnecessary."  (*Id*. at 9-10.)  According to Defendant, class-wide adjudication of this issue is impossible because "the form of consent . . . is not at issue here" and the "wide permutation of factual scenarios on issues surrounding potential consent or EBR

1    defenses for each potential class member must be determined case-by-case." (*Id.* at 13-

2    14.) Defendant also argues that Plaintiff's reliance on the E-Sign Act is misplaced because

3    "compliance with E-SIGN" is not "the 'only' form of compliance under the TCPA" and,

4    in any case, non-compliance with the E-Sign Act "would not address or negate

5    individualized issues concerning EBRs whatsoever." (*Id.* at 16-17 nn.11-12.)[5]

6          In reply, Plaintiff reiterates that Defendant "cannot identify a single person by name

7    who provided consent." (Doc. 81 at 2.) According to Plaintiff, consent and EBR are "both

8    affirmative defenses for which [Defendant] bears the burden of proof" and "[t]his Court

9    cannot presume the existence of evidence of consent that [Defendant] has not provided in

10   the eighteen months since this case was filed." (*Id.* at 1-2.)

11                    2.    <u>Analysis</u>

12         Plaintiff has failed to show that common questions predominate over individual

13   issues with respect to the proposed Class. There can be no liability under 47 U.S.C.

14   § 227(c)(5) for a call or message that is sent "to any person with that person's prior express

15   invitation or permission." 47 U.S.C. § 227(a)(4); 47 C.F.R. § 64.1200(c)(2). *See also*

16   *Johansen v. Nat'l Gas & Elec. LLC*, 2018 WL 3933472, *5 (S.D. Ohio 2018) ("[A] call is

17   excluded from the definition of a telephone solicitation if it is placed to any person with

18   that person's prior express invitation or permission."). The federal regulations require that

19   a person's prior express invitation or permission "must be evidenced by a signed, written

20   agreement between the consumer and seller which states that the consumer agrees to be

21   contacted by this seller and includes the telephone number to which the calls may be

22   placed." 47 C.F.R. § 64.1200(c)(2)(ii).

23         Similarly, there can be no liability under 47 U.S.C. § 227(c)(5) for a call or message

24   that is sent "to any person with whom the caller has an" EBR. 47 U.S.C. § 227(a)(4); 47

25   C.F.R. § 64.1200(c)(2). *See also Hovila v. Tween Brands, Inc.*, 2010 WL 1433417, *5

26   (W.D. Wash. 2010) ("[T]he Court finds that plaintiff and defendant's relationship falls

27

28   ---

     [5]    Defendant also argues that, to the extent the form of consent is at issue, it
     undermines Plaintiff's arguments as to adequacy and typicality. (Doc. 78 at 18.) That
     argument is addressed in a separate portion of this order.

within the EBR exemption to the TCPA.  The Court therefore GRANTS defendant's motion for summary judgment.").  The federal regulations define EBR to mean:

> [A] prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

47 C.F.R. § 64.1200(c)(2)(ii).

As a preliminary matter, the parties disagree over who has the burden of showing that consent and EBR are (or are not) common questions susceptible to class-wide proof. Consent "is not an element of a plaintiff's prima facie case but is an affirmative defense for which the defendant bears the burden of proof" at trial.  *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017).  *See also True Health Chiropractic, Inc.*, 896 F.3d at 931 ("We see no distinction between 'express consent' and 'prior express invitation or permission' that would affect which party bears the burden of proving consent.").  The parties also appear to agree that EBR is an affirmative defense.  (Doc. 69 at 14 ["[Defendant] . . . cannot establish a defense of prior express consent, or [EBR]."]; Doc. 78 at 8 ["[C]onsent and/or EBRs present 'a complete defense' to a TCPA claim."].) This burden at trial "strongly affects" the predominance analysis.  *True Health*, 896 F.3d at 931.  "Since [Defendant] bears the burden, we assess predominance by analyzing the consent defenses [Defendant] has actually advanced and for which it has presented evidence."  *Id.*  Plaintiff, however, ultimately "retain[s] the burden of showing that the proposed class satisfies the requirements of Rule 23, including the predominance requirement."  *Id.*

In *True Health*, the plaintiff sought to represent a class of businesses and individuals that received unsolicited fax advertisements in violation of the TCPA.  *Id.* at 925-26.  The district court found that individual issues of consent would predominate based on three exhibits submitted by the defendant "listing putative class members who purportedly

consented." *Id.* at 927, 932.  Exhibit A showed putative class members who "provided their fax numbers when registering a product" with the defendant's subsidiary and/or "entered into software-licensing agreements" with the defendant's subsidiary.  *Id.* at 927 (cleaned up).  Exhibit B—a subset of Exhibit A—listed putative class members who either "checked a box during their software registration," "completed a written consent form," or "confirmed, via phone, that they would like to continue to receive faxes." *Id.* (cleaned up). Exhibit C, a second subset of Exhibit A, listed putative class members who "gave consent in individual 'oral or email' communications with [the defendant's] sales representatives." *Id.*

For the customers listed in Exhibit A (minus the subset of customers in Exhibits B and C), the Ninth Circuit held that individual questions of consent did not predominate because "there [was] little or no variation in the product registrations and the [software licensing agreements]" and "[c]onsent, or lack thereof, [was] ascertainable by simply examining" those documents.  *Id.* at 932.  However, for the customers listed in Exhibit C, the Ninth Circuit held that individual questions of consent predominated because those defenses were "based on individual communications and personal relationships between [the defendant's] representatives and their customers." *Id.*  For the customers listed in Exhibit B, the Ninth Circuit remanded the class determination to the district court for additional proceedings.  *Id.* at 932-33.

If consent were the only affirmative defense at issue here, the question of predominance would present a close call in light of *True Health*.  On the one hand, Defendant has presented evidence that it "does not message consumers" until "a consumer's telephone number is entered into a touchscreen display located at the transaction counters at [Defendant's] store locations, or when the consumer otherwise enrolls through an online sign-up form or also when an individual messages [Defendant] in the first place."  (Doc. 39-1 at 4 ¶ 4.)  In addition, when a customer inputs a phone number into the Lift System, small text at the bottom of the screen informs the customer that "providing my mobile number" constitutes "consent to receiving marketing messages

via automated technology" and "enrolls me in all Circle K/Holiday text message programs." (*Id.* at 8.) Thus, there is a colorable argument that the members of the proposed Class here are akin to the customers listed in Exhibit C in *True Health*, *i.e.*, customers as to whom the question of consent would turn on the circumstances of each person's "individual communications" with Defendant via the Lift System. On the other hand, Defendant cannot prove, with certainty, that each person who received text messages was the same person who entered the corresponding phone number into the Lift System. Additionally, the form of consent solicited via the Lift System may not be TCPA-compliant, and litigation over that consent-related issue would be susceptible to class-wide resolution, similar to the customers listed in Exhibit A in *True Health*. *Mantha v. Quotewizard.com, LLC*, 2021 WL 6061919, *8 (D. Mass. 2021).

Consent, however, is not the only affirmative defense advanced by Defendant—Plaintiff also has the burden of showing that EBR is a common question capable of class-wide resolution. Plaintiff has failed to carry this burden for two reasons. First, Plaintiff has not advanced a theory to explain why customers who enter their phone number into the Lift System and later receive a text message fall outside the EBR defense. EBR creates a complete defense to liability when there is a "a voluntary two-way communication between a person or entity and a residential subscriber . . . on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call." 47 C.F.R. § 64.1200(c)(2)(ii). This definition appears, on its face, to contemplate the relationship between Defendant and an significant portion of the proposed Class.[6] The proposed Class is thus "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct." *Olean Wholesale*, 31 F.4th at 669 n.14 (cleaned up). In such

---

[6]    Plaintiff's counsel estimates there are "millions of persons who fall within th[e] Class definition." (Doc. 69 at 8.) However, Plaintiff's expert estimates that only 219 of those persons responded to Defendant with some variation of the word "wrong number" (Doc. 71-4 at 4) and, therefore, likely did not have an EBR with Defendant. Nor does Plaintiff provide any estimate (let alone evidence) of how many putative Class members, like her, lacked an EBR with Defendant, received text messages from Defendant, and yet never responded.

1  cases, "the class is defined too broadly to permit certification." *Id.*[7]

2    Second, even if Plaintiff had advanced a viable theory to counter Defendant's

3  affirmative EBR defense, Plaintiff has not identified a body of evidence that will allow the

4  Court to resolve this issue "in one stroke." *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

5  338, 350 (2011) (defining common vs. individual question). The record is somewhat

6  underdeveloped on this point because Plaintiff contends she never entered a phone number

7  into the Lift System and the little evidence available suggests that the Lift System wasn't

8  the only way Defendant obtained the telephone numbers it used in its messaging program.

9  (Doc. 39-1 at 4 ¶ 4 ["[Defendant] does not message consumers without their prior express

10 consent, which is given when a consumer's telephone number is entered into a touchscreen

11 display located at the transaction counters at [Defendant's] store locations, *or when the*

12 *consumer otherwise enrolls through an online sign-up form or also when an individual*

13 *messages [Defendant] in the first place*."]). Plaintiff has not proposed a method for sorting

14 and adjudicating these factual questions on a class-wide basis. As a result, this case is

15 distinguishable from other TCPA cases where district courts have found that common

16 questions predominate over individual affirmative defenses. *Compare Vance v. DirecTV,*

17 *LLC*, 2022 WL 3044653, *8 (N.D.W. Va. 2022) ("Any individual issues or defenses are

18 limited and easily resolved with aggregate data from defendant DirecTV."); *Knapper v.*

19 *Cox Commc'ns, Inc.*, 329 F.R.D. 238, 246 (D. Ariz. 2019) ("[I]t appears likely that

20 determining whether someone gave consent, and how, should not result in individual mini-

21 trials because the issue of consent would likely be of little concern and could be traced to

22 one source—Defendant's records."). *See also Hiller v. Money Source Inc.*, 2025 WL

23 1331702, *5 (D. Ariz. 2025) ("[T]he Court foresees that the question of consent revocation

24 will be amenable to a rather simple and straightforward resolution. . . . [The class]

25 definition makes clear that Plaintiff expects the issue of consent revocation to be

26 determined largely, if not entirely, based upon a limited set of documents that have already

27 been subject to discovery, namely Defendant's business records."). Because individual

28
---
[7] In *Olean Wholesale*, the Ninth Circuit identified this flaw in the course of its predominance analysis under Rule 23(b)(3), so the Court follows the same approach here.

inquiries into EBRs threaten to overwhelm common questions, class certification is inappropriate with respect to the proposed Class.

        **B.**    **Typicality**

The certification request as to the proposed Class also fails for an independent reason—Plaintiff has failed to show that her claims are typical of the proposed Class. "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class. The requirement is permissive, such that representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (citation omitted). "[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class." *Id.* at 1118. However, a class representative fails the typicality requirement if he or she "is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Some courts have also found that a plaintiff's claim is atypical when an affirmative defense is available against absent class members but unavailable against the class representative. *Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021). *See also Ward v. Crow Vote LLC*, 343 F.R.D. 133, 145 (C.D. Cal. 2022) ("The same principle—that a named plaintiff's inability to raise arguments on behalf of putative class members renders that plaintiff atypical—was reaffirmed in *Lawson*.")

        1.    The Parties' Arguments

Plaintiff argues that her claims are "typical of the claims of the Class" because she and the other members of the proposed Class "were each harmed in the same way by [Defendant's] common practice of delivering telephone solicitations via text message to persons whose telephone numbers were on the DNC registry." (Doc. 69 at 13.)

In response, Defendant argues that Plaintiff's claim is atypical because consent and EBR defenses will be central to the litigation, yet neither applies to Plaintiff. (Doc. 78 at 2 ["99.9978% of persons [in the proposed Class] presumably gave their express and willing

consent to be contacted by [Defendant] during a business transaction."]; *id.* at 17 ["Plaintiff pursues an atypical claim in which even if [Defendant's] Lift system provides a fully TCPA-compliant form of consent . . . she would still have purportedly been messaged without her consent or an EBR."].)

2.    Analysis

In *Lawson*, the Ninth Circuit affirmed a district court's denial of class certification in an action brought by a food delivery driver who claimed he had been misclassified as an independent contractor rather than as an employee.  13 F.4th at 909.  The Ninth Circuit explained that the plaintiff was "neither typical of the class nor an adequate representative" because "[a]ll members of [the plaintiff's] putative class—except [the plaintiff] and one other—signed agreements waiving their right to participate in a class action."  *Id.* at 913.

This case shares notable similarities with *Lawson*.  Like the waiver argument in *Lawson*, EBR is an affirmative defense.  *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 268-69 (S.D. Cal. 2023) ("[T]o prove its affirmative defense of class action waiver, Marriott would bear the burden to establish that Lead Plaintiffs both (1) had notice of Marriott's terms and conditions, which included a class action waiver; and (2) agreed to those terms and conditions.")  In *Lawson*, it was also likely that the defendants would prevail on their affirmative defense.  13 F.4th at 913 ("[T]he record is clear that they waived the right to have any dispute or claim brought between or among them, or heard or arbitrated as a class action.") (cleaned up).  Here, similarly, Defendant has introduced evidence suggesting that a substantial number of proposed Class members had an EBR with Defendant.  *Cf. Bustillos v. W. Covina Corp. Fitness, Inc.*, 2022 WL 423396, *3 (C.D. Cal. 2022) (concluding that the lead plaintiff in a putative TCPA class action was "entirely atypical of the class she seeks to represent" because "unlike all or virtually all of the other class members," she "never signed any agreement consenting to be contacted by Defendant" and thus "has no stake in whether the agreements signed by other class members satisfied the requirements of the TCPA and its implementing regulations"); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 987 (N.D. Cal. 2019) ("The Ninth Circuit has suggested that a single

class should not be certified when it is comprised of members who both are and are not subject to contractual agreements requiring mandatory arbitration and waiver of class action rights.  The same reasoning applies to an affirmative defense like express consent here.") (citation omitted).  Plaintiff has therefore failed to meet her burden of satisfying Rule 23(a)(3)'s typicality requirement.

II.     The Proposed Subclass

Plaintiff also seeks certification of the proposed Subclass, which includes all persons "who did not provide their telephone number to [Defendant]" and "to whom [Defendant] delivered, or directed to be delivered, more than one text message within a 12-month period, which read, in part, either 'Circle K: Reply 'YES' to Sign Up to receive special offers via txt message' or 'Circle K: Reply 'YES' to get offers via txt.'"  (Doc. 64 ¶ 45.)

"When appropriate, a class may be divided into subclasses that are each treated as a class under [Rule 23]."  Fed. R. Civ. P. 23(c)(5).  "[E]ach subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."  *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

A.     **Numerosity**

The first requirement under Rule 23(a) is numerosity.  "The requirement is met if, due to class size, it would be extremely difficult or inconvenient to join all class members."  *Brink v. First Credit Res.*, 185 F.R.D. 567, 569 (D. Ariz. 1999) (cleaned up).  "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980).  "The Supreme Court has held fifteen is too small."  *Harik v. Cal. Teachers Ass'n*, 326 F.3d 1042, 1051 (9th Cir. 2003).  However, "courts [generally] find the numerosity requirement satisfied when a class includes at least 40 members."  *Rannis v. Rechia*, 380 F. App'x 646, 651 (9th Cir. 2010).

1.     The Parties' Arguments

Plaintiff argues the proposed Subclass satisfies the numerosity requirement.  (Doc.

69 at 7-10.)  In support, Plaintiff attaches the report of Dr. Olund, which identifies "219 unique telephone numbers that were registered on the DNC Registry for at least thirty days before the start of the class period, and where a person at each of those telephone numbers responded to one of [Defendant's] text messages by texting back some variation of the phrase 'wrong number.'"  (*Id.* at 10, citing Doc. 74-1 at 4.)  Further, Plaintiff argues that "in addition to these 219 telephone numbers, there are people like [Plaintiff]—who received Offer Text Messages unsolicited from [Defendant] while their telephone numbers were on the DNC Registry but who did not respond to the messages at all."  (*Id.*)

In response, Defendant argues that "Plaintiff does not identify a single other individual in her proposed Subclass" and that Plaintiff "concedes that [Defendant's] records do not identify such persons as [Plaintiff] . . . who failed to respond" to Defendant's text messages.  (Doc. 78 at 17-18.)  In addition, Defendant argues that its records "do not conclusively demonstrate that persons who responded, 'wrong number' were messaged without their consent or without an EBR," because "many individuals actually confirmed their opt-in status by subsequently responding 'yes,' . . . some such numbers were non-residential recipients (and thus not subject to TCPA liability), and . . . some who responded 'wrong number' did so because the customer sent a message to the wrong number, not [Defendant]."  (*Id.* at 13, 18.)[8]  Further, Defendant argues that the fact that "only 839 unique numbers responded with some variation of 'wrong number' out of an estimated 37.9 million—or .0022% of all recipients—wholly undermines Plaintiff's entire 'wrong number' theory and distinguishes this case from any other cited 'wrong-number' case that may have been certified."  (*Id.* at 18.)  Defendant also submits two rebuttal expert reports from Moran, who opines in each report that "Olund's expert report . . . does not provide a reliable method for identifying purported class members" and "lacks critical steps that would substantially impact the size and composition of the purported class." (Doc. 78-1 at

---

[8]    Defendant also appears to argue that Plaintiff cannot establish numerosity and predominance for the Subclass because "all such numbers [for the limited subset of persons who responded 'wrong number'] were entered during transactions at Circle K immediately preceding the receipt of an 'opt-in' message."  (Doc. 78 at 14.)  This argument, however, ignores the fact that the proposed Subclass only includes those persons who did not provide their phone number to Defendant.

137, 179, capitalization omitted.)  Moran also analyzes text exchanges with various phone numbers contained in Defendant's records and opines that those text exchanges show that an individual inquiry into each phone number is required.  (*Id.* at 155-60, 182-194.)

In reply, Plaintiff argues that Moran's first rebuttal report "relied entirely on irrelevant phone numbers outside of the Class" and that Moran's second rebuttal report is untimely and should be stricken.  (Doc. 81 at 13.)

2.   <u>Analysis</u>

Plaintiff has succeeded in establishing numerosity with respect to the proposed Subclass.  Defendant produced "all incoming text messages to [Defendant] in which an individual messaged [Defendant] stating 'wrong number,' 'wrong telephone number,' 'wrong #,' 'wrong phone,' 'incorrect number,' 'incorrect #,' 'incorrect phone,' 'bad number,' 'bad phone number,' or 'wrong person.'  (Doc. 69-2 ¶ 2.)  Dr. Olund refined this list by excluding duplicate numbers, numbers that responded with some variation of the word "yes," and numbers that were not registered on the DNC Registry.  (Doc. 74-1 at 3-4.)  As a result of this refinement, Dr. Olund identified 228 unique phone numbers "on the National DNC Registry 31+ days prior to message timestamps" and 219 unique phone numbers "on the National DNC Registry 31+ days prior to June 6, 2020."  (Doc. 74-1 at 4, capitalization omitted.)   It is more likely than not that this latter number represents members of the proposed Subclass *i.e.*, persons who registered their phone numbers on the DNC Registry and received offer text messages during the relevant period, even though they never provided their phone number to Defendant.

In addition, there is evidence that Plaintiff received four text messages from Defendant (Doc. 39-1 at 34) even though she never entered her telephone number into "a computer or other platform at [Defendant's] store" and "never provided, or authorized anyone to provide" her telephone number to Defendant.  (Doc. 51-1 at 29-30 ¶ 7-13.)  Because Plaintiff never responded to Defendant with a variation of the phrase "wrong number" (Doc. 39-1 at 34), this evidence supports a finding that, more likely than not, there are other persons within the proposed Subclass who never responded to Defendant with

the phrase "wrong number." Although this evidence does not provide a watertight estimate of Subclass membership, Plaintiff is only required to establish numerosity by a preponderance of the evidence and "judges within this district have repeatedly recognized that numerosity may be satisfied 'when general knowledge and common sense indicate that joinder would be impracticable,' even where it is not possible to estimate a specific number of class members." *Head v. Citibank, N.A.*, 340 F.R.D. 145, 149 (D. Ariz. 2022).

Moran's rebuttal reports do not change this conclusion. In her initial report, Moran analyzed "a sample of five telephone numbers" that, in her opinion, demonstrate "the nuances of indicia of consent and established business relationships demonstrating the requirement for individualized investigation for every number considered for class inclusion." (Doc. 78-1 at 155.) Three of these phone numbers are analyzed in detail. (*Id.* at 155-59.) The first number initially responded "yes" to Defendant, opting in to receive offer text messages, but then texted "wrong number" only after mistakenly texting Defendant instead of a friend. (*Id.* at 155-56.) The second number initially responded with "scammer" and "wrong number" but then later responded "yes" and opted in to receive offer text messages. (*Id.* at 156-58.) The third number initially responded "yes," opting in, then opted out by texting "no" and "no thanks sorry wrong number." (*Id.* at 158-59.) These examples, however, do not undermine Plaintiff's numerosity arguments because Moran later acknowledged that none of these sample numbers were identified by Dr. Olund as being on the DNC Registry (Doc. 78-1 at 180) and Moran did not independently verify that those numbers were on the Registry (Doc. 81-1 at 15-16). As a result, the sample numbers analyzed by Moran fall outside the proposed Subclass and have limited value for determining the numerosity of its membership.

Moran also criticizes Dr. Olund's methodology for identifying Class and Subclass members, explaining that Dr. Olund failed to account for telephone numbers that were reassigned to new users, telephone numbers belonging to a business, and telephone numbers outside of "active US area codes." (Doc. 78-1 at 160-63.)[9] Assuming without

---

[9] Moran also opines that Dr. Olund failed to account for telephone numbers where the initial offer messages were marked undelivered. However, this point is only relevant

deciding that Moran is correct and that Dr. Olund failed to consider these categories of phone numbers (and that the users of such phone numbers are ineligible for recovery under the TCPA), Moran's opinion still fails to defeat Plaintiff's numerosity arguments because Moran does not provide any estimate or opinion as to the number of putative Subclass members whom Dr. Olund incorrectly included in his estimate by failing to exclude these three categories of phone numbers.  (*See, e.g.*, Doc. 78-1 at 160 ¶ 92 ["[T]he difference between current owners of telephone lines and those who registered telephone numbers to the NDNCR is largely indeterminable . . . ."].)  Even assuming that half of the 219 phone numbers identified by Dr. Olund (1) were reassigned to a new user after being placed on the DNC Registry, (2) belong to a business, and/or (3) have area codes outside of the U.S., the remaining 109 telephone numbers—corresponding to 109 customary telephone users— would still be sufficiently numerous to justify class certification.

Moran's Supplemental Report is likewise unpersuasive on this point.[10]  In that report, Moran analyzes 10 unique phone numbers from Defendant's records where the number was placed on the DNC Registry and where the recipient responded with some variation of the phrase "wrong number."  (Doc. 78-1 at 180.)  For four of these numbers, Moran merely describes the text message exchange between Defendant and the user and concludes that "[t]he text exchange . . . is a direct result of the telephone number being entered during . . . [a] retail transaction" and "without further individualized investigation, it is impossible to tell whether the individual that responded 'wrong number' was a different person than the individual who entered the . . . number during the transaction."  (*See, e.g.*, *id.* at 183-84.)  In addition, Moran describes one exchange where a phone number was entered into a Lift System multiple times and the recipient received multiple opt-in messages before eventually responding "wrong number" (*id.* at 185-87), one exchange

for evaluating the numerosity of the *Class* (which is unnecessary in light of the determinations reached in Part I above).  In contrast, Dr. Olund's estimate for the *Subclass* only contains phone numbers that responded "wrong number" (suggesting that the initial offer message was successfully delivered).

[10]    Because the Supplemental Report does not alter the Court's findings with regard to numerosity or predominance (discussed below), it is unnecessary to decide whether the report should be stricken.

where a recipient responded to an offer text message by saying "[y]ou have reached United Bank text banking support" (*id.* at 190), and one exchange where the recipient responded "no," opting out of the receipt of text messages within one minute of responding "wrong number" (*id.* at 193-94). Last, Moran describes two exchanges where Defendant did not send any additional text messages after the recipient responded with "wrong number." (*Id.* at 191-93.) Except for the United Bank telephone number and the phone numbers that only received one text message from Defendant, Defendant does not explain why these other exchanges support a finding that the customary user is ineligible to be included in the Subclass. (Doc. 78 at 8, 15.)[11]

## B.    **Commonality**

The second requirement under Rule 23(a) is commonality. "To show commonality, Plaintiffs must demonstrate that there are questions of fact and law that are common to the class." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011). Those common questions, moreover, "must be of such a nature that [they are] capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Plaintiff argues there are multiple questions of fact and law that are common to the proposed Subclass. (Doc. 69 at 10-12.) For example:

1.    "[W]hether the Offer Text Messages are 'telephone solicitations' under the TCPA." (*Id.* at 11.)

2.    "[T]hat each . . . Subclass member suffered the same injury and is entitled to the same statutorily mandated relief." (*Id.*)

3.    "[W]hether [Defendant] sent Offer Text Messages to telephone numbers on the DNC Registry." (*Id.*)

4.    "[W]hether [Defendant] is liable for Offer Text Messages sent by Mobivity

---

[11]    For example, Defendant doesn't explain why subsequent consent supports a finding that the recipient consented to the receipt of the earlier message(s).

on its behalf to persons on the DNC Registry." (*Id.* at 11-12.)

5. "[W]hether [Defendant] is liable under the TCPA for Offer Text Messages delivered to wrong or reassigned telephone numbers." (*Id.* at 12.)

The Court is satisfied that the commonality requirement is satisfied here. The elements of each proposed Subclass member's claims under the TCPA are the same, and courts in the Ninth Circuit frequently find that common questions exist in TCPA cases. *See, e.g.*, *Head*, 340 F.R.D. at 151 (identifying common questions in TCPA litigation); *Knapper*, 329 F.R.D. at 242 (same). In any case, "even a single common question will do." *Wal-Mart*, 564 U.S. at 359 (cleaned up). Issues surrounding whether Defendant's text messages qualify as "solicitations" are likely to generate common answers and drive resolution of this litigation. (*See also* Doc. 77 at 8-17 [summary judgment order analyzing whether the text messages qualify as "solicitations"].)

Defendant's separate arguments concerning consent, EBR, and predominance (Doc. 78 at 10-14) are addressed in greater detail below.

C.    **Typicality**

The third requirement under Rule 23(a) is typicality. As noted, a class representative's claims "are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc.*, 847 F.3d at 1116. However, a class representative fails the typicality requirement if he or she "is subject to unique defenses which threaten to become the focus of the litigation." *Hanon*, 976 F.2d at 508.

1.    The Parties' Arguments

Plaintiff argues that her claims are "typical of the claims of the . . . Subclass" because she and the other proposed Subclass members "were each harmed in the same way by [Defendant's] common practice of delivering telephone solicitations via text message to persons whose telephone numbers were on the DNC registry." (Doc. 69 at 12.) In addition, Plaintiff argues that her claim is "typical of members of the Subclass because she never provided her telephone number to [Defendant]." (*Id.* at 13.)

In response, Defendant argues that "Plaintiff is not an adequate representative of either class" because Plaintiff's claims "have serious factual contradictions and credibility deficiencies, rendering her proposed class representation inadequate" and she has a "history of TCPA lawsuits alleging the receipt of messages without consent or an EBR in which the company's records discredited her claims." (*Id.* at 2, 18, capitalization and emphasis omitted.)[12]   Defendant cites three cases that purportedly demonstrate that Plaintiff is a "serial TCPA litigant" with credibility issues. (*Id.* at 18-20.)  Defendant also argues that it is statistically unlikely Plaintiff is telling the truth about her claims because the odds that Defendant accidentally messaged a "serial TCPA litigant" has a "probability so low as to be mind-boggling." (*Id.* at 2 & n.1.)

In reply, Plaintiff argues that "[b]eing a so-called professional plaintiff does not, standing alone, disqualify an individual from serving as a class representative" and that, even though Defendant "identifies three lawsuits [Plaintiff] filed where it contends her 'claims have been discredited,' it points to no finding by a court in any of those cases as to the credibility of [Plaintiff's] allegations or any evidence offered by the defendants, let alone any finding of misconduct by [Plaintiff]." (Doc. 81 at 12.)

### 2    Analysis

The typicality analysis presents a fairly close call because Defendant intends to raise a defense as to Plaintiff's TCPA claim that is unique to Plaintiff and would not be applicable to the other members of the proposed Subclass—namely, that Plaintiff has a *modus operandi* of using deceptive tactics in an effort to serve as the lead plaintiff in TCPA class actions premised on the receipt of unsolicited text messages.  According to Defendant, Plaintiff's deceptive tactics in past TCPA cases involved falsely disclaiming the existence of consent to receive the challenged messages and/or falsely disclaiming the existence of an EBR with the sender.  Defendant further contends that in this case, the deceptive tactic likely involved Plaintiff "signing up for services . . . or instructing someone else to sign up

---

[12]    Defendant brings these arguments under the heading of "adequacy"; however, "[a defendant's] contention that Plaintiffs will be preoccupied with unique defenses falls within our typicality caselaw." *DZ Rsrv. v. Meta Platforms, Inc.*, 96 F.4th 1223, 1238 (9th Cir. 2024).

on her behalf." (Doc. 78 at 19.)  In Defendant's view, a successful showing on these points would establish the affirmative defenses of consent and EBR as to Plaintiff, which may not be applicable to other members of the proposed Subclass.  (*Id.*)

On the one hand, "class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it," such as when the lead plaintiff's "unique background and factual situation require him to prepare to meet defenses that are not typical of the defenses which may be raised against other members of the proposed class."  *Hanon*, 976 F.2d at 508 (cleaned up).  In *Hanon*, the Ninth Circuit applied this principle in a case where the putative lead plaintiff purchased 10 shares of a company's stock and later sued the company under the theory that it "misled the market about one of its new product lines and concealed strategic decisions."  *Id.* at 500.  One of the key issues in the case was whether "the plaintiff would have bought his stock at the same price had he known the information that was not disclosed or misrepresented."  *Id.* at 507.  The putative lead plaintiff testified that he bought the stock "to make money, receive more information about the company, 'test the waters,' and have an incentive to follow the company's progress," but "[s]ubstantial evidence in the record suggest[ed] these were not his true motives."  *Id.*  Based in part on this evidence, the Ninth Circuit found that the plaintiff was not a "typical" class member because his "reliance on the integrity of the market would be subject to serious dispute."  *Id.* at 508.

On the other hand, although *Hanon* establishes that the existence of unique defenses will *sometimes* defeat class certification, "[u]nique defenses are not invariably disabling.  A unique defense that is insignificant or improbable will not render the proposed class representative's claims atypical.  Only if the unique defense is likely to be a major focus of the litigation may the proposed representative's claims be rendered atypical."  1 Newberg and Rubenstein on Class Actions § 3:45 (6th ed. June 2025 update) (cleaned up).  "Given that only certain unique defenses are disqualifying, courts have balked at rejecting certification merely on the assertion that the proposed representative's claims are subject to a unique defense.  They have instead required the opponent of class certification to make

a sufficiently clear showing that the alleged unique defense will occupy a significant portion of the litigation before concluding that the unique defense renders the class representative's claims atypical." *Id.* (cleaned up). *See also DZ Rsrv.*, 96 F.4th at 1239 ("Credibility issues only destroy typicality in unique situations where it is predictable that a major focus of the litigation will be on a defense unique to the named plaintiff.").

Defendant has failed to make a sufficiently clear showing that the unique defenses it intends to raise as to Plaintiff's TCPA claim are likely to be a major focus of the litigation. As an initial matter, although Defendant denigrates Plaintiff as "a serial TCPA litigant" (Doc. 78 at 2), "being a serial or professional plaintiff is generally not grounds for inadequacy." *Chinitz v. NRT W., Inc.*, 2019 WL 4142044, *4 (N.D. Cal. 2019). *See also Moser v. Health Ins. Innovations, Inc.*, 2019 WL 2271804, *4 (S.D. Cal. 2019) ("[B]eing a so-called 'professional plaintiff' does not, standing alone, disqualify an individual from serving as a class representative."). *Cf. D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008) ("[B]ecause the district court focused on [the plaintiff's] history of ADA litigation as a basis for questioning the sincerity of her intent to return to the Best Western Encina, we reject its purported adverse credibility determination."). In a related vein, the litigation history of the putative lead plaintiff in *Hanon*, who "previously brought four derivative suits against publicly held corporations with the help of some of the same lawyers involved here," was relevant due to the nature of the claims he sought to assert— securities fraud claims premised in part on his purported reliance on the challenged disclosures. *Hanon*, 976 F.2d at 506-07. The plaintiff's litigation history was thus relevant because it had the tendency to undermine the notion that he, as compared to other putative class members with less litigation experience, had relied on the disclosures. But the same dynamic is not present here—possessing past experience in TCPA litigation doesn't have any inherent bearing on whether a person has consented to receive text messages from, and/or has an EBR with, a different company not involved in those past lawsuits.

Defendant also contends that typicality is lacking because "Plaintiff's claims have been discredited by the defendant's records" in past TCPA cases against other companies.

(Doc. 78 at 19.)  If this assertion were borne out by the record, the typicality analysis might be different, but Defendant merely points to three prior cases in which the defendant *claimed* that Plaintiff's allegations of no consent and no EBR were false.  However, the courts overseeing those cases did not *find* that Plaintiff had made false representations.  Moreover, the defendants in some of those other cases came forward with purported documentary evidence of Plaintiff's prior consent or EBR.  Here, in contrast, Defendant has not come forward with any such documentary evidence.  Instead, Defendant merely speculates that Plaintiff must have, perhaps via the help of an unidentified co-conspirator, come up with some sort of scheme to induce Defendant to send the challenged text messages to her.

The bottom line is that although the Court understands the reasons for Defendant's deep skepticism of Plaintiff's account of how she came to receive the challenged text messages, the mere fact that Defendant intends to raise a unique defense as to Plaintiff's claims does not mean typicality is lacking.  Instead, the analysis hinges on the substantiality of Defendant's basis for raising the contemplated unique challenges to Plaintiff's consent and EBR.  *See, e.g.*, *Mendez v. R + L Carriers, Inc.*, 2012 WL 5868973, *14 (N.D. Cal. 2012) ("For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exists admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims.  This standard is difficult to satisfy.") (cleaned up); *In re Omnicom Group, Inc. Securities Litig.*, 2007 WL 1280640, *4 (S.D.N.Y. 2007) ("[A] court need not definitively resolve whether such defenses would succeed on their merits, but also need not deny certification merely because of the presence of a colorable unique defense.  In practice, courts . . . refus[e] certification only when confronted with a sufficiently clear showing of the defense's applicability to the representative plaintiff.") (citations omitted).  On this record, Defendant's showing is not sufficiently substantial.  Although Plaintiff's "personal narrative is somewhat more colorful, . . . it falls within the common contours of Plaintiff's theory of liability." *Ruiz*

1    *Torres*, 835 F.3d at 1142.

2          D.    **Adequacy**

3          The fourth requirement under Rule 23(a) is adequacy.  "To determine whether

4    named plaintiffs will adequately represent a class, courts must resolve two questions: '(1)

5    do the named plaintiffs and their counsel have any conflicts of interest with other class

6    members and (2) will the named plaintiffs and their counsel prosecute the action vigorously

7    on behalf of the class?'"  *Ellis*, 657 F.3d at 985.

8          Plaintiff argues she is an adequate representative because she "is capable of, has,

9    and will continue to protect the interests of the . . . Subclass," communicates regularly with

10   counsel, and "is prepared to make all necessary decisions involving this case with class

11   members' best interests in mind."  (Doc. 69 at 13.)  Further, Plaintiff argues she "retained

12   counsel with significant experience in class action litigation . . . who are ably qualified to

13   serve the proposed . . . Subclass."  (*Id.*).  Defendant does not argue that Plaintiff or her

14   counsel are inadequate except that "Plaintiff is an inadequate class representative given her

15   history of TCPA lawsuits" and her questionable credibility.  (Doc. 78 at 18-20.)

16         Defendant's arguments regarding Plaintiff's litigation history and credibility are

17   addressed above with regard to typicality.  Defendant has not identified any conflicts of

18   interest between Plaintiff and the other class members, nor has Defendant offered any

19   reason why Plaintiff and her counsel would be unwilling or unable to prosecute the action

20   vigorously on behalf of the proposed Subclass.

21         E.    **Rule 23(b)(3) Considerations**

22         A plaintiff seeking class certification under Rule 23(b)(3) is also required to show

23   that "questions of law or fact common to class members predominate over any questions

24   affecting only individual members, and that a class action is superior to other available

25   methods for fairly and efficiently adjudicating the controversy."  As noted, the

26   "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant

27   adjudication by representation."  *Amchem Products*, 521 U.S. at 623.  "When 'one or more

28   of the central issues in the action are common to the class and can be said to predominate,

the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as . . . some affirmative defenses peculiar to some individual class members.'" *Tyson Foods*, 577 U.S. at 453-54.

In addition, "Rule 23(b)(3) provides a non-exhaustive list of factors to consider in determining superiority":

> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)    the likely difficulties in managing a class action.

*Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (cleaned up).  This inquiry "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1023 (9th Cir. 1998), *overruled on other grounds by Wal-Mart*, 564 U.S. at 338.  Class litigation is usually superior when putative class members will be "unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover." *Loc. Joint Exec. Bd. of Culinary/Bartender Tr. Fund*, 244 F.3d at 1163.  *See also Hanlon*, 150 F.3d at 1023 ("Even if efficacious, these claims would not only unnecessarily burden the judiciary, but would prove uneconomic for potential plaintiffs.  In most cases, litigation costs would dwarf potential recovery.")  In addition, there is a "well-settled presumption that courts should not refuse to certify a class merely on the basis of manageability concerns." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1128 (9th Cir. 2017) (citation omitted).

### 1.    The Parties' Arguments

Plaintiff argues that "there are no individual issues that would overwhelm the

litigation" and that issues of consent and EBR will not predominate because Defendant "cannot identify any person who entered a telephone number into its Lift system." (Doc. 69 at 14.) In addition, Plaintiff argues that "even if [Defendant] could identi[f]y some persons in the . . . Subclass who provided prior express written consent . . . predominance would still be satisfied" because common questions can still predominate even if "some persons in the . . . Subclass 'may separately have consented to the transmissions at issue.'" (*Id.* at 15, citation omitted.) Plaintiff also argues that class adjudication is superior in this case because "the claims of the . . . Subclass are identical . . . and they result in uniform damages calculated on a per-violation basis," and "absent a class action, numerous claims like [Plaintiff's] . . . will go un-redressed." (*Id.* at 16-17.) In addition, Plaintiff argues that "there are unlikely to be serious difficulties in the management of this case as a class action" because the Subclass is "defined by reference to objective criteria" and class membership can be determined by using "reverse lookups to identify persons associated" with the telephone numbers that responded with "wrong number" after receiving Defendant's opt-in text messages. (*Id.* at 18.) Plaintiff also proposes a plan for notifying potential class members "consistent with numerous other TCPA class actions" and argues that "should a judgment in favor of the . . . Subclass be obtained," Plaintiff can "use self-identifying declarations, or other methods, to confirm membership in the . . . Subclass." (*Id.* at 18-20.)

In response, Defendant argues that "Plaintiff must establish that [Defendant's] records can be used to identify persons whose numbers were entered by other persons." (Doc. 78 at 6.) Defendant then produces a sample of text exchanges and uses this sample to argue that "even for the limited subset of persons who responded 'wrong number,' [Defendant's] records demonstrate that . . . all such numbers were entered during transactions at Circle K," "many individuals actually confirmed their opt-in status by subsequently responding 'yes,'" "some such numbers were non-residential recipients (and thus not subject to TCPA liability)," and "some who responded wrong number' did so because the customer sent a message to the wrong number, not [Defendant]." (*Id.* at 6, 13.)

1    According to Defendant, "[t]his wide permutation of factual scenarios on issues

2    surrounding potential consent or EBR . . . must be determined case-by-case."  (*Id.* at 14.)

3    Defendant also argues that class-wide adjudication is not superior because individual

4    "[c]laimants can collect statutory damages of $500 or $1,500 *per message* for TCPA

5    violations and have ample incentives . . . . to pursue claims" (*id.* at 15) and that the

6    proposed Subclass is unmanageable because "there is no method to conclusively identify

7    class members without individualized inquiry" (*id.* at 12).[13]  Last, Defendant argues that

8    Plaintiff's proposed method of identifying Subclass members and verifying membership

9    through self-identification would risk "denial of [Defendant's] due process rights" because

10   Defendant is "entitled to present all unique defenses available and test the credibility of

11   any allegation the claimant makes."  (*Id.* at 15.)

12          In reply, Plaintiff again argues that she "need not demonstrate that [Defendant's]

13   records can identify members of the Class," because, in the Ninth Circuit, "[a]n

14   ascertainable class is simply one that is defined in a clear, objective manner," as the

15   Subclass is defined here.  (Doc. 81 at 3-4.)  As a result, Plaintiff argues that Defendant

16   "conflates two critically distinct groups of persons: those who are *bona fide* . . . Subclass

17   members entitled to a recovery . . . and the more expansive group of potential . . . Subclass

18   members who may receive class notice."  (*Id.* at 4.)  Plaintiff further argues that Defendant

19   "cannot identify a single person by name who provided consent"; that the sample text

20   exchanges produced by Defendant do not create individualized issues of consent; and that

21   "the fact that a class list may contain some business numbers whose claims fail on the

22   merits does not mean that the class cannot be certified."  (*Id.* at 2, 6-7, 11, citation omitted.)

23   Next, Plaintiff argues that Defendant's due-process concerns are unfounded because "if

---

[13]    Defendant also argues the proposed method of identification is deficient because "Plaintiff falsely states that its proposed process for identifying Subclass members 'identified [Plaintiff]' as associated with the 3670 telephone number" but such identification is impossible because Plaintiff never responded "wrong number" to Defendant's text messages.  (Doc. 78 at 16.)  This argument appears to be based on a misunderstanding. Plaintiff clarifies in reply that the "reverse look-up process" she proposes would only be "used to generate the names of all individuals who customarily use a phone number."  (Doc. 81 at 10.)

[Plaintiff] ultimately obtains a class judgment, Class members can self-identify through affidavits and other methods while allowing [Defendant] the reasonable opportunity to contest claims." (*Id.* at 8, citation omitted.) Plaintiff argues that "self-identification is particularly warranted here, where [Defendant] has no record of the names of the persons to whom it delivered the text messages at issue." (*Id.*) Last, Plaintiff argues that the reverse-lookup process is not required to identify Subclass members with "perfect accuracy," but "only to identify persons who are *potentially* . . . Subclass members so that notice can be sent to those persons," and that Defendant can revisit concerns about consent, EBR, and business vs. residential lines if and when it comes forward with more substantial evidence showing individualized issues. (*Id.* at 10-11.)

    2. <u>Analysis</u>

     a. **Predominance**

  Unlike with the proposed Class, individual issues of consent and EBR do not predominate over legal and factual questions common to the proposed Subclass. That is because, by definition, the Subclass only includes persons, like Plaintiff, "who did not provide their telephone number to [Defendant]." (Doc. 64 ¶ 45.) Because the proposed Subclass members did not input their telephone numbers into the Lift System after completing a transaction, Defendant's business records and pattern of business do not create an inference that the Subclass members consented to receive text messages or otherwise had an EBR with Defendant.

  The only evidence Defendant presents to show that members of the proposed Subclass consented to receive text messages is an expert rebuttal report analyzing 15 text message exchanges between Defendant and telephone users who responded with some variation of the phrase "wrong number." (Doc. 78-1 at 144, 180.) Three of those recipients responded with some variation of the word "yes," potentially suggesting that the recipients "confirmed" their earlier consent to receive solicitations. (*Id.* at 155-58.) However, none of the recipients that responded "yes" were on the DNC Registry and, thus, the customary users of those telephone numbers fall outside the proposed Subclass. (Doc. 78-1 at 180;

Doc. 81-1 at 15-16.)  Of the remaining text exchanges analyzed by Defendant's expert, none suggests the existence of consent or an EBR except that "such numbers were entered during transactions at [Defendant's store] immediately preceding the receipt of an 'opt-in' message." (Doc. 78 at 13.)  For the reasons described in the summary judgment order, the mere fact that someone, apart from the proposed Subclass member, provided a phone number to Defendant does not necessarily support a finding of consent or EBR.  (*See generally* Doc. 77.)  And because Defendant has not produced any evidence showing the identity of persons who entered their phone numbers in the Lift System, it's difficult to see how Defendant could effectively challenge a Subclass member's affidavit stating that he or she never provided a telephone number to Defendant.  For these reasons, individual issues related to consent or EBR are unlikely to predominate over issues common to Subclass members.  *See also Kristensen v. Credit Payment Servs.*, 12 F. Supp. 3d 1292, 1306-07 (D. Nev. 2014) ("The Ninth Circuit has held that in the absence of any evidence of consent by the defendant, consent is a common issue with a common answer.").

Defendant also argues that determining whether a Subclass member's phone number is a residential line (rather than a business line) will require individualized inquiries that predominate over common questions.  This argument is unavailing.  The Ninth Circuit has held that "registered cell phones that are used for both personal and business purposes are presumptively 'residential' within the meaning of § 227(c)." *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1227 (9th Cir. 2022).  True, "[d]efendants may overcome the presumption by showing that plaintiffs use their cell phones to such an extent and in such a manner that the presumption is rebutted." *Id.*  However, at this stage of litigation, Defendant has only produced evidence that a single phone number belonging to a putative Subclass member is a business line rather than residential.[14]  This solitary example does not make it likely that individual inquiries into whether a given phone number is a business

---

[14]    Defendant also argues, in a footnote, that "[a] review of CK000073 [telephone numbers responding with 'wrong number'] demonstrates several more apparent business lines ('2333, '9089, '5412, '4033)." (Doc. 78 at 15 n.10.)  Defendant, however, has not provided any evidence that these other phone numbers were listed on the DNC Registry or that the customary users of these telephone numbers are otherwise part of the proposed Subclass.

line will predominate over other common questions.  *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7391299, *14 (N.D. Cal. 2020) ("[T]he fact that a class list may contain some business numbers whose claims fail on the merits does not mean that the class cannot be certified.").  *See also Olean Wholesale*, 31 F.4th at 668 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate."); *id.* at 669 ("[W]e reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.").

  *Payne v. Sieva Networks, Inc.*, 347 F.R.D. 224 (N.D. Cal. 2024), which Defendant cites, does not compel a different conclusion.  There, the plaintiff alleged that he used his personal cell phone (which was registered on the DNC Registry) to "register[] a USDOT [United States Department of Transportation] number,' and that shortly thereafter, he received unsolicited text messages from [the defendant] to his cell phone."  *Id.* at 226.  The plaintiff asserted a TCPA claim and sought to certify a class of persons who had similarly received unsolicited text messages from the defendant.  *Id.*  The court found that plaintiff failed to satisfy the predominance requirement because, even though "phone numbers that are  used for both personal and business purposes are presumptively residential," rebutting that presumption required the court to consider five factors including "how plaintiff hold[s] their phone numbers out to the public" and "other factors bearing on how a reasonable observer would view the phone line."  *Id.* at 227.  The court held that "asking class members whether the line in question is a residential line during the class notification process" would not obviate the need for individual inquiry because it "would not satisfy the multi-factor test."  *Id.* at 227.   In addition, the court emphasized that all of the phone numbers contacted by the defendant "were registered with the USDOT, which is some indication of a non-residential use."  *Id.* at 228.

  Unlike in *Payne*, the transactions that resulted in Defendant collecting phone numbers are not "some indication of a non-residential use."  Therefore, there is no reason to infer that all putative Subclass members held out their phone numbers as business lines.

1    Moreover, the Court is unpersuaded that the other factors relevant to this determination

2    cannot be resolved through the class notification process.  Although it may be insufficient

3    to simply "ask class members whether the line in question is a residential line," the class

4    notification might also ask additional questions such as "whether plaintiff uses their phone

5    for business or employment," "whether their company or employer pays their phone bills,"

6    and "whether [their] phones are registered with the telephone company as residential or

7    business lines."  *Chennette*, 50 F.4th at 1225 (factors for determining whether multi-

8    purpose lines are for business).  In any case, if it becomes apparent at a later stage of

9    litigation that these individualized inquires will predominate over other common questions,

10   "the Court can revisit this question and can consider whether decertification is

11   appropriate."  *Hiller*, 2025 WL 1331702 at *6.

### b. **Superiority**

13   District courts routinely find that class actions are a superior method of adjudicating

14   TCPA claims due to the relatively low amount of statutory damages available to each

15   individual plaintiff.  *Knapper*, 329 F.R.D. at 247; *Bennett v. GoDaddy.com LLC*, 2019 WL

16   1552911, *12 (D. Ariz. 2019); *Lavigne v. First Community Bancshares, Inc.*, 2018 WL

17   2694457, *8 (D.N.M. 2018); *Green v. Serv. Master On Location Servs. Corp.*, 2009 WL

18   1810769, *3 (N.D. Ill. 2009).  Although the proposed Subclass appears smaller than many

19   classes certified in other TCPA cases, the same logic applies here.  If a class isn't certified,

20   the only alternatives are (1) numerous individual lawsuits or (2) no lawsuits at all, because

21   the costs of litigation outweigh potential recovery.  Moreover, "the class members'

22   interests in individually controlling the prosecution or defense of separate actions" is

23   minimal.  Fed. R. Civ. P 23(b)(3)(A).  And there is nothing undesirable about concentrating

24   these claims in this particular forum because only federal law applies.  Fed. R. Civ. P.

25   23(b)(3)(C).  This is particularly true here, where Defendant has not presented any evidence

26   of other "litigation concerning the controversy already begun by . . . [other] class

27   members."  Fed. R. Civ. P. 23(b)(3)(B).

28   Defendant cites a single contrary case—*Sliwa v. Bright House Networks, LLC*, 333

F.R.D. 255 (M.D. Fla. 2019)—and argues that putative class members "have ample incentives . . . to pursue claims against [Defendant] individually" because "[c]laimants can collect statutory damages of $500 or $1,500 *per message*." (Doc. 78 at 15.) In addition to being against the weight of persuasive authority, *Sliwa* is distinguishable because the court determined that individual issues predominated over common issues and, in the Eleventh Circuit, "[a] court's predominance analysis has a tremendous impact on its superiority analysis." *Sliwa*, 333 F.R.D. at 281 (cleaned up). That is because "the less common the issues, the less desirable a class action will be as a vehicle for resolving them" and "a class action containing numerous uncommon issues may quickly become unmanageable." *Id.* (citation omitted). Because individual issues do not predominate here (at least with respect to the proposed Subclass), these same concerns do not apply. Also, even though it is theoretically possible for an individual plaintiff to obtain a large award of statutory damages under the TCPA, this is not a case where Defendant sent hundreds of text messages to each individual plaintiff. *Compare Chennette*, 50 F.4th at 1220 (2,754 text messages sent to 15 individual plaintiffs on the DNC Registry). Instead, the evidence suggests that after Defendant received a telephone number in its Lift System, it sent "up to three confirmation messages," unless a user responded "STOP." (Doc. 39-1 at 4 ¶¶ 3-10.) That means that recovery for most proposed Subclass members will be between $500 and $7,500—a paltry sum compared to the costs of litigation.

### c.   **Manageability/Due Process**

As part of the superiority analysis above, the Court is also required to consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). Plaintiff has shown that this factor likewise favors granting class certification as to the proposed Subclass. Specifically, Plaintiff has used objective criteria to define the Subclass so potential class members can determine if they are included in the proposed definition. *Farar v. Bayer AG*, 2017 WL 5952876, *13 (N.D. Cal. 2017) ("[A] class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right

to recover based on the description.") (citation omitted).  Here, Subclass members would only need to determine whether they (1) provided their phone number to Defendant, (2) received more than one offer text message from Defendant within a 12-month period, (3) registered their residential phone number on the DNC Registry 30 days before receipt of at least two of the text messages, and (D) did these things within the relevant time period.  In addition, Plaintiff has developed a plan, with the help of an expert, to notify potential Subclass members of this lawsuit.  Plaintiff's expert will use a reverse-lookup function, in cooperation with third-party vendors, to obtain the names and residential addresses of persons on the "wrong number" call list and notify them of the class action with direct mail.  (Doc. 69-7 ¶¶ 20-27.)  In the event that additional notice is needed, Plaintiff's expert also proposes a "notice campaign . . . designed to ensure that an appropriate percentage of likely class members are provided with an opportunity to learn of this class action."  (*Id.* ¶ 28.)  Such a campaign would include various quality control mechanisms and "digital notices placed using ad networks or other social media platforms and/or the distribution of a press release."  (*Id.* ¶ 31.)  These procedures are consistent with the requirements of due process.  *Briseno*, 844 F.3d at 1128-29 ("Rule 23 requires only the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. . . .  Courts have routinely held that notice by publication in a periodical, on a website, or even at an appropriate physical location is sufficient to satisfy due process.") (cleaned up).  Further, in the event Plaintiff is able to obtain a judgment, Plaintiff proposes that "Subclass members who wish to participate in any recovery will be able to attest to receiving at least two Offer Text Messages from [Defendant] at a time when their telephone number had already been registered on the DNC Registry for at least thirty days, and, if necessary, submit supporting documentation."  (Doc. 69 at 20.)

Defendant challenges manageability for a variety of reasons.  However, each of Defendant's arguments is a variation on an argument rejected in *Briseno*.  There, the district court certified a class of consumers "who purchased Wesson-brand cooking oil products

labeled '100% Natural'" under the theory that the label was "false or misleading because Wesson oils are made from bioengineered ingredients." *Briseno,* 844 F.3d at 1123. Defendants argued that the class should be decertified because, among other things, the named class representatives failed "to proffer a reliable way to identify members of the certified class" and no "administratively feasible method exists because consumers do not generally save grocery receipts and are unlikely to remember details about individual purchases of a low-cost product like cooking oil." *Id.* at 1123, 1125. Ultimately, however, the Ninth Circuit found that "administrative feasibility" is not required for class certification under Rule 23(b)(3). *Id.* at 1123.

As in *Briseno*, it is difficult to identify absent class members (because Defendant does not record the names of customers who input their phone numbers when they complete a business transaction). And just like the defendants in *Briseno*, Defendant argues that Plaintiff has not come forward with evidence that can "conclusively identify" absent class members without an individualized inquiry and that Defendant must be provided an opportunity to contest each of the claims asserting class membership. To this end, Defendant retained an expert who, in two rebuttal opinions, states that "Olund's expert report . . . does not provide a reliable method for identifying purported class members and . . . there is no way, absent an individualized investigation, to do so." (Doc. 78-1 at 179, capitalization omitted.) In *Briseno*, however, the Ninth Circuit explained that "a method for reliably identifying class members" is not required because defendants can "raise individual challenges and defenses to claims" even when class members have not been conclusively identified. 844 F.4d at 1128, 1130. That is because "[d]efendants will have . . . opportunities to individually challenge the claims of absent class members if and when they file claims for damages. At the claims administration stage, parties have long relied on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to validate claims." *Id.* at 1131. Defendants have not explained why this process of disputing individual claims is deficient here.

Defendant also cites a number of cases from outside of the Ninth Circuit suggesting that "self-identification is 'a danger that impacts due process protections for Defendant.'" (Doc. 78 at 14, citations omitted.)  But *Briseno* squarely addressed this issue, explaining that "[i]f the concern is that claimants in cases like this will eventually offer only a 'self-serving affidavit' as proof of class membership, it is again unclear why that issue must be resolved at the class certification stage to protect a defendant's due process rights.  If a [class member] were to pursue an individual lawsuit instead of a class action, an affidavit describing her purchases would create a genuine issue if [a defendant] disputed the affidavit . . . .  [W]e see no reason to refuse class certification simply because that same consumer will present her affidavit in a claims administration process after a liability determination has already been made."  *Briseno*, 844 F.3d at 1132.  *See also id.* at 1130 ("The fraud concern may be valid in theory, but in practice, the risk of dilution based on fraudulent or mistaken claims seems low, perhaps to the point of being negligible. . . .  [C]ourts can rely, as they have for decades, on claim administrators, various auditing processes, sampling for fraud detection, follow-up notices to explain the claims process, and other techniques tailored by the parties and the court to avoid or minimize fraudulent claims.") (cleaned up).

The Court acknowledges that it might be possible to factually distinguish *Briseno*. There, the amount at stake for each individual class member was much lower—a few cents or dollars—rather than a few hundred or thousand dollars, as here.  Moreover, the court in *Briseno* suggested, albeit indirectly, that the due process calculus might differ in cases where identification of class members affects a defendant's *aggregate* liability.  The defendant's aggregate liability for selling cooking oil in *Briseno* would not change based on class membership because the defendant could determine "how many units of a product it sold in the geographic area in question" and "the aggregate amount of liability will be determinable even if the identity of all class members is not."  *Id.* at 1133.  Here, in contrast, the amount of damages that Defendant would be required to pay depends entirely on the number of Subclass members and the number of text messages those Subclass members received.  Even so, the Ninth Circuit's expansive language in *Briseno* does not suggest

1   there is a separate "administrative feasibility" requirement in cases where aggregate
2   liability depends on class membership.  Nor has Defendant advanced this particular due
3   process argument.

        Accordingly,

        **IT IS ORDERED** that:

        1.      Defendant's motion for class certification (Doc. 69) is **granted in part and**
**denied in part**.

        2.      Under Fed. R. Civ. P. 23(b), the following class is certified:

        All persons throughout the United States (1) who did not provide their
        telephone number to Circle K Stores Inc., (2) to whom Circle K Stores Inc.
        delivered, or directed to be delivered, more than one text message within a
        12-month period, which read, in part, either "Circle K: Reply 'YES' to Sign
        Up to receive special offers via txt message" or "Circle K: Reply 'YES' to
        get offers via txt", (3) where the person's residential telephone number had
        been registered with the National Do Not Call Registry for at least thirty days
        before Circle K Stores, Inc. delivered or directed to be delivered at least two
        of the text messages within the 12-month period, (4) from June 6, 2020
        through the date of class certification

        3.      Under Fed. R. Civ. P. 23(g), Greenwald Davidson Radbil PLLC and
Paronich Law, P.C. are appointed as class counsel.