**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Monica Abboud, | No. CV-23-01683-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Circle K Stores Incorporated, | |
| Defendant. | |

In this putative class action, Monica Abboud ("Plaintiff") alleges that Circle K Stores Inc. ("Defendant") violated the Telephone Consumer Protection Act ("TCPA") by sending several text messages to her after she registered her phone number on the National Do Not Call Registry ("DNC Registry"). Plaintiff also alleges that Defendant sent identical text messages to millions of other people whose telephone numbers appear on the DNC Registry (the "proposed Class"), including smaller group of people—likely numbering in the tens of thousands—who, like her, never provided their telephone phone number to Defendant (the "proposed Subclass").

Now pending before the Court is Plaintiff's motion for class certification and appointment of counsel. (Doc. 69.) Although the tentative ruling issued before oral argument indicated that the proposed Subclass (but not the proposed Class) should be certified, the Court now concludes, with the benefit of oral argument and the parties' post-argument briefing, that Plaintiff's certification request should be denied in full.

**BACKGROUND**

I.      Relevant Factual Background

    A.      **The Parties**

Since before 2023, Plaintiff has been the "regular and customary user of . . . [t]he telephone number ending in 3670." (Doc. 51-1 at 29 ¶¶ 4-5.) That phone number "is assigned to a cellular telephone service and [Plaintiff] use[s] the phone number as a residential telephone line." (*Id.* at 29 ¶ 5.) Plaintiff "registered [her] telephone number . . . on the [DNC Registry] prior to 2023 and it has remained registered since that time." (*Id.* at 29 ¶ 6.)

Defendant is a corporation headquartered in Tempe, Arizona, and its "business is selling fuel and convenience store items." (*Id.* at 6.) Defendant has "[r]oughly, 7,000 stores" throughout the United States. (*Id.*) More specifically, "the 6,669 Circle K stores [in America] make up the majority of [Defendant's parent company's] 7,115 stores in the United States and account for more than one-third of all stores world-wide. Total revenue for all 7,115 stores in the most recent Annual Information Form equaled approximately $41.597 billion. And [Defendant's parent company] serves 'over 9 million customers daily' across its 17,000 stores world-wide. That is more than 3 million customers at U.S. stores per day." (Doc. 97 at 6, citing Doc. 97-1.)

    B.      **The Messaging Program**

Defendant "operates a messaging program through which customers can affirmatively opt-in to the receipt of messages containing notice of discounts on products at [Defendant's] stores." (Doc. 39-1 at 4 ¶ 3.) More specifically, Defendant offers a "Tobacco club" program "through which customers can sign up by entering their phone number on a touchscreen display," called the Lift System, that is located at the checkout counter. (*Id.* at 4 ¶¶ 5-6.) This 20-inch screen displays advertisements in a loop when no transaction is taking place. (Doc. 51-1 at 7-8.) However, when a customer or sales attendant scans a certain product at the checkout counter, the Lift System "show[s] a screen to upsell the customer for . . . a promo that's related to the item that's been scanned." (*Id.*

at 8, 13.)  At that point, the customer has the option to enter a phone number into the Lift System.  (*Id.* at 13.)  Under the Tobacco Club program, a customer who enters a phone number will "save $1.70 instantly when [they] buy a 2nd identical item."  (Doc. 39-1 at 8.) Small text at the bottom of the screen informs the customer that:

> By providing my mobile number, I consent to receiving marketing messages via automated technology from Circle K/Holiday to the mobile number provided above.  I understand my consent is not a condition of purchase.  I understand that entering the mobile number provided above enrolls me in all Circle K/Holiday text message programs, and that my consent applies to all Circle K/Holiday text message programs.

(*Id.*)

Once the customer enters a phone number and receives the discount, that customer's interaction with the Lift System ends.  (Doc. 51-1 at 14-15.)  However, upon entry of the phone number, an automatic process is triggered that results in a text message being sent to the just-entered phone number.  (*Id.* at 16-17.)  First, the phone number is uploaded to the Lift System cloud, and that system then transmits the phone number to a third-party messaging service, Mobivity Holdings Corp ("Mobivity"), and asks Mobivity to send a text message to the number.  (*Id.*)  Defendant refers to this sequence as "a double opt-in process.  If an individual enters their phone number to consent to enroll in [Defendant's] messaging program, [Defendant] sends a message to the individual asking them to respond 'YES' to complete their sign-up."  (Doc. 39-1 at 4 ¶ 8.)  Defendant then "sends up to three confirmation messages" (*id.* at 4 ¶ 9), with "about a month" between each text message (Doc. 51-1 at 20).  "If the individual either (a) responds 'STOP' to opt-out or (b) fails to respond following the third confirmation attempt, the individual is opted out and will not receive any discount or marketing messages."  (Doc. 39-1 at 4 ¶ 10.)[1]

### C.    The Transaction And Text Messages

On August 2, 2023, someone entered Plaintiff's phone number ending in 3670 into the Lift System at one of Defendant's stores in Texas to receive a discount on cigarettes.

---

[1]    If a recipient responds with "wrong number" instead of "STOP," the system will send that person a duplicate of the first text message.  (Doc. 51-1 at 25.)  If, at that point, the recipient fails to respond, the automated messages will cease.  (*Id.*)

(Doc. 39-1 at 14-32.  *See also* Doc. 39 at 4 [explaining the electronic records].)  This action "began the enrollment process into [Defendant's] messaging program" (Doc. 39 at 4) and Defendant ultimately sent four text messages to Plaintiff's phone number ending in 3670, to which she never responded.  (39-1 at 34.)  Those text messages read:

• August 2, 2023:  "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message.  Msg & Data rates may apply.  Txt 'STOP' to Opt-Out.  855-276-1947." (Doc. 39-1 at 34.)

• August 2, 2023:  "Circle K: Reply 'YES' to get offers via txt.  Go to myck.site/k2KmEU, Age-verify 18/21+ offers.  Msg & Data rates may apply.  Txt 'STOP' to Opt-Out.  855-276-1947."  (*Id.*)

• September 11, 2023:  "Circle K: Reply 'YES' to get offers via txt.  Go to myck.site/Qb9PtF, Age-verify 18/21+ offers.  Msg & Data rates may apply.  Txt 'STOP' to Opt-Out.  855-276-1947."  (*Id.*)

• September 12, 2023:  "Circle K: Opt-Out confirmed.  Thank you for responding.  Msg & Data rates may apply.  To Sign Up in the future reply yes.  855-276-1947."  (*Id.*)[2]

Plaintiff avows that she never consented to receive text messages from Defendant or Mobivity and "never provided, or authorized anyone to provide" her telephone number to either party.  (Doc. 51-1 at 29-30 ¶¶ 7-8, 10-13.)  Plaintiff also avows that she never entered her telephone number into "a computer or other platform at [Defendant's] store" and that she "do[es] not smoke or use any tobacco products, and ha[s] never purchased any tobacco product from [Defendant]."  (*Id.* at 30 ¶¶ 9, 14.)  However, it is undisputed that Defendant's credit card was used to make purchases at Defendant's stores on multiple occasions during the 18-month period preceding the first challenged text message—both sides acknowledged this point during oral argument and Defendant submitted post-hearing evidence to substantiate it.  (Doc. 97-1 at 2-7.)

…

---

[2]    Although the final message reads "[t]hank you for responding" (Doc. 39-1 at 34) Defendant's representative states that "Plaintiff did not respond to [Defendant's] messages" and "Plaintiff was affirmatively opted-out" (*id.* at 5).

### D.    **Putative Class Members**

Plaintiff alleges that Defendant sent similar text messages to other people, like her, whose telephone numbers were registered on the DNC Registry.  (Doc. 63 ¶ 3.)  In support of these allegations, Plaintiff attaches the report of her expert, Dr. Olund.  (Doc. 74-1.)

Plaintiff initially sought discovery from Defendant of "electronically stored information sufficient to identify the unique telephone numbers to which Defendant . . . delivered or attempted to deliver during any twelve-month period with[in] the Relevant Time Period at least two text messages that read, in part, either 'Circle K: Reply 'YES' to Sign Up to receive special offers via txt message' or 'Circle K: Reply 'YES' to get offers via txt.'"  (Doc. 43-1 at 4 ¶ 12 [discovery request].)  After the Court ordered Defendant to comply with that discovery request (Doc. 46), Plaintiff retained Dr. Olund to analyze the "data produced via an external hard drive prepared by the Defendant."  (Doc. 74-1 at 5 ¶ 11.)  Based on this analysis, Dr. Olund estimates that the files contain 37,880,244 unique phone numbers.  (*Id.* at 6-7.)  Dr. Olund then took "a 5,000 record sample of text messages believed to have been sent in February 2021" and cross-referenced those recipient telephone numbers with data from a "third party DNC Registry data provider."  (*Id.* at 5-6 ¶¶ 12-13.)  Based on that analysis, Dr. Olund concluded that "approximately 22% were registered on the DNC Registry at least 31 days before the start of the class period."  (Doc. 69 at 8.)  Plaintiff argues this analysis provides an approximation of putative Class membership, that is:

> All persons throughout the United States (1) to whom Circle K Stores Inc. delivered, or directed to be delivered, more than one text message within a 12-month period, which read, in part, either "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message" or "Circle K: Reply 'YES' to get offers via txt", (2) where the person's residential telephone number had been registered with the National Do Not Call Registry for at least thirty days before Circle K Stores, Inc. delivered or directed to be delivered at least two of the text messages within the 12-month period, (3) from June 6, 2020 through the date of class certification.

(Doc. 63 ¶ 45 [defining proposed Class]; Doc. 69 at 8 ["[T]here are millions of persons

who fall within this Class definition."].)

In addition, during the discovery process, Defendant provided Plaintiff with "all incoming text messages to [Defendant] in which an individual messaged [Defendant] stating 'wrong number,' 'wrong telephone number,' 'wrong #,' 'wrong phone,' 'incorrect number,' 'incorrect #,' 'incorrect phone,' 'bad number,' 'bad phone number,' or 'wrong person.'"  (Doc. 69-2 ¶ 2.)  After refining and filtering this dataset, Dr. Olund identified 219 unique phone numbers "on the National DNC Registry 31+ days prior to June 6, 2020." (Doc. 74-1 at 4, capitalization omitted.)  According to Plaintiff, the 219 subscribers to those telephone numbers fall within the putative Subclass, which is defined as:

> All persons throughout the United States (1) who did not provide their telephone number to Circle K Stores Inc., (2) to whom Circle K Stores Inc. delivered, or directed to be delivered, more than one text message within a 12-month period, which read, in part, either "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message" or "Circle K: Reply 'YES' to get offers via txt", (3) where the person's residential telephone number had been registered with the National Do Not Call Registry for at least thirty days before Circle K Stores, Inc. delivered or directed to be delivered at least two of the text messages within the 12-month period, (4) from June 6, 2020 through the date of class certification.

(Doc. 63 ¶ 45 [defining proposed Subclass].)

To be clear, Plaintiff does not contend that the proposed Subclass is limited to the 219 individuals identified by Dr. Olund.  During oral argument, Plaintiff clarified that this figure merely represents the floor of the proposed Subclass, which also includes an unspecified number of people who (like Plaintiff) simply did not respond to Defendant's text messages.  Plaintiff stated that the proposed Subclass "is likely much larger than" 219 people and likely encompasses "tens of thousands of people."

II.    Procedural History

On August 17, 2023, Plaintiff initiated this action.  (Doc. 1.)

On October 20, 2023, Plaintiff filed the First Amended Complaint ("FAC"), alleging additional facts to support her TCPA claim and revising the class definition.  (Doc. 11.)

- 6 -

1    On November 3, 2023, Defendant moved to dismiss the FAC for failure to state a

2    claim or, in the alternative, to strike class allegations.  (Doc. 13.)

3         On April 24, 2024, the Court denied Defendant's motion to dismiss.  (Doc. 20.)

4         On June 5, 2024, with Defendant's consent, Plaintiff filed the Second Amended

5    Complaint ("SAC").  (Doc. 28.)  The SAC added Mobivity as a defendant.  (*Id.*)

6         On July 16, 2024, Defendant filed a motion for summary judgment.  (Doc. 38.)

7         On September 11, 2024, Plaintiff filed a motion to amend the SAC in two respects:

8    (1) removing Mobivity as a Defendant; and (2) refining the proposed Class while adding

9    the proposed Subclass.  (Doc. 55.)

10        On November 8, 2024, the Court granted Plaintiff's amendment request.  (Doc. 62.)

11        On November 13, 2024, Plaintiff filed her operative pleading, the Third Amended

12   Complaint ("TAC").  (Doc. 63.)

13        On December 12, 2024, Plaintiff filed the pending motion for class certification and

14   appointment of counsel.  (Doc. 69.)

15        On January 27, 2025, the Court denied Defendant's summary judgment motion.

16   (Doc. 77.)  That same day, Defendant filed a response to Plaintiff's motion for class

17   certification.  (Doc. 78.)  The response brief included a "supplemental expert rebuttal

18   report" from Madelyn Moran as an exhibit (the "Supplemental Report").  (Doc. 78-1 at

19   179-95, capitalization omitted.)

20        On February 26, 2025, Plaintiff filed a reply.  (Doc. 81.)  Pursuant to LRCiv

21   7.2(m)(2),[3] Plaintiff asked the Court to strike the Supplemental Report.  (*Id.*)

22        On March 6, 2025, the parties filed a joint motion for: "(1) [Defendant] to file a two

23   (2) page response to [Plaintiff's] request, contained in her reply in support of her motion

24   for class certification, to strike the [Supplemental Report]; and (2) [Plaintiff] to file an

25   optional two (2) page reply in support of its request to strike the Supplemental Report."

26   _____

27   [3]      LRCiv 7.2(m)(2) provides that "[a]n objection to (and any argument regarding) the
     admissibility of evidence offered in support of or opposition to a motion must be presented
     in the objecting party's responsive or reply memorandum and not in a separate motion to
28   strike or other separate filing."   In light of the conclusions reached in this order, it is
     unnecessary to resolve Plaintiff's request to strike the Supplemental Report.

1    (Doc. 82 at 2.)

2            On March 7, 2025, the Court granted the parties' joint motion.  (Doc. 84.)  That

3    same day, Defendant filed its two-page response.  (Doc. 85.)

4            On March 12, 2025, Plaintiff filed a two-page reply.  (Doc. 86.)

5            On September 12, 2025, the Court issued a tentative ruling.  (Doc. 92.)

6            On September 17, 2025, the Court heard oral argument.  (Doc. 95.)

7            On September 22, 2025, both sides submitted post-argument supplemental briefing.

8    (Docs. 96, 97.)

9                                **LEGAL STANDARD**

10   I.    Class Certification

11           "At an early practicable time after a person sues or is sued as a class representative,

12   the court must determine by order whether to certify the action as a class action."  Fed. R.

13   Civ. P. 23(c)(1)(A).  Under Rule 23(a), "[o]ne or more members of a class may sue . . . as

14   representative parties on behalf of all members only if":

15           (1)    the class is so numerous that joinder of all members is impracticable;

16           (2)    there are questions of law or fact common to the class;

17
18           (3)    the claims or defenses of the representative parties are typical of the
                    claims or defenses of the class; and

19           (4)    the representative parties will fairly and adequately protect the
20                  interests of the class.

21   *Id*.  In addition, under Rule 23(b)(3), the certifying court must find that "questions of law

22   or fact common to class members predominate over any questions affecting only individual

23   members, and that a class action is superior to other available methods for fairly and

24   efficiently adjudicating the controversy."  *Id*.[4]

25           "Before a class may be certified, the district court must conduct a rigorous analysis

26   to determine if the prerequisites of FRCP 23 have been satisfied."  *Lytle v. Nutramax*

27
28   _____

     [4]       Plaintiff does not seek class certification under Rule 23(b)(1) or Rule 23(b)(2).

                                        - 8 -

*Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024) (cleaned up). "Plaintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022). The standard of proof is a preponderance of the evidence. *Id.* "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim . . . because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (cleaned up). However, the "[m]erits questions may be considered only to the extent that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Olean Wholesale*, 31 F.4th at 667 (cleaned up).

II.    Telephone Consumer Protection Act

        The TCPA and its implementing regulations prohibit initiating "more than one telephone [solicitation] within any 12-month period" to "[a] residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government." 47 U.S.C. § 227(c)(5); 47 C.F.R. § 64.1200(c)(2). "Telephone solicitation" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message (A) to any person with that person's prior express invitation or permission, (B) to any person with whom the caller has an established business relationship, or (C) by a tax exempt nonprofit organization." 47 U.S.C. § 227(a)(4). A telephone solicitation can be a call or text message. 47 C.F.R. § 64.1200(e) ("The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls or text messages to wireless telephone numbers.").

        …

**DISCUSSION**

I.    <u>The Proposed Class</u>

The proposed Class includes all persons whose residential phone numbers are registered on the DNC Registry and to whom Defendant sent more than one text message within a 12-month period, which text messages read, in part, "Circle K: Reply 'YES' to Sign Up to receive special offers via txt message" or "Circle K: Reply 'YES' to get offers via txt." (Doc. 63 ¶ 45.) Defendant does not challenge numerosity or commonality with respect to the Class. Instead, Defendant argues the "proposed class is overbroad," "individual issues of consent and established business relationship predominate over purported common issues," "Plaintiff pursues an atypical claim," and "Plaintiff is not an adequate representative." (Doc. 78 at 8-13, 17-20, capitalization omitted.) Because predominance and typicality are dispositive, the Court turns to those issues.

A.    **Predominance**

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). This "inquiry asks the court to make a global determination of whether common questions prevail over individualized ones. For purposes of this analysis, an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016) (cleaned up). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as . . . some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453-54 (2016) (citation omitted).

At the same time, "[d]efenses that must be litigated on an individual basis can defeat

1   class certification," *True Health Chiropractic, Inc. v. McKesson Corp.*, 896 F.3d 923, 931

2   (9th Cir. 2018), particularly when individualized questions are "complicated" and there is

3   no "representative evidence introduced to fill . . . evidentiary gap[s]," *Bowerman v. Field*

4   *Asset Servs., Inc.*, 60 F.4th 459, 471 (9th Cir. 2023).  The predominance analysis ultimately

5   turns on "whether the common, aggregation-enabling, issues in the case are more prevalent

6   or important than the non-common, aggregation-defeating, individual issues." *Ambrosio*

7   *v. Progressive Preferred Ins. Co.*, __ F.4th __, 2025 WL 2628179, *3 (9th Cir. 2025)

8   (citation omitted).   "A district court is in the best position to determine whether

9   individualized questions . . . will overwhelm common ones and render class certification

10  inappropriate under Rule 23(b)(3)."  *Olean Wholesale*, 31 F.4th at 669 (cleaned up).

11                  1.    The Parties' Arguments

12          Plaintiff identifies several common questions of law and fact that are susceptible to

13  class-wide proof, such as "whether the Offer Text messages are 'telephone solicitations'

14  under the TCPA" and "[w]hether [Defendant] sent Offer Text messages to telephone

15  numbers on the DNC Registry."  (Doc 69 at 10-11.)  Plaintiff also argues that "whether

16  Class . . . members could effectively give consent by agreeing to [Defendant's] terms and

17  conditions on its Lift [System]" is a common question.  (*Id.* at 11)  Further, to the extent

18  consent is an individual question, Plaintiff argues it will not predominate over common

19  questions because Defendant "cannot identify any person who entered a telephone number

20  into its Lift system" and therefore Defendant "acknowledges that it cannot establish a

21  defense of prior express consent, or established business relationship, as to any member of

22  the Class . . .  because it cannot prove the identity of any of the persons from whom it

23  obtained the telephone numbers to which it sent Offer Text Messages."  (*Id.* at 14.)  Last,

24  Plaintiff argues that "to be TCPA compliant, a consumer's consent to receive solicitations

25  from a seller must comply with the E-SIGN Act" and that the Lift System does not contain

26  many of the disclosures required by that statute.  (*Id.* at 14-15.)

27          In response, Defendant identifies two issues that will require individualized proof:

28  (1) "express invitation or permission"; and (2) the presence or absence of an established

                                        - 11 -

business relationship ("EBR").  (Doc. 78 at 10-13.)  Defendant argues that it "has presented evidence that every customer it messaged provided consent and created a business relationship prior to [Defendant] sending even the opt-in confirmation message" and that these two issues "will necessarily predominate" because Plaintiff has not "advance[d] a viable theory employing generalized proof to establish liability" or otherwise shown that "individual adjudication of the pivotal element of prior express consent is unnecessary." (*Id.* at 9-10.)  According to Defendant, class-wide adjudication is impossible because "the form of consent . . . is not at issue here" and the "wide permutation of factual scenarios on issues surrounding potential consent or EBR defenses for each potential class member must be determined case-by-case."  (*Id.* at 13-14.)  Defendant also argues that Plaintiff's reliance on the E-Sign Act is misplaced because "compliance with E-SIGN" is not "the 'only' form of compliance under the TCPA" and, in any case, non-compliance with the E-Sign Act "would not address or negate individualized issues concerning EBRs whatsoever."  (*Id.* at 16-17 nn.11-12.)[5]

In reply, Plaintiff reiterates that Defendant "cannot identify a single person by name who provided consent."  (Doc. 81 at 2.)  According to Plaintiff, consent and EBR are "both affirmative defenses for which [Defendant] bears the burden of proof" and "[t]his Court cannot presume the existence of evidence of consent that [Defendant] has not provided in the eighteen months since this case was filed."  (*Id.* at 1-2.)

## 2.  Analysis

Plaintiff has failed to show that common questions predominate over individual questions with respect to the proposed Class.  The Court will focus on the EBR issue because it is dispositive.[6]

---

[5]    Defendant also argues that, to the extent the form of consent is at issue, it undermines Plaintiff's arguments as to adequacy and typicality.  (Doc. 78 at 18.)

[6]    When addressing the proposed Class, the tentative ruling included some discussion of whether individual questions of consent would predominate but did not definitely resolve that issue.  (Doc. 92 at 14-15 ["If consent were the only affirmative defense at issue here, the question of predominance would present a close call in light of *True Health.*"].)  Instead, the tentative ruling concluded that Plaintiff could not establish predominance with respect to the proposed Class in light of the EBR issue.  (*Id.* at 15-16.)  Because Plaintiff did not seek to challenge the tentative ruling's analysis of the proposed Class during oral

There can be no liability under 47 U.S.C. § 227(c)(5) for a call or message that is sent "to any person with whom the caller has an [EBR]." 47 U.S.C. § 227(a)(4). *See also Hovila v. Tween Brands, Inc.*, 2010 WL 1433417, *5 (W.D. Wash. 2010) ("[T]he Court finds that plaintiff and defendant's relationship falls within the EBR exemption to the TCPA. The Court therefore GRANTS defendant's motion for summary judgment."). An EBR is defined as "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call . . . ." 47 C.F.R. § 64.1200(f)(3). Even though the parties disagree over the precise contours of the EBR defense and what is required to form an EBR—a dispute addressed in more detail in later portions of this order—both sides agree that an EBR would, at a minimum, arise if a customer provided his or her phone number to Defendant in the course of making a purchase. (Doc. 96 at 2 [Plaintiff's supplemental brief: "An [EBR] . . . requires more than just a purchase or sale. It requires the provision of a telephone number to the business by the consumer such that the consumer has a reasonable expectation of receiving solicitation calls."].)

This agreement is significant because the proposed Class (unlike the proposed Subclass) includes individuals who provided their phone number to Defendant. Indeed, the only difference in the two class definitions is that the proposed Subclass includes the additional limitation "did not provide their telephone number to Circle K Stores Inc." (Doc. 63 ¶ 45.) Plaintiff also estimates that the proposed Class would encompass millions of people, whereas Plaintiff estimates that the proposed Subclass would be much smaller, perhaps encompassing tens of thousands of people. Thus, the only difference between the two classes is that the proposed Class includes millions of additional individuals who

---

argument, and because Defendant's presentation during oral argument has persuaded the Court that the EBR issues in this case present an even more compelling predominance problem than was apparent at the time the tentative ruling was written, the consent-related discussion from the tentative ruling have been omitted from this order.

provided their phone number to Defendant.  The evidence (not to mention common sense) suggests that at least a significant portion of those individuals did so in the course of making a purchase from Defendant during a transaction involving the Lift system.

Plaintiff has not advanced a theory to explain why such individuals fall outside the EBR defense.  The proposed Class is thus "defined so broadly as to include a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct."  *Olean Wholesale*, 31 F.4th at 669 n.14 (cleaned up).  In such cases, "the class is defined too broadly to permit certification."  *Id.*[7]

Moreover, even if Plaintiff had advanced a viable theory to counter Defendant's EBR defense[8] in relation to the proposed Class, Plaintiff has not identified a body of evidence that would allow the Court to resolve this issue "in one stroke."  *Cf. Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (defining common vs. individual question).  The record is somewhat underdeveloped on this point because Plaintiff contends she never entered a phone number into the Lift System and the little evidence available suggests that the Lift System wasn't the only way Defendant obtained the telephone numbers it used in its messaging program.  (Doc. 39-1 at 4 ¶ 4 ["[Defendant] does not message consumers

---

[7]    In *Olean Wholesale*, the Ninth Circuit identified this flaw in the course of its predominance analysis under Rule 23(b)(3), so the Court follows the same approach here.

[8]    During oral argument, the parties disagreed over who has the burden of proving the presence (or absence) of an EBR.  Plaintiff contended that because the existence of an EBR is an affirmative defense, Defendant bears the burden.  Defendant contended that because the "elements [of] the consent and EBR [are] not just listed as exceptions" but are "affirmatively excluded from the very definition of solicitation under the statute," it follows that they "aren't really affirmative defenses.  Rather, ensuring a solicitation as defined is not premised on consent or EBR are core elements of the statutory definition.  Therefore, it remains Plaintiff's burden to establish that each of those elements in the supposed solicitations do not exist."  On the one hand, Defendant's position appears to be foreclosed by Ninth Circuit law, which holds that the issue of consent in an TCPA case is an affirmative defense as to which the defendant bears the burden of proof.  *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1044 n.3 (9th Cir. 2017) ("We think it plain from the statutory language that prior express consent is an affirmative defense, not an element of a TCPA claim . . . ."); *True Health Chiropractic*, 896 F.3d at 931 ("We see no distinction between 'express consent' and 'prior express invitation or permission' that would affect which party bears the burden of proving consent.").  If that is the rule as to consent, it is difficult to understand how EBR could be treated differently.  On the other hand, even assuming EBR is an affirmative defense, Plaintiff still "retain[s] the burden of showing that the proposed class satisfies the requirements of Rule 23, including the predominance requirement."  *True Health Chiropractic*, 896 F.3d at 931.

- 14 -

without their prior express consent, which is given when a consumer's telephone number is entered into a touchscreen display located at the transaction counters at [Defendant's] store locations, *or when the consumer otherwise enrolls through an online sign-up form or also when an individual messages [Defendant] in the first place*."]).  At any rate, Plaintiff has not proposed a method for sorting and adjudicating these factual questions on a class-wide basis.

These details also distinguish this case from *Head v. Citibank, N.A.*, 340 F.R.D. 145 (D. Ariz. 2022), and *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019), which Plaintiff cited in her motion papers and again during oral argument as supportive authorities.  In *Head*, the class was composed of individuals who received robocalls from the defendant and, by definition, were *not* customers of the defendant.  *Head*, 340 F.R.D. at 148 ("Plaintiff Christine Head seeks to certify a class of persons and entities within the United States who received a call with an artificial or prerecorded voice from Citibank, N.A. in connection with a past-due credit card account even though the person or entity is not a Citibank customer.").  Similarly, in *Knapper*, the plaintiff's theory was that the class was wholly "comprised of non-customers" who had received "wrong number[]" robocalls from the defendant.  *Knapper*, 329 F.R.D. at 241, 244.   The proposed Class, in contrast, includes millions of individuals who, unlike the proposed Subclass members, had previously provided their phone number to Defendant.[9]

B.  **Typicality**

The certification request as to the proposed Class also fails for an independent reason—Plaintiff has failed to show that her claims are typical of the proposed Class. "Typicality focuses on the class representative's claim—but not the specific facts from which the claim arose—and ensures that the interest of the class representative aligns with the interests of the class.  The requirement is permissive, such that representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1116 (9th

---

[9]    Additionally, the disputed predominance issue in *Head* and *Knapper* was consent, not the presence or absence of an EBR.

Cir. 2017) (citation omitted).  "[I]t is sufficient for typicality if the plaintiff endured a course of conduct directed against the class."  *Id.* at 1118.  However, a class representative fails the typicality requirement if he or she "is subject to unique defenses which threaten to become the focus of the litigation."  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  Some courts have also found that a plaintiff's claim is atypical when an affirmative defense is available against absent class members but unavailable against the class representative.  *Lawson v. Grubhub, Inc.*, 13 F.4th 908, 913 (9th Cir. 2021).  *See also Ward v. Crow Vote LLC*, 343 F.R.D. 133, 145 (C.D. Cal. 2022) ("The same principle—that a named plaintiff's inability to raise arguments on behalf of putative class members renders that plaintiff atypical—was reaffirmed in *Lawson*.").

### 1.    The Parties' Arguments

Plaintiff argues that her claims are "typical of the claims of the Class" because she and the other members of the proposed Class "were each harmed in the same way by [Defendant's] common practice of delivering telephone solicitations via text message to persons whose telephone numbers were on the DNC registry."  (Doc. 69 at 13.)

Defendant argues in its response brief that Plaintiff's claim is atypical because consent and EBR defenses will be central to the litigation, yet neither applies to Plaintiff.  (Doc. 78 at 2 ["99.9978% of persons [in the proposed Class] presumably gave their express and willing consent to be contacted by [Defendant] during a business transaction."]; *id.* at 17 ["Plaintiff pursues an atypical claim in which even if [Defendant's] Lift system provides a fully TCPA-compliant form of consent . . . she would still have purportedly been messaged without her consent or an EBR."].)  However, in its supplemental brief, Defendant clarifies that it will, in fact, raise an EBR defense to Plaintiff's claim based on the evidence that her credit card was used to make purchases at Defendant's stores on multiple occasions during the 18-month period preceding the first challenged text message.  (Doc. 97 at 5, capitalization omitted ["Plaintiff's purchase records confirm she established an EBR . . . , which prevents her from pursuing her claim or from serving as an adequate class representative."].

- 16 -

During oral argument, Plaintiff disputed that she ever formed an EBR with Defendant, both for the legal reasons addressed in Part II of this order and also because, even if a prior purchase could alone establish an EBR, Defendant hasn't established "that she is the one that used the credit card" or "the one that made the purchases."

2.    Analysis

In *Lawson*, the Ninth Circuit affirmed a district court's denial of class certification in an action brought by a food delivery driver who claimed he had been misclassified as an independent contractor rather than as an employee. 13 F.4th at 909. The Ninth Circuit explained that the plaintiff was "neither typical of the class nor an adequate representative" because "[a]ll members of [the plaintiff's] putative class—except [the plaintiff] and one other—signed agreements waiving their right to participate in a class action." *Id.* at 913.

Like the waiver argument in *Lawson*, EBR is an affirmative defense. *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 247, 268-69 (S.D. Cal. 2023) ("[T]o prove its affirmative defense of class action waiver, Marriott would bear the burden to establish that Lead Plaintiffs both (1) had notice of Marriott's terms and conditions, which included a class action waiver; and (2) agreed to those terms and conditions."). In *Lawson*, it was also likely that the defendants would prevail on their affirmative defense. 13 F.4th at 913 ("[T]he record is clear that they waived the right to have any dispute or claim brought between or among them, or heard or arbitrated as a class action.") (cleaned up). Here, similarly, Defendant has introduced evidence—and common sense suggests—that a substantial number of proposed Class members had an EBR with Defendant. *Cf. Bustillos v. W. Covina Corp. Fitness, Inc.*, 2022 WL 423396, *3 (C.D. Cal. 2022) (concluding that the lead plaintiff in a putative TCPA class action was "entirely atypical of the class she seeks to represent" because "unlike all or virtually all of the other class members," she "never signed any agreement consenting to be contacted by Defendant" and thus "has no stake in whether the agreements signed by other class members satisfied the requirements of the TCPA and its implementing regulations"); *Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 987 (N.D. Cal. 2019) ("The Ninth Circuit has suggested that a single

- 17 -

1   class should not be certified when it is comprised of members who both are and are not
2   subject to contractual agreements requiring mandatory arbitration and waiver of class
3   action rights.  The same reasoning applies to an affirmative defense like express consent
4   here.") (citation omitted).

5          Plaintiff, of course, contends she never formed an EBR with Defendant.  But if
6   Plaintiff is correct on this point, this would make her an atypical representative in relation
7   to the proposed Class.  And if Plaintiff is incorrect on this point, this would make her an
8   even less appropriate class representative, as she would then lack a valid claim.  *Cowen v.*
9   *Bank United of Tex., FSB*, 70 F.3d 937, 941 (7th Cir. 1995) ("A decision that the claim of
10  the named plaintiffs lacks merit ordinarily, though not invariably . . . disqualifies the named
11  plaintiffs as proper class representatives."); *Saeger v. Pacific Life Ins. Co.*, 305 F. App'x
12  492, 493 (9th Cir. 2008) (affirming district court's determination that request for class
13  certification became moot upon the dismissal of the lead plaintiff's claim).  Either way,
14  this consideration provides an additional reason for declining to certify the proposed Class.

15  II.    The Proposed Subclass

16         "When appropriate, a class may be divided into subclasses that are each treated as a
17  class under [Rule 23]."  Fed. R. Civ. P. 23(c)(5).  "[E]ach subclass must independently
18  meet the requirements of Rule 23 for the maintenance of a class action."  *Betts v. Reliable*
19  *Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).  Plaintiff seeks certification
20  of the proposed Subclass, which includes all persons who are on the DNC Registry, "who
21  did not provide their telephone number to [Defendant]," and "to whom [Defendant]
22  delivered, or directed to be delivered, more than one text message within a 12-month
23  period, which read, in part, either 'Circle K: Reply 'YES' to Sign Up to receive special
24  offers via txt message' or 'Circle K: Reply 'YES' to get offers via txt.'"  (Doc. 63 ¶ 45.)

25         In the tentative ruling issued before oral argument, the Court concluded the
26  proposed Subclass should be certified.  With the benefit of oral argument, the Court
27  changes course and agrees with Defendant that Plaintiff cannot satisfy the predominance

28

1    and typicality requirements due to the EBR issues presented by this case.[10]

2        A.    **EBR**

3        During oral argument, the topic of what it takes to establish an EBR was the subject

4    of extensive discussion, prompting the Court to solicit submit supplemental briefing.  In

5    that briefing, Defendant contends that the formation of an EBR does not "require anything

6    more than a single purchase or transaction."  (Doc. 97 at 4.)  Plaintiff disagrees, arguing

7    that an EBR "requires more than just a purchase or sale.  It requires the provision of a

8    telephone number to the business by the consumer such that the consumer has a reasonable

9    expectation of receiving solicitation calls."  (Doc. 96 at 2.)

10       Defendant has the better of this argument.  Many courts have addressed this issue,

11   and it appears they have uniformly agreed with Defendant's interpretation.  *See, e.g., Hand*

12   *v. Beach Entertainment KC, LLC*, 456 F. Supp. 3d 1099, 1122-23 (W.D. Mo. 2020)

13   ("Congress intended the relationship to be interpreted broadly and contemplated that it

14   could be formed through a single purchase.  The FCC has likewise interpreted the term

15   broadly.  Courts applying the EBR exception have also found it applies solely on the basis

16   of a purchase or transaction . . . .  Hand has cited no authority to support his position that

17   more is required.") (citations omitted); *Davies v. W.W. Grainger, Inc.*, 2016 WL 6833902,

18   *3 (N.D. Ill. 2016) (stating that an EBR may be formed "even if based on one purchase");

19   *Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 387-88 (M.D.N.C. 2015) ("[A]n [EBR]

20   with a person . . . is created after an individual makes a purchase, inquiry, or application

21   for products or services and lasts for a certain number of months."); *Zelma v. Art Conway*,

22   2013 WL 6498548, *2 (D.N.J. 2013) ("Plaintiff's election to receive a free Prevention

23   Magazine subscription through the SkyMiles program is a sufficient 'transaction' to trigger

24   the [EBR] exception."); *Cubbage v. Talbots, Inc.*, 2010 WL 2710628, *3 (W.D. Wash.

25   2010) ("Mitchell purchased at least one product at a Talbots store within the eighteen

26   months prior to April of 2009, the date of the call.  Therefore, Mitchell and Talbots had an

27
28   ---

[10]    Given this conclusion, the Court has omitted the discussion that appeared in the tentative ruling concerning how the other class certification requirements apply to the proposed Subclass.

[EBR].""); *Carnett's, Inc. v. Hammond*, 610 S.E.2d 529, 531-32 (Ga. 2005) ("The FCC has opined that the established business relationship exemption is broad and that '[y]ou have an [EBR] with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products or services offered by such person or entity.'") (citation omitted).  Although those decisions are not binding, the Court agrees with their analysis and conclusions and thus joins the apparently unbroken line of courts that have concluded that an EBR may be formed based solely on a prior voluntary purchase, regardless of whether the customer provided a phone number during the purchase process.

Plaintiff's arguments to the contrary are unavailing.  Although Plaintiff suggests in her supplemental brief that all of the cases adopting Defendant's position were wrongly decided, Plaintiff cites no authority adopting her preferred interpretation.  Plaintiff identifies *Smith v. Truman Road Development, LLC*, 2020 WL 2044730 (E.D. Mo. 2020), as a case recognizing a shortcoming in the reasoning of some of Defendant's cited decisions (Doc. 96 at 3), but Plaintiff ignores that *Smith* ultimately reached the same conclusion as those decisions—namely, that "evidence of a recipient's purchase is sufficient." *Smith*, 2020 WL 2044730 at *9.

More fundamentally, the Court is unpersuaded by Plaintiff's contention that the inclusion of the phrase "voluntary two-way communication" in the regulatory definition of the term EBR means that a prior purchase is insufficient to establish an EBR unless accompanied by the provision of a phone number.  The term EBR is not defined in the relevant portion of the TCPA.  Instead, the TCPA simply incorporates, with certain exceptions, the regulatory definition of that "term in section 64.1200 of title 47, Code of Federal Regulations, as in effect on January 1, 2003." 47 U.S.C. § 227(a)(2)(A).  *See also Levitt v. Fax.com*, 2007 WL 3169078, *3 n.3 (D. Md. 2007) ("When Congress codified the 'established business relationship' exception, it adopted by reference the FCC's definition of the term.").

As of January 1, 2003, "[a]n established business relationship was then defined under 47 C.F.R. § 64.1200(f)(3) as follows: 'The term established business relationship

means a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.'" *Lampkin v. GGH, Inc.*, 146 P.3d 847, 853 (Okla. Ct. App. 2006).  That definition mirrors the current definition—an EBR is today defined as "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the eighteen (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party."  47 C.F.R. § 64.1200(f)(5).

At the time Congress adopted, by reference, the regulatory definition of the term EBR (*i.e.*, January 1, 2003), the Federal Communications Commission ("FCC") had repeatedly indicated that a prior voluntary purchase was alone sufficient to create an EBR. For example, in October 1992, the FCC adopted the "conclusion that a business relationship should be defined broadly rather than narrowly" and that "[t]he relationship may be formed with or without an exchange of consideration on the basis of an inquiry, application, purchase or transaction by the residential telephone subscriber regarding products or services offered by the telemarketer." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 7 F.C.C.R. 8752, 8771 (Oct. 16, 1992).  In 1998, the FCC reiterated that "[y]ou have an established business relationship with a person or entity if you have made an inquiry, application, purchase, or transaction regarding products or services offered by such person or entity." *Carnett's,*

*Inc.*, 610 S.E.2d at 531-32 (citation omitted).  *See also Patten v. Vertical Fitness Group, LLC*, 2013 WL 12069031, *8 & n.4 (S.D. Cal. 2013) (citing, with approval, the discussion in *Carnett's* regarding the 1998 FCC guidance document).  Moreover, in June 2003, the FCC confirmed that "if a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller, entitling the seller to call that consumer under the EBR exemption."  *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14083 n.382 (July 3, 2003).  This regulatory backdrop strongly supports Defendant's position.  *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 385-86 (2024) ("[E]xercising independent judgment often included according due respect to Executive Branch interpretations of federal statutes. . . .  Such respect was thought especially warranted when an Executive Branch interpretation was issued roughly contemporaneously with enactment of the statute and remained consistent over time.  That is because the longstanding practice of the government—like any other interpretive aid—can inform a court's determination of what the law is.") (cleaned up); *id.* at 413 ("[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it.").

Moreover, even putting aside this regulatory backdrop, Plaintiff's proffered interpretation of the phrase "voluntary two-way communication" is unpersuasive as a matter of statutory interpretation.  Plaintiff contends this phrase would be rendered superfluous if an EBR could be formed by "[a] purchase alone," "such as a consumer buying a soda in a Circle K store."  (Doc. 96 at 2.)  Not so.  If, for example, a consumer unknowingly made a purchase from a business, or made such a purchase under duress, the transaction might not involve a "voluntary" two-way communication.  Accordingly, this phrase is not superfluous or redundant.

## B.     **Predominance**

With these principles in mind, the Court returns to the issue of predominance.  The proposed Subclass, unlike the proposed Class, does not include individuals who provided

their phone number to Defendant.  As a result, the proposed Subclass does not suffer from the same flaw of being "defined too broadly to permit certification." *Olean Wholesale*, 31 F.4th at 669 n.14 (cleaned up).  Nevertheless, the Court concludes that individual issues related to Defendant's EBR defense will still predominate over common issues with respect to the proposed Subclass.

Even assuming, as Plaintiff contends and Defendant disputes, that a recipient's decision to respond to a text message from Defendant with the phrase "wrong number" (or not respond at all) is evidence that the recipient did not previously consent to receive the text message and did not provide his or her phone number to Defendant, such a recipient may still have an EBR with Defendant.  As noted, an EBR may arise solely from a voluntary purchase from Defendant during the preceding 18-month period.  In addition to proffering evidence that Plaintiff's credit card was used to make multiple purchases from Defendant during the preceding 18-month period—which suggests Plaintiff may have formed an EBR with Defendant—Defendant also proffers evidence establishing that it has nearly 7,000 stores in America that serve more than three million customers each day. (Doc. 97 at 6, citing Doc. 97-1.)  This evidence suggests that at least a significant portion of the proposed Subclass members—which, as noted, is likely composed of tens of thousands of individuals in the United States—made a purchase from Defendant during the relevant period and thus also formed an EBR with Defendant.[11]  However, determining whether each proposed Subclass member in fact had an EBR with Defendant will require an individualized inquiry that cannot be resolved "in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350.

Courts have repeatedly declined to certify TCPA class actions when, as here, an

---

[11]    As the Ninth Circuit has recognized, "[t]hat the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate." *Olean Wholesale*, 31 F.4th at 668.  *See also id.* at 669 ("[W]e reject the dissent's argument that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members.").  Those principles are not implicated here because Defendant's evidence suggests that more than an a "de minimis" number of the proposed Subclass members have an EBR with Defendant.

- 23 -

individualized inquiry will be required to determine whether each class member had an EBR with the defendant. For example, in *Sapan v. Yelp., Inc.*, 2021 WL 5302908 (N.D. Cal. 2021), the plaintiff sought to certify "a class of '[a]ll persons located within the United States of America who provide a phone bill or statement showing they had had a phone number subscribed to a residential tariff and provide a confirmation e-mail from the federal National Do Not Call Registry showing their number was on the Registry to whom Yelp transmitted more than one solicitation call within any 12-month period anytime from June 5, 2013 to the present.'" *Id.* at *2. The defendant, in turn, "raise[d] a predominance issue principally with respect to determining whether an individual call may come within an exception to the TCPA," arguing that it had "identified evidence in the record showing an established business relationship with, or other prior consent provided by, putative class members" and that it would be required to perform an individualized factual inquiry "for each putative class members" to "determine whether any created an established business relationship." *Id.* at *5. The district court agreed and denied the plaintiff's motion for class certification, concluding that the plaintiff had "not demonstrated a level of predominance and commonality that would make this case is suitable for adjudication on a class wide basis." *Id.* at *6.

Similarly, in *Fitzhenry v. ADT Corp.*, 2014 WL 6663379 (S.D. Fla. 2014), the plaintiff in a TCPA action sought to certify a class that was similar to the proposed Subclass here—it consisted of "[a]ll persons within the United States whom (a) ADT, through their agents, played a pre-recorded message during a telephone call the purpose of which was to sell ADT goods or services (or develop 'leads' for such sales) from June 22, 2013 ongoing, and (b) and who did not previously give such number to ADT, or their agents with permission to be contacted." *Id.* at *2. The defendant argued that "despite the existence of some common issues, individual issues as to an established business relationship preclude class certification for lack of predominance." *Id.* at *6. In support, the defendant proffered evidence that, out of a sample of over 36,000 challenged calls, there was evidence that 26 of the recipients had an EBR with the defendant. *Id.* The district court concluded

this was enough to establish "that individual issues exist as to whether the call recipients had an established business relationship with Defendants" and thus denied certification due to a lack of predominance. *Id.* at *7.

Again, in *Vandervort v. Balboa Capital Corp.*, 287 F.R.D. 554 (C.D. Cal. 2012), the plaintiff sought to certify a class, referred to as "Class A," of individuals who had received unsolicited faxes from the defendant in violation of the TCPA. *Id.* at 557. The defendant, in turn, presented evidence that most of the putative class members "had an established business relationship with Defendant." *Id.* at 558. The court denied certification because that was "no class definition that would enable a class member to accurately self-identify as being within the group for whom class-wide proof shows consent was not obtained and no established business relationship existed." *Id.* at 559.[12]

Finally, in *Carnett's*, the Georgia Supreme Court affirmed the trial court's denial of class certification in a case involving a TCPA claim against a car wash for "fax[ing] 73,500 unsolicited advertisements to Atlanta area residents." *Carnett's*, 610 S.E.2d at 529-30. The court emphasized that even though there was a lack of evidence that the car wash had "obtained express permission from the fax recipients," it was likely that "at least some fax recipients . . . had an established business relationship with Carnett's" because they "were sent to residents where Carnett's does business" and because "the definition of an established business relationship in the FCC rules . . . suggest[s] that even one car wash at Carnett's would likely suffice" to create an EBR between the purchaser and the defendant. *Id.* at 532.

For similar reasons here, the predominance factor precludes class certification. Again, "an individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one

---

[12]    Additionally, the court granted certification as to a different class because EBR did not provide a defense to the underlying claim: "The claims of Class B are aimed at the opt-out notices, and not whether Defendant had permission to send the faxes in the first place. Accordingly, Defendant's focus on the fact that it had an established business relationship with, possibly, every single recipient is immaterial to the real issue. . . . The statute . . . unambiguously requires a compliant opt-out notice on an unsolicited fax, notwithstanding the existence of an established business relationship." *Vandervort*, 287 F.R.D. at 560.

where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Ruiz Torres*, 835 F.3d at 1134 (cleaned up). Whether each member of the proposed Subclass had an EBR with Defendant is a quintessentially individual question because it cannot be resolved via a common inquiry or a representative body of evidence—instead, Defendant will need to pursue and present evidence specific to each Subclass member in an effort to prove the existence of prior purchases or transactions that created an EBR.

Defendant's evidentiary submissions related to Plaintiff underscore this point. In an effort to show that Plaintiff formed an EBR, Defendant conducted discovery into Plaintiff's financial records and then combed through her credit card records in an effort to identify transactions in which her credit card was used to make a purchase at one of Defendant's locations. (Doc. 97-1 at 2-7.) If the proposed Subclass were certified, the same process would need to be completed potentially tens of thousands of times, once for each Subclass member. Moreover, Plaintiff disputes the sufficiency of Defendant's current evidence, arguing that her credit card records are alone insufficient to prove the existence of an EBR because the record is silent as to whether she was the one who used the credit card during the transactions depicted in her records. But this only underscores why running down the issue of each Subclass member's purchase history, as necessary to determine whether an EBR with Defendant existed, will require individualized inquiries that will overwhelm the remainder of the litigation. As the Ninth Circuit recently emphasized, when "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person . . . [t]his is the exact type of aggregation-defeating, individual issue . . . that Rule 23(b)(3) intends to prevent." *Ambrosio*, 2025 WL 2628179 at *5 (cleaned up).

The authorities cited in Plaintiff's supplemental brief do not compel a different conclusion. Although Plaintiff cites *Krakauer* as a case supporting certification even when a defendant asserts an intention to raise an EBR defense as to each class member, the court in *Krakauer* emphasized that it was "highly likely that this defense can in fact be resolved

on a class-wide basis, at least in large part," because the defendant—a provider of satellite television programming—could simply "offer[] a comprehensible customer list along with testimony about the list and which calls were to Dish customers; the factfinder could then determine whether those individuals as a group are not entitled to recover because of an EBR." *Krakauer*, 311 F.R.D. at 398. That approach might make sense in a case where the defendant, due to the nature of its business, maintains easily assembled and searchable customer lists, but it would not work here due to the nature of Defendant's business. Again, the fact-intensive nature of the hunt for evidence of Defendant's purchase history via her credit card records underscores this point.[13]

Nor is there any merit to Plaintiff's contention, raised during oral argument, that Defendant's EBR-related concerns do not raise "a class certification issue" and can instead be "addressed in a claims process through administration." This argument overreads *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), which simply rejected the notion "that demonstrating an administratively feasible way to identify class members is a prerequisite to class certification." *Id.* at 1133. *Briseno* does not overrule the many Ninth Circuit authorities recognizing that "[d]efenses that must be litigated on an individual basis can defeat class certification," *True Health Chiropractic*, 896 F.3d at 931, particularly when individualized questions are "complicated" and there is no "representative evidence introduced to fill . . . evidentiary gap[s]," *Bowerman*, 60 F.4th at 471. *See also Ambrosio*, 2025 WL 2628179 at *4 ("Progressive is entitled to invoke individualized issues and provide sufficient evidence that the individualized issues bar recovery on at least some claims, thus raising the spectre of class-member-by-class-member adjudication of the issue. . . . Progressive has provided evidence that at least two members of the proposed class [are subject to a particular defense]. Allowing Progressive to mount this defense towards the remaining proposed class members would render class certification

---

[13] Additionally, whereas the defendant in *Krakauer* largely offered "unsubstantiated claims in a brief" to support its contention that it had an EBR with a significant number of class members (and "identified only 16 such persons"), *Krakauer*, 311 F.R.D. 398, the Court is satisfied that Defendant's evidence—similar to the evidence in *Carnett's*—creates a likelihood that a substantial portion of the proposed Subclass members have an EBR with Defendant.

1  inappropriate.").

2      C.    **Typicality**

3      Although the analysis could end there, the Court concludes that the typicality

4  requirement also undermines Plaintiff's request to certify the proposed Subclass.

5      One of Defendant's theories as to why Plaintiff cannot satisfy the typicality

6  requirement is "because Defendant intends to raise a defense as to Plaintiff's TCPA claim

7  that is unique to Plaintiff and would not be applicable to the other members of the proposed

8  Subclass—namely, that Plaintiff has a *modus operandi* of using deceptive tactics in an

9  effort to serve as the lead plaintiff in TCPA class actions premised on the receipt of

10  unsolicited text messages." (Doc. 92 at 27.)  In the tentative ruling, the Court stated that

11  this argument presented a "fairly close call" but was not alone sufficient to prove a lack of

12  typicality as to the proposed Subclass.  (*Id.* at 27-31.)

13      Even so, the EBR-related conclusions reached in this order provide a separate, more

14  substantial reason for finding a lack of typicality.  The analysis here mirrors the typicality

15  analysis as to the proposed Class.  If, as Plaintiff contends, Plaintiff did not have an EBR

16  with Defendant (notwithstanding her credit card records), this will render her atypical of

17  other Subclass members.  And if Defendant did have an EBR, this will also make her an

18  unsuitable class representative.  Of course, "[u]nique defenses are not invariably disabling.

19  A unique defense that is insignificant or improbable will not render the proposed class

20  representative's claims atypical.  Only if the unique defense is likely to be a major focus

21  of the litigation may the proposed representative's claims be rendered atypical."  1

22  Newberg and Rubenstein on Class Actions § 3:45 (6th ed. June 2025 update) (cleaned up).

23  But Defendant's evidence of Plaintiff's EBR is not insignificant or improbable.

24      …

25      …

26      …

27      …

28      …

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for class certification (Doc. 69) is **denied**. This case will proceed solely on the basis of Plaintiff's individual claim.

Dated this 30th day of September, 2025.

Dominic W. Lanza
United States District Judge